O

CC: Capital  Habeas Corpus Law Clerks

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| TRACY DEARL CAIN, | ) | CASE NO. CV 96-2584 ABC |
|---|---|---|
| Petitioner, | ) | **DEATH PENALTY CASE** |
| v. | ) | |
| VINCENT CULLEN,* Warden of California State Prison at San Quentin, | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR EVIDENTIARY HEARING |
| Respondent. | ) | |

Petitioner was convicted in 1988 of the burglary, robbery, and first degree murders of his neighbors, William and Modena Galloway.  The jury found true special circumstance allegations of burglary-murder, robbery-murder, multiple-murder, and attempted-rape-murder.  Petitioner was acquitted on a charge of rape.

The jury sentenced Petitioner to death.  After denying the motion for modification of the penalty verdict, the court entered judgment accordingly.  The California Supreme Court affirmed Petitioner's conviction and sentence on May 4, 1995. *California v. Cain*, 10 Cal. 4th 1 (1995), *cert. denied*, 516 U.S. 1077 (1996). On July 19, 1995, the California Supreme Court denied his petition for writ of habeas corpus.

---

* Vincent Cullen is substituted for his predecessors as Warden of California State Prison at San Quentin, pursuant to Federal Rule of Civil Procedure 25(d)(1).

Petitioner filed a federal petition for writ of habeas corpus on June 24, 1997. Petitioner was ordered to return to state court to exhaust certain claims. He filed a First Amended Petition containing only unexhausted claims on January 12, 1998, and the federal habeas proceedings were held in abeyance. The California Supreme Court denied relief on the state exhaustion petition on June 28, 2000.

Petitioner filed a Second Amended Petition on October 3, 2000. The court granted discovery on limited issues on March 5, 2001 and September 24, 2002.

Also on March 5, 2001, Respondent filed a motion to dismiss the Second Amended Petition. The Court denied the motion but required that Claim 10(4) be withdrawn from the Second Amended Petition because it was unexhausted. Petitioner withdrew Claim 10(4) on August 1, 2001.

Following the filing of an answer and traverse, on February 7, 2003, Respondent filed a motion for judgment on the pleadings. The next month, Petitioner filed an initial motion for evidentiary hearing. On June 12, 2003, the Court granted judgment on the pleadings in favor of Respondent on Claims 4, 5, 6, 7, and 14.

On June 19, 2003, Petitioner filed notice with the Court that he had filed a state habeas petition raising claims under *Atkins v. Virginia*, 536 U.S. 304 (2002). The Court stayed the federal proceedings and held them in abeyance pending the state court's resolution of that petition. The California Supreme Court denied the petition on April 22, 2009.

The Court lifted the stay of the instant proceedings on April 30, 2009. At that time, the Court denied without prejudice the March 2003 motion for evidentiary hearing. The Court explained that "[a]t the time the motion was filed Petitioner believed that this case was not governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because it was the date that the request for counsel was filed which determined the applicability of the AEDPA. However, since that time it has become clear that this case is governed by the

1  AEDPA because it is the filing of the petition, not the request for appointment of
2  counsel, which determines whether a case was pending before the AEDPA
3  was enacted."  (Minute Order, April 30, 2009, at 2 (citations omitted).)

4       Petitioner filed a Third Amended Petition on June 15, 2009 ("Petition").  He
5  filed the instant Motion for Evidentiary Hearing on October 23, 2009 ("Motion").

6  **I.    Scope of Motion**

7       Petitioner's Motion purports to request an evidentiary hearing on a number
8  of broad issues, listed below.  His memorandum discusses and proposes evidence
9  to be presented in support of only select subclaims within those categories,
10  however.  The claims included in the Motion are as follows:[1]

11       (A)    "ineffective assistance of counsel at the penalty phase and related
12  claims (Tenth Claim for Relief; Eleventh Claim for Relief, Subclaims 4-6, 10, 13
13  and 14)."  The Motion presents and proposes evidence regarding each subclaim of
14  Claim 10 (i.e., Claims 10(1) - 10(18)), but gives no discussion of these subclaims
15  of Claim 11.

16       (B)    "conflict of interest and related claims, including ineffective
17  assistance and the deprivation of competent expert assistance (Second Claim for
18  Relief, Subclaim 1; Third Claim for Relief, Subclaim 1; Eleventh Claim for Relief,
19  Subclaim 11; Thirteenth Claim for Relief)."  The Motion presents and proposes
20  evidence regarding each claim:  Claim 2(1), 3(1), 11(11), and 13.

21       (C)    "ineffective assistance of counsel at the guilt phase (Second Claim for
22  Relief)."  The Second Claim for relief has 19 subclaims.  The Motion presents and
23  proposes evidence regarding only Claims 2(1), 2(2), 2(7), 2(11), 2(12), 2(13),
24  2(14), 2(17), and 2(18) of the Petition.

25       (D)    "prosecutorial misconduct (First Claim for Relief; Eighth Claim for
26  Relief, Subclaim 1; Ninth Claim for Relief; Eleventh Claim for Relief, Subclaims

27  
28   [1]  Quotations from Notice of Motion and Motion for Evidentiary Hearing at 1 (citations to Petition pages omitted).

3

2, 4, 7, 8, 17; Fifteenth Claim for Relief, Subclaims 1, 10 and 11; Nineteenth Claim for Relief, Subclaims 1-4)."  The Motion presents and proposes evidence regarding only Claims 1(1), 1(2), and 1(3).

(E)   "cumulative error (Eighteenth Claim for Relief)."  The Motion presents and proposes evidence regarding Claim 18.

(F)   "lethal injection (Eighth Claim, Subclaim 4)."  The Motion presents and proposes evidence regarding Claim 8(4).

A request for evidentiary hearing must "include a specification of the factual issues and the legal reasoning that require a hearing and a summary of the evidence of each claim the movant proposes to offer at the hearing."  L.R. 83-17.7(g) (2003).  The Court, therefore, addresses only those claims for which Petitioner has specified the facts and law requiring a hearing and the evidence he would present at such a hearing.

## II.   Legal Standard for Evidentiary Hearing

"Prior to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts.  That basic rule has not changed."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citations omitted).  "Because a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards," however, the court "may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts. . . .  If, for example, a state court makes evidentiary findings without holding a hearing . . . such findings clearly result in an unreasonable determination of the facts."  *Earp v. Ornoski*, 431 F.3d 1158, 1166-67 (9th Cir. 2005) (internal quotation omitted).  Likewise, where "an evidentiary hearing is needed in order to resolve the[] factual allegations . . . the state court's decision was based on an unreasonable determination of the facts."  *Id.* at 1173.

An evidentiary hearing is required if the petitioner "establishes a colorable

4

1   claim for relief and has never been afforded a state or federal hearing on this claim

2   . . . .   In showing a colorable claim, a petitioner is required to allege specific facts

3   which, if true, would entitle him to relief." *Id.* at 1167, 1167 n.4 (internal citation

4   omitted); *see also Alberni v. McDaniel*, 458 F.3d 860, 873 (9th Cir. 2006) (holding

5   petitioner "is entitled to an evidentiary hearing if he (1) alleges facts, which, if

6   proven, would entitle him to relief; and (2) show[s] that he did not receive a full

7   and fair hearing in state court either at trial or in a collateral proceeding").

8        Under the habeas statute as amended by AEDPA, "[i]f the applicant has

9   failed to develop the factual basis of a claim in State court proceedings, the court

10   shall not hold an evidentiary hearing on the claim" unless certain narrow

11   circumstances apply.  28 U.S.C. § 2254(e)(2); *Williams (Michael) v. Taylor*, 529

12   U.S. 420, 429-30 (2000).  A finding that the petitioner failed to develop the factual

13   basis of a claim requires a showing of "lack of diligence, or some greater fault,

14   attributable to" the petitioner or his counsel.  *Williams (Michael)*, 529 U.S. at 432;

15   *accord Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (holding that

16   "petitioner is barred from having an evidentiary hearing under § 2254(e)(2) when

17   petitioner did not exercise diligence in developing facts in the relevant state court

18   proceedings").  Thus, if a petitioner properly presented the factual basis for his

19   claim to the state court but was denied a hearing, the AEDPA does not bar an

20   evidentiary hearing in federal court.  *See Williams (Michael)*, 529 U.S. at 440-44.

21   If, as here, "the California Supreme Court summarily denied [the] state habeas

22   petition without ordering formal pleadings," the petitioner would "never reach[]

23   the stage of the proceedings at which an evidentiary hearing should be requested."

24   *Horton v. Mayle*, 408 F.3d 570, 582 n.6 (9th Cir. 2005); *California v. Romero*, 8

25   Cal. 4th 728, 737-40 (1994) (summarizing the California procedures for habeas

26   petitions).  Petitioner has not, therefore, shown any lack of diligence.  *See Horton*

27   *v. Mayle*, 408 F.3d at 582 n.6.

28        To obtain relief on a claim, the petitioner must establish that the state court's

5

denial of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 131 S. Ct. 770, 783-84 (2011).  A state court decision is "contrary to" federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that reached by the Supreme Court. *Williams (Terry) v. Taylor*, 529 U.S. 362, 405-06 (2000).

A decision is an "unreasonable application" of federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," or "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407-08.  For the court's application of Supreme Court precedent to be "unreasonable," the decision "must have been more than incorrect or erroneous . . . ; [it] must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams (Terry)*, 529 U.S. at 409).

Here, the California Supreme Court summarily denied Petitioner's state habeas claims.  Thus:

> [w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden . . . must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient . . . .
>
> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask

> whether it is possible fairminded jurists could disagree
> that those arguments or theories are inconsistent with the
> holding in a prior decision of this Court.

*Richter*, 131 S. Ct. at 784, 786.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Id.* at 786 (internal quotation and citation omitted).

"In deciding whether to grant a hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations" meriting relief.  *Schriro*, 550 U.S. at 474 (citations omitted).  "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate."  *Id.*

## III.   Legal Standard for Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, Petitioner must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Counsel's representation is deficient if, "considering all the circumstances," it "fell below an objective standard of reasonableness" and was unreasonable "under prevailing professional norms."  *Id.* at 688.  "Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight."  *Id.* at 689.  The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* (internal quotation omitted).

To establish that counsel's deficient performance prejudiced the defense, Petitioner must show "that there is a reasonable probability that, but for counsel's

7

unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

As the Supreme Court emphasized in *Richter*:

> [s]urmounting *Strickland*'s high bar is never an easy task. . . . Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 131 S. Ct. at 788 (internal quotations and citations omitted).

**IV.   Claims 1(1) and 1(3), and Claims 2(12), 10(6), and 10(13) as to Mendoza**

First, Petitioner alleges that the prosecution failed to provide to the defense (Claim 1(1)) and failed to preserve (Claim 1(3)) evidence of the personal involvement of "the prosecution's primary guilt phase witness," Uly Mendoza, in violation of Petitioner's right to due process.  (Pet. at 141 ¶ 343, 148.)[2]  In Claims 2(12), 10(6), and 10(13)[3], Petitioner alleges, *inter alia*, that trial counsel provided ineffective assistance by failing to "present substantial additional evidence . . . [regarding] the lack of credibility of Mendoza."  (*Id.* at 179 ¶ 465; *see also id.* at 233 ¶ 624.)  Mendoza was, among other things, present at a party at Petitioner's house on the night of the murders.  *See Cain*, 10 Cal. 4th at 19-24; (*see also, e.g.*, 20 RT 5466-67; Pet. Ex. 177 at 00512-18).  Petitioner argues that counsel should have further attacked the credibility of Mendoza's testimony that Petitioner was solely responsibility for the crimes and expressed no remorse for them.  (*Id.* at 179 ¶ 465, 233 ¶ 624.)

Specifically, Petitioner alleges that the prosecution (a) failed to preserve evidence regarding Floyd Clements' and Kathy Lazoff's statements to police that

---

[2]  Claim 1(3) involves the same factual allegations at issue in Claim 1(1).  (*See* Mot. at 82 (stating, as to claim that law enforcement failed to investigate Mendoza's involvement, that "[t]he factual disputes at issue in this claim are set forth above and a hearing is requested in relation to that subclaim [1(1)].")  While Petitioner's Motion "does not request an additional hearing on these facts," Claim 1(3) may be decided on the same basis as Claim 1(1).  (*Id.*)

[3]  In Claim 10(13), Petitioner alleges trial counsel failed to present evidence in the penalty phase of trial to support a "lingering doubt" factor in mitigation.  (Pet. at 237-38 ¶ 637; Mot. at 47.)  Petitioner fails to specify what evidence trial counsel failed to present.  *See* Habeas Corpus R. 2(c)(1)-(2) (requiring petitioner to specify all grounds for relief and supporting facts); L.R. 83-17.7(g) (2003) ("Any request for evidentiary hearing . . . shall include a specification of the factual issues and the legal reasoning that require a hearing"); *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (upholding denial of evidentiary hearing on ineffective assistance of counsel claim where petitioner failed "to allege specific facts which, if true, would entitle him to relief" (internal quotation and citation omitted)).  He indicates in his Motion, however, that at an evidentiary hearing he would present the evidence identified in support of Claim 2(12), regarding Mendoza's credibility, the bloody footprints, David Cerda's presence in the Galloways' house, and Petitioner's leadership capacity.  (*See infra* pp. 58-64; Mot. at 47; Pet. at 179 ¶ 465.)  Accordingly, to the extent that the Court finds any portion of Claim 2(12) to be appropriate for an evidentiary hearing, the Court will also consider the issue in connection with Claim 10(13).

1    Mendoza asked them to lie to create an alibi for the night of the crimes, because

2    law enforcement agents told them they were not interested in such evidence; (b)

3    failed to "undertake any efforts to search the home of Mendoza in order to locate

4    and potentially preserve evidence of the crimes," including "the jewelry box which

5    was stolen from the crime scene, but was not found either in the drainage ditch or

6    the residence of Mr. Cain or Cerda, and which Mendoza was reported by witnesses

7    as having attempted to sell after the crime;" (c) failed to inform the defense that

8    Mendoza "had received a deal in exchange for his testimony against Mr. Cain;"

9    and (d) failed to disclose Mendoza's criminal history.  (Pet. at 142-43 ¶ 346, Mot.

10   at 80.)

11          In a declaration offered in support of the Petition, Clements states, "The DA

12   would turn off the tape recorder when they did not want to hear what I had to say.

13   For example, whenever I mentioned Uly [Mendoza]'s name they would turn off the

14   recorder.  They said that they were not interested in what Uly told me."  (Pet. Ex.

15   162 ¶ 13.)  Lazoff states that the police spoke with her before trial, and did not

16   question her further when she recanted her alibi and told them that Mendoza asked

17   her to say he was with her.  (Pet. Ex. 165 at 2.)

18          The Court granted discovery on Petitioner's allegations of prosecutorial

19   misconduct.  (Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at

20   5-7.)

21          **A.     Legal Standard re Failure to Disclose, Collect, or Preserve**

22                   **Evidence**

23                   **1.     Disclosure**

24          As to evidence in the prosecution's possession, "the suppression by the

25   prosecution of evidence favorable to an accused upon request violates due process

26   where the evidence is material either to guilt or to punishment, irrespective of the

27   good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87

28   (1963).  Even when no request has been made, the prosecution must provide

defense counsel with exculpatory evidence if it is "material[, i.e.,] . . . if the omitted evidence creates a reasonable doubt that did not otherwise exist . . . ." *United States v. Agurs*, 427 U.S. 97, 112 (1976).  Materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United States v. Bagley,* 473 U.S. 667, 682 (1985).

### 2.        Collection and Preservation

#### a.        Generally

To establish a due process violation in the prosecution's failure to collect or preserve potentially exculpatory evidence, by contrast, the defendant must demonstrate bad faith.  *See Miller v. Vasquez*, 868 F.2d 1116, 1120-21 (9th Cir. 1989); *see also Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").  In addition:

> [w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *see also United States v. Martinez-Martinez*, 369 F.3d 1076, 1086-87 (9th Cir. 2004) (applying *Trombetta* standard of materiality to claim of failure to collect evidence).

#### b.        Comparable Evidence

In *Trombetta*, defendants accused of driving under the influence claimed

California's failure to preserve their breath samples denied them access to exculpatory evidence in violation of the Due Process Clause.  467 U.S. at 481.  The Court found no due process violation because, among other reasons, the failure to preserve breath samples did not leave defendants "without alternative means of demonstrating their innocence."  *Id.* at 490.  For example, defendants could challenge the breath test results by inspecting the breath analysis machine for faulty calibration, reviewing weekly calibration results, demonstrating that the defendant was dieting at the time of the test or the test was conducted near a source of radio waves, and cross-examining the officer who administered the test for operator error.  *Id.*

Interpreting *Trombetta*, the Sixth Circuit reasoned that a defendant's due process rights are not violated simply because the best available tool for raising doubts in the mind of the fact-finder is destroyed.  *See Elmore v. Foltz*, 768 F.2d 773, 778 (6th Cir. 1985) (finding no *Trombetta* violation in destruction of audiotape from police informant's "wire" during alleged drug sale).  "Under *Trombetta,* [] all that matters is that some reasonable alternative means exists for attempting to do what one would have attempted to do with the destroyed evidence.  [Defendant] might have cast aspersions upon [the informant's] reliability in any number of ways; the tapes were not indispensable to that effort." *Id.* at 778; *see also Kordenbrock v. Scroggy*, 919 F.2d 1091, 1103 (6th Cir. 1990) (holding capital habeas petitioner "was not prevented from presenting his defense of diminished capacity because the police failed to preserve and test" drugs contained in a bottle in front of petitioner during police interrogation, and therefore failed to meet *Trombetta* standard).

Similarly, the First Circuit rejected a petitioner's argument that the destroyed evidence was irreplaceable because cross-examining the police and the source of the evidence forced him "to try to prove his case through impeachment of a

12

damaging, hostile witness." *Olszewski v. Spencer*, 466 F.3d 47, 59 (1st Cir. 2006) (internal quotation omitted). The court noted that "*Trombetta* itself involved the need to recreate the evidence through hostile witnesses, but there is no suggestion that this is insufficient." *Id.*; *see also United States v. Donaldson*, 915 F.2d 612, 614 (10th Cir. 1990) (holding, where weight of seized marijuana was at issue, that submitting affidavits and cross-examining government witnesses regarding weight was comparable evidence to weighing the marijuana itself).

The Ninth Circuit found a *Trombetta* violation in *United States v. Cooper*, 983 F.2d 928, 931-32 (1993), where police destroyed machinery alleged to manufacture methamphetamine and defendants had no other means of showing it had not been altered from its design, incapable of making methamphetamine, more than twenty-five years prior. By contrast, the Circuit has repeatedly found no *Trombetta* violation where other means of demonstrating the contents of the incriminating evidence are available. *See United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) (holding fourteen still images of a robbery and officers' testimony about contents of surveillance video were comparable evidence to the video itself); *Featherstone v. Estelle*, 948 F.2d 1497, 1505 (9th Cir. 1991) (holding, where petitioner argued police photo lineup was inherently suggestive, that defense counsel's in-court photo lineup impeaching the prior results was comparable evidence to the destroyed, actual photo used in the original line up); *United States v. Sherlock*, 962 F.2d 1349, 1355 (9th Cir. 1989) (holding, in prosecution for rape, that testimony of examining physician that fluid samples from vaginal cavities of alleged victims showed no sperm was alternative, potentially exculpatory evidence for lost rape kit); *United States v. Alderdyce*, 787 F.2d 1365, 1370-71 (9th Cir. 1986) (holding that lack of vaginal swabs did not "completely deprive[] [rape defendant] of potentially exculpatory evidence" in violation of *Trombetta,* because defendant had access to sperm samples found on victim's clothing, results of tests done on those samples, and results from pap smear

13

indicating presence of sperm); *United States v. Dela Espriella*, 781 F.2d 1432, 1437-38 (9th Cir. 1986) (finding no *Trombetta* violation where defendant had opportunity to challenge the reliability of narcotics-sniffing dogs said to have detected cocaine on his money, even though money itself was not preserved for examination).

### B.   Analysis

#### 1.   Claims 1(1) and 1(3) regarding Clements and Lazoff, Stolen Items, and Inducement for Testimony

##### a.   Statements by Clements and Lazoff

As to Petitioner's allegation that the police, in bad faith, failed to collect or preserve statements by Clements or Lazoff, that evidence was not "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489.  Clements and Lazoff testified at trial, and the defense could have interviewed them about any alibis Mendoza sought from them and any other topics police allegedly failed to investigate.  The California Supreme Court's rejection of the claim on that basis would not be an unreasonable application of Supreme Court precedent.

##### b.   Stolen Items at Mendoza's Home

The California Supreme Court likewise could have reasonably determined that Petitioner failed to demonstrate that comparable evidence of any stolen items that may have been at Mendoza's home was unavailable to the defense by other reasonably available means. *See Trombetta*, 467 U.S. at 489.  Witnesses Willis and Sampson, for example, testified at trial that Mendoza possessed items matching those that were stolen, including a VCR and the jewelry box with necklaces and women's rings.  (21 RT 5628, 5747-48, 5753-54, 5774-75; *cf.* 19 RT at 5328-30 (testimony of Kenneth Mehaffie describing small, wooden jewelry box with jewelry missing from the Galloways' house).)  Witness Greene also testified at trial that Mendoza told her he took a VCR.  (22 RT 5931.)  The prosecutor even

14

1    acknowledged in his closing argument that witnesses testified that Mendoza was

2    selling a VCR and "the jewelry." (23 RT 6080-81.) The California Supreme Court

3    could have reasonably determined that the witnesses' testimony about Mendoza's

4    possession of stolen items was evidence comparable to the recovery of such items

5    at his house. *See, e.g.*, *Drake*, 543 F.3d at 1090; *Sherlock*, 962 F.2d at 1355. The

6    court's denial of this claim was not, therefore, an unreasonable application of

7    Supreme Court precedent.

8                        **c.    Inducement for Mendoza's Testimony**

9            The state high court may have reasonably concluded that Petitioner's

10    allegations that Mendoza received an undisclosed inducement for his testimony are

11    speculative. *See Phillips v. Woodford*, 267 F.3d 966, 986-87 (9th Cir. 2001)

12    (holding petitioner's *Brady* claims were "without merit" because they were "mere

13    suppositions," and petitioner was "not entitled to a hearing to pursue them

14    further"). The only evidence Petitioner offers in support of his claim is (1) a

15    statement by Lazoff that "[i]t always seemed to me that the reason Tony

16    [Mendoza] was not charged with being involved in the Galloway murder case was

17    because he was granted immunity by the District Attorney. I don't remember if

18    Tony told me that or if I heard it from someone else" (Pet. Ex. 165 at 2); and (2) a

19    statement by Clements that "[m]any of us suspected that Uly made a deal with the

20    DA" because he did not go to jail on several pending cases and he bought a new

21    truck although he had no money. (Pet. Ex. 162 ¶ 16.) The California Supreme

22    Court may have reasonably concluded that each witness's conclusion is speculative

23    on its face. *See Phillips v. Woodford*, 267 F.3d at 986-87. Because the court's

24    denial of this claim was not unreasonable, Petitioner is not entitled to federal

25    habeas relief on the claim.

26                   **2.    Claims 2(12), 10(6), and 10(13) regarding Clements and**

27                          **Lazoff, Stolen Items, Inducement for Testimony**

28            Petitioner alleges that trial counsel provided ineffective assistance at the

1  guilt phase (Claim 2(12)) and at the penalty phase (Claims 10(6), 10(13)) of trial

2  by failing to "present substantial additional evidence . . . [regarding] the lack of

3  credibility of Mendoza."  (Pet. at 179 ¶ 465, 233 ¶ 624; Mot. at 21-22, 70-71.)

4  Petitioner refers generally to the same evidence discussed above (Mot. at 71 (citing

5  Mot. at 77-92)), regarding the statements by Clements and Lazoff, potential

6  evidence at Mendoza's home, the alleged inducement for Mendoza's testimony,

7  and Mendoza's prior criminal history.

8  a.      **Statements by Clements and Lazoff**

9  Petitioner submits declarations from Clements and Lazoff that Mendoza

10  asked them to provide an alibi for him for Friday and, apparently, Saturday nights,

11  respectively.  (Pet. Ex. 162 ¶¶ 8-9; Pet. Ex. 165 ¶ 10.)  Clements and Lazoff

12  testified at trial, and defense counsel did not ask the witnesses if Mendoza sought

13  an alibi from them.  Petitioner contends that this alleged information would have

14  cast doubt upon the credibility of Mendoza's trial testimony against Petitioner.

15  Because an evidentiary hearing is necessary to determine whether trial

16  counsel adequately investigated and presented any information about Mendoza's

17  alleged attempts to create an alibi from Clements and Lazoff, and to evaluate the

18  nature and weight of any such testimony they could have provided, the California

19  Supreme Court's decision summarily rejecting this claim was based on an

20  unreasonable determination of the facts.  *See Earp*, 431 F.3d at 1173 ("Because an

21  evidentiary hearing is needed in order to resolve these factual allegations we hold

22  that the state court's decision was based on an unreasonable determination of the

23  facts").  Accordingly, this portion of Claims 2(12), 10(6), and 10(13) will be

24  included within the scope of the evidentiary hearing.

25  //

26  b.      **Stolen Items at Mendoza's Home**

27  Trial counsel could not have been ineffective for failing to present certain

28  evidence of stolen items at Mendoza's home that he could not reasonably have

16

possessed.  As discussed above, significant evidence of Mendoza's possession of the stolen items obtained from other reasonably available means was presented at trial.  The California Supreme Court would not have been unreasonable in determining that trial counsel was not ineffective on this basis.

### c.      Inducement for Mendoza's Testimony

As the Court held above, the state high court could have reasonably concluded that Petitioner's allegations that Mendoza received an undisclosed inducement for his testimony are speculative.  The court may have reasonably determined that it is not reasonable that counsel would have succeeded in introducing Clements' or Lazoff's speculative testimony at trial.  *Cf. Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("To show prejudice under *Strickland* from failure to file a motion," petitioner must show, in part, that "had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious").  If a witness "has no relevant personal knowledge . . . of a reason that a witness may be lying or mistaken, he might have no relevant testimony to provide.  No witness may give testimony based on conjecture or speculation." *California v. Chatman*, 38 Cal. 4th 344, 382 (2006).  The trial court "has no discretion to admit irrelevant evidence.  Speculative inferences . . . cannot be deemed to be relevant to establish the speculatively inferred fact . . . ." *California v. Babbitt*, 45 Cal. 3d 660, 681 (1988).

Petitioner cannot have been denied any constitutional rights or suffered any prejudice where he "claims a right the law simply does not recognize," *Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993) (internal quotation omitted), such as the introduction of speculative testimony.  The California Supreme Court's denial of Petitioner's claim of ineffective assistance on this basis, therefore, was not unreasonable.

### 3.      Claims 1(1), 2(12), 10(6), 10(9), and 10(13) regarding Mendoza's Criminal History

17

Petitioner alleges that the prosecution violated *Brady* by failing to disclose Mendoza's "criminal activity prior to and after the crimes against the Galloways," including "drug sales, burglary of a residence, theft and assaults." (Mot. at 80; *see also* Pet. at 143 ¶ 346 (d).) In support, Petitioner cites "criminal history information regarding Mendoza . . . available publicly" as well as statements by Clements and Lazoff. (Mot. at 80 (citing Pet. Ex. 196); *see also* Pet. at 143 ¶ 346 (d) (citing Pet. Exs. 162, 165).) Petitioner also contends that trial counsel was ineffective for failing to investigate and present evidence of Mendoza's criminal history. (Pet. at 179 ¶ 465, 233 ¶ 624; Mot. at 21-22, 24-26, 70-71.)

Clements states in his declaration that Mendoza "had several pending cases" in or before 1987. (Pet. Ex. 162 ¶ 16.) Lazoff declares that Mendoza "was in jail for three or four weeks a few months before the Galloway murders. He told me that he was only in jail for traffic warrants, but he was probably lying about that." (Pet. Ex. 165 ¶ 11.) Finally, a probation officer's report on Mendoza's criminal history shows incidents that occurred before his testimony at Petitioner's trial in April 1988. (*See* Pet. Ex. 196 at VENT 19774.) The report includes a juvenile misdemeanor adjudication of grand theft committed in September 1983 and an adult misdemeanor conviction of reckless driving committed in August 1987. (*Id.*)[4]

---

[4] The criminal history report also includes two instances on which Mendoza was released pursuant to California Penal Code § 849(b)(1), which provides that a "peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever [h]e or she is satisfied that there are insufficient grounds for making a criminal complaint against the person arrested." Since "evidence of mere arrests is inadmissible [as to a witness's credibility] because it is more prejudicial than probative," *California v. Lopez*, 129 Cal. App. 4th 1508, 1523 (2005), the arrests themselves could not have been used to impeach Mendoza.                                    CONTINUED

    CONTINUED

The Court need not and does not now decide whether the arrest records could constitute a part of Petitioner's *Brady* claim. "There is no uniform approach in the federal courts to the treatment of inadmissible evidence as the basis for *Brady* claims. . . . It appears that our Circuit's law on this issue is not entirely consistent." *Paradis v. Arave*, 240 F.3d 1169, 1178-79 (9th Cir.

Evidence of the conduct underlying the juvenile adjudication might have been admissible to impeach Mendoza if the conduct evinced moral turpitude and if Mendoza's discharge from the Youthful Offender Parole Board was not an honorable discharge. *See California v. Lee*, 28 Cal. App. 4th 1724, 1739-40 (1994) (holding that such conduct may be used for impeachment "at least" in cases where the juvenile did not receive an honorable discharge). Mendoza's adjudication of grand theft would have involved moral turpitude. *California v. Wheeler*, 4 Cal. 4th 284, 297 (1992) (agreeing with trial court that misdemeanor grand theft was "an offense necessarily involving both moral turpitude and dishonesty"). Moreover, Mendoza appears to have twice violated his probation (Pet. Ex. 196 at VENT 19774 (noting "2 VOPs")), although it was "successfully term[inated]." (*Id.*) The record does not indicate whether Mendoza was honorably discharged.

Evidence of the conduct underlying the adult misdemeanor conviction of reckless driving might also have been admissible for impeachment. *Wheeler*, 4 Cal. 4th at 295 ("[I]n proper cases, nonfelony conduct involving moral turpitude should be admissible to impeach a criminal witness"). Whether Mendoza's reckless driving involved moral turpitude is a fact-dependent question. *Cf. Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1489 (2010) (Scalia, J., dissenting) (observing, in deportation context, that "[d]etermining whether a particular crime is one involving moral turpitude is no[t] eas[y]," and citing ABA guideline that misdemeanor DUI "generally" does not involve moral turpitude, but "may" do so if it results in injury or if the driver knew his license had been suspended or revoked); *Marmolejo-Campos v. Gonzales*, 503 F.3d 922, 926 (9th Cir. 2007) (citing with approval decisions that "criminally reckless conduct" and "reckless conduct endangering the safety of others can be a crime of moral turpitude");

---

2001) (gathering cases and holding that the "instant case does not require resolution of that possible conflict"); *United States v. Price*, 566 F.3d 900, 911-12 (9th Cir. 2009) (same).

*compare California v. Coad*, 181 Cal. App. 3d 1094, 1109 (1986) (citing with approval federal district court decision that reckless driving does not involve moral turpitude); *In re Kelly*, 52 Cal. 3d 487, 494 (1990) (holding, in attorney discipline matter, that DUI does not involve moral turpitude). Mendoza's probation report indicates only that he "took a tarp cover and a stereo speaker from a pick up truck parked in a shopping center. He told police he did it because the truck looked similar to one whose owner had stolen some property from a friend's vehicle." (Pet. Ex. 196 at VENT 19774.) The record thus far developed does not resolve the issue of moral turpitude.

The prosecution must disclose material impeachment evidence concerning its witnesses, regardless of whether defense counsel requested that information. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (discussing *United States v. Bagley*, 473 U.S. 667 (1985)). The prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. That duty extends to the criminal histories of government witnesses. *See Price*, 566 F.3d at 903 (finding *Brady* violation where prosecutor failed to learn of and disclose material evidence of government witness's criminal history that lead investigating officer likely possessed); *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997).

In *Carriger*, the Ninth Circuit considered a *Brady* claim based upon the criminal history of the prosecution's key witness, who was "known by police and prosecutors to be a career burglar and six-time felon, with a criminal record going back to adolescence." 132 F.3d at 480. The court held:

> When the state decides to rely on the testimony of such a witness, it is the state's obligation to turn over all information bearing on that witness's credibility. This must include the witness's criminal record, including prison records, and any information therein which bears on credibility. The state had an obligation, before putting [the witness] on the stand, to obtain and review [his]

1
2

> corrections file, and to treat its contents in accordance
> with the requirements of *Brady* and *Giglio*.

3
4
5
6
7
8

> To the extent defense counsel's failure to request the file
> was a cause of the state's failure to disclose it, that failure
> constituted clear ineffective assistance of counsel.  Either
> way, [petitioner] was denied a fair trial.  We do not
> independently consider the ineffective assistance of
> counsel issue because the Supreme Court has clarified
> that the state's *Brady* obligations do not depend upon the
> defense's discovery requests.

9

*Id.* (citations omitted).

10
11
12
13
14

The record does not indicate what information, if any, the prosecution divulged about Mendoza's criminal history or what representations it made to trial counsel.  The record is also silent about what requests, if any, trial counsel made for Mendoza's criminal background information and to what extent he may have been aware of it.

15
16
17
18

An evidentiary hearing is needed to resolve these fact-dependent issues.  *See Earp*, 431 F.3d at 1173, 1176.  Accordingly, the Court will include within the scope of the evidentiary hearing Claims 1(1), 2(12), 10(6), 10(9), and 10(13) as to Mendoza's criminal history.

19

**V.   Claim 1(2) as to Mendoza**

20

In Claim 1(2), Petitioner alleges, *inter alia*, that the prosecutor:

21
22
23
24
25
26
27

> committed misconduct when he allowed Mendoza to
> falsely testify that he had no involvement in the crimes at
> the Galloway residence, and failed to correct that false
> testimony; when he allowed Mendoza to deny receiving
> any deal in exchange for his testimony against Mr. Cain;
> and when he repeatedly argued to the jury in his closing
> argument that it should believe Mendoza's testimony
> implicating Mr. Cain, when he knew Mendoza's
> testimony to be false and misleading in many material
> aspects.

28

1  (Pet. at 146 ¶ 352; *see also* Pet. at 143-44 ¶ 346(d).)  At trial, Mendoza testified on

2  direct examination that he had never "been charged with any crime in this case"

3  and had never "go[ne] into the Galloway[s'] house."  (20 RT 5502.)

4      "[A] conviction obtained through use of false evidence, known to be such by

5  representatives of the State, must fall under the Fourteenth Amendment." *Napue v.*

6  *Illinois*, 360 U.S. 264, 269 (1959) (citing, *inter alia*, *Mooney v. Holohan*, 294 U.S.

7  103 (1935)).  "To prevail on a claim based on *Mooney-Napue*, the petitioner must

8  show that (1) the testimony (or evidence) was actually false, (2) the prosecution

9  knew or should have known that the testimony was actually false, and (3) [] the

10  false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th

11  Cir. 2003).  The burden of demonstrating falsity rests on petitioner.  *See id.*

12  (denying relief where petitioner's evidence of falsity was "unreliable" and "failed

13  to demonstrate that the testimony [at issue] was false").

14      First, as discussed above (*supra* p. 15), the court could have reasonably

15  determined that Petitioner failed to demonstrate that Mendoza received an

16  undisclosed inducement for his testimony.  The court could have reasonably found

17  Petitioner's allegations that Mendoza received such an inducement to be purely

18  speculative.  *See Phillips v. Woodford*, 267 F.3d at 986-87.  The court, therefore,

19  could have reasonably held that Petitioner did not meet his burden of

20  demonstrating falsity with such allegations.

21      Beyond that claim, the court would not have been unreasonable in

22  concluding that Petitioner failed to establish that any of Mendoza's testimony was

23  "actually false." *Zuno-Arce*, 339 F.3d at 889.  The entirety of the evidence

24  Petitioner points to as "contradict[ing]" Mendoza's testimony consists of testimony

25  from other witnesses.  (Pet. at 60-63 ¶ 110.)  "A challenge to evidence through

26  another witness," or "[m]ere inconsistency between witnesses' testimony . . . is

27  insufficient to establish prosecutorial use of false testimony." *United States v.*

28  *Martin (Sidney)*, 59 F.3d 767, 770 (8th Cir. 1995) (internal quotation omitted); *see*

1   *also United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992) (denying *Napue*

2   claim where the "only showing made by [petitioner] is that [the witness's]

3   statement may have been contradicted by another witness"); *United States v.*

4   *Brown*, 634 F.2d 819, 827 (5th Cir. 1981) ("[D]ue process is not implicated by the

5   prosecution's introduction or allowance of false or perjured testimony unless the

6   prosecution actually knows or believes the testimony to be false or perjured; it is

7   not enough that the testimony is challenged by another witness").  The prosecutor

8   acknowledged in his closing statement that "if you believe the other witness, you

9   can't believe Ulie Mendoza's testimony when he says he didn't go in the house"

10   Saturday morning.  (23 RT 6081.)  The only physical evidence that could have

11   placed Mendoza inside the house, which the prosecution investigated, was

12   determined to eliminate Mendoza as a source.  (*See* 20 RT 5425, 5436, 5575-76);

13   *cf. Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (holding prosecution has a

14   duty to investigate suspected perjury; "[i]f the state had conducted an investigation

15   and formed a good-faith belief that [there was no falsity presented at trial] . . . there

16   would have been . . . no duty under *Mooney* and *Napue*).

17        Accordingly, the California Supreme Court's denial of Claim 1(2) as to

18   Mendoza was not unreasonable.  Claim 1(2) is, therefore, denied as to Mendoza.

19   **VI.**   **Claim 1(2) as to Testimony of Investigator David Stone, Kenneth**

20          **Mehaffie, and Officer Dwight Holmbom**

21        In portion of Claim 1(2), Petitioner alleges the prosecutor committed

22   misconduct in presenting false testimony from Investigator David Stone, Kenneth

23   Mehaffie, and Officer Dwight Holmbom.

24   //

25        **A.**   **Investigator David Stone**

26           **1.**   **Allegations and Background**

27        Petitioner alleges that the prosecutor presented false testimony from District

28   Attorney Investigator David Stone to impeach defense witness Floyd Clements.

1  (Pet. at 84-85 ¶¶ 161-66; Mot. at 85.)  Petitioner claims that after Clements

2  "testified in a manner that contradicted Mendoza's claims about what occurred on

3  the night of the crime, the prosecutor called Stone, who testified that Clements had

4  previously given him a statement which contradicted his testimony and supported

5  Mendoza's claims regarding the crimes."  (Mot. at 85.)  Petitioner alleges that

6  Stone's testimony was false and Clements' prior statements were consistent with

7  his trial testimony.  (*Id.*)  In support of this claim, Petitioner seeks to present at an

8  evidentiary hearing "[t]he records of the statements of . . . Clements, to Stone."

9  (*Id.* at 90.)

10      At trial, Clements testified that on Saturday night, Val Cain was in his

11  bedroom with "some girls," Petitioner told Val to open the door, and Petitioner

12  kicked the door.  (21 RT 5775-77.)  Clements testified that Petitioner did not say

13  anything about the girls in the room and he did not recall telling Stone and the

14  prosecutor that Petitioner told Val to "share the women in the bedroom."  (*Id.*)

15      The prosecutor later called David Stone, who testified that Clements told

16  him previously that the events happened Friday night and that Clements "made

17  reference to the fact that Tracy had said words to the effect that if . . . he, Tracy,

18  couldn't have the women, then Val shouldn't have them either."  (*Id.* at 5890-94.)

19  Stone testified that Clements' statements to him were tape recorded and that he

20  listened to the recording after Clements testified to refresh his recollection.  (*Id.* at

21  5891.)

22      Petitioner claims that "the transcript of the tape recording of the statement

23  by Clements confirms his testimony, and establishes that Stone's testimony was

24  false. . . .  The prosecutor knew that Clements testified consistently with his

25  previously taped interview, because the prosecutor was present at that interview[, .

26  . . and] the claims by investigator Stone . . . were false."  (Pet. at 85 ¶¶ 163, 165-66

27  (citing Pet. Ex. 76).)

28          **2.    Analysis**

24

As discussed above, "[t]o prevail on a claim based on *Mooney-Napue*, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) [] the false testimony was material." *Zuno-Arce*, 339 F.3d at 889.  The burden of demonstrating falsity rests on petitioner.  *See id.*

The California Supreme Court could have reasonably determined that Petitioner has not demonstrated the falsity of Stone's testimony about Clements' statement about the girls in the bedroom.  The transcript of Stone's interview with Clements shows that Clements told Stone that Petitioner "did say something like if, if you don't get none, Val ain't getting none either, something like that," about the girls.  (Pet. Ex. 76 at 0021.)  The court could have reasonably determined that the statement reflected Petitioner's instruction to Val to "share" the girls or else Val shouldn't "have them" either.

As to Stone's testimony that Clements told him previously that the events happened Friday night, the portion of the transcript submitted in Exhibit 76 suggests otherwise.  Clements told Stone that the two girls were in Val's bedroom Saturday, not Friday, night.  (*Id.* at 0004-05, 0019-23.)  The transcript attached as Exhibit 76 to the Petition appears to be truncated, however.  It ends with a question pending from Stone.  (*See id.* at 0025.)  The Court cannot determine, based upon the evidence submitted, if Clements' recollection of the events Friday and Saturday nights changed or was clarified before the conclusion of the interview.  The Court will, therefore, include within the scope of the evidentiary hearing Claim 1(2) as to Stone's testimony about Clements' prior statement that the girls were in Val Cain's bedroom Friday, not Saturday, night.

## B.   Kenneth Mehaffie

Petitioner contends that the prosecutor presented false testimony from Kenneth Mehaffie, the Galloways' son-in-law, regarding "whether Mr. Cain was guilty of robbery, and whether the murders of the Galloways were committed

1    while Mr. Cain was engaged in the commission of a robbery . . . ." (Pet. at 147 ¶

2    360; Mot. at 85.)  Petitioner alleges that Mehaffie's subsequent testimony at

3    Cerda's trial contradicted his allegedly false testimony in Petitioner's trial. (Mot.

4    at 85.)  In support of this claim, Petitioner seeks to present at an evidentiary

5    hearing Mehaffie's subsequent testimony. (*Id.* at 90.)

6             **1.    Factual Background**

7         At Petitioner's trial, Mehaffie testified that William Galloway kept a small

8    brown wallet containing approximately $1,000 in a nightstand similar to a

9    homemade desk, next to his bed. (19 RT 5322, 5324-25.)  He testified that the

10   wallet Mr. Galloway carried with him, with less money, was black. (*Id.* at 5322-

11   23.)  Mehaffie identified Trial Exhibit 78 as the black wallet Mr. Galloway carried.

12   (*Id.* at 5326.)  Mehaffie testified that he looked for the brown wallet after police

13   were finished in the house and did not find it. (*Id.* at 5325.)

14        At Cerda's trial, Mehaffie testified to opposite colors of the wallets. (*See*

15   Lodged Doc. C-2, Ex. C, at 76-77.)  He testified that the wallet Mr. Galloway kept

16   in his bedroom in a desk-type drawer, containing approximately $1,000 to $1,500,

17   was black, and the wallet he carried with him with less money was brown. (*Id.*)

18   Mehaffie testified that he looked for the larger-amount wallet after the police left

19   the house and did not find it. (*Id.* at 76.)  He said police showed him a brown

20   wallet with a small amount of money, which was not the wallet where Mr.

21   Galloway kept the larger amount. (*Id.* at 77.)  He reported that the police told him

22   they found a wallet without any money in the bedroom, in a place where Mehaffie

23   indicated it was not normally kept. (*Id.* at 77-78.)

24   //

25            **2.    Analysis**

26        Mehaffie's subsequent testimony suggests, at most, the potential falsity of

27   his statements establishing the colors of the wallets.  Petitioner presents no

28   independent evidence to establish that Mehaffie's testimony at Cerda's trial, rather

1    than his testimony at Petitioner's trial, was accurate.  *Cf. Martin (Sidney)*, 59 F.3d

2    at 770 ("A challenge to evidence through . . . prior inconsistent statements is

3    insufficient to establish prosecutorial use of false testimony" (internal quotation

4    omitted)); *Zuno-Arce*, 339 F.3d at 889 (rejecting *Napue* claim where petitioner

5    failed to demonstrate testimony at trial was "actually false").  Likewise, Petitioner

6    has not demonstrated that the prosecution knew or should have known of any

7    falsity regarding the colors of the wallets, or any other portion of Mehaffie's

8    testimony.  *See Schad v. Ryan*, 606 F.3d 1022, 1037 (9th Cir. 2010) (holding that

9    "it is not entirely clear that [the prosecution witness] lied," and "[e]ven assuming

10   he did, there is no evidence that the state knew or should have known that his

11   testimony was false"); *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006).

12   Petitioner has not suggested any means by which the police or prosecution should

13   have known what color wallet William Galloway carried or what color wallet he

14   stored.

15         The California Supreme Court, therefore, could have reasonably denied the

16   claim on the basis that Petitioner presented no evidence to establish that Mehaffie's

17   testimony at Petitioner's trial was false or that the prosecution knew or should have

18   known of any falsity.  Accordingly, Claim 1(2) as to Mehaffie's testimony at

19   Petitioner's trial is denied.

20         **C.    Officer Dwayne Holmbom**

21         Similarly, Petitioner contends that the prosecutor presented false testimony

22   from Officer Dwight Holmbom regarding "whether Mr. Cain was guilty of

23   robbery, and whether the murders of the Galloways were committed while Mr.

24   Cain was engaged in the commission of a robbery . . . ."  (Pet. at 147 ¶ 360; Mot. at

25   85.)  Petitioner alleges that the subsequent testimony of Kenneth Mehaffie in

26   Cerda's trial contradicted Holmbom's allegedly false testimony.  (*Id.*)  In support

27   of this claim, Petitioner seeks to present at an evidentiary hearing Mehaffie's

28   testimony at the Cerda trial.  (*Id.* at 90.)

### 1.     Factual Background

At Petitioner's trial, Officer Holmbom testified that officers at the scene, including Officer Holmbom and Officer Robert Hoffman, found a black men's wallet on top of a drawer in the southeast bedroom of the Galloways' house.  (19 RT 5293-94, 5296.)  Officer Holmbom identified the wallet as Trial Exhibit 78. (*Id.*)  According to Officer Holmbom, the wallet contained $170, a MasterCard of Modena Galloway, a social security card of J. Galloway, Jr., some papers with the Galloways' names and others without, and photographs.  (*Id.*)  Officer Holmbom was asked:

> Q.     Did you look thoroughly for any other wallets in that southeast bedroom where the television set was?
> A.     Yes.
> Q.     Did you find any?
> A.     No.
> Q.     Did you find a brown wallet?
> A.     No.

(*Id.* at 5295.)

Officer Hoffman testified at Petitioner's trial that at the Galloways' house, he took the photograph entered as Trial Exhibit 6.  (19 RT 5253; Pet. Ex. 112.) That photograph appears to show, among other things, a brown wallet next to a brown purse in Mrs. Galloway's southwest bedroom.  (Pet. Ex. 112; 19 RT 5230, 5251-53.)  The wallet contains what appears to be a woman's driver's license along with several other credit-card sized items.  (*Id.*)

As noted above, at Cerda's trial, Mehaffie testified that Mr. Galloway kept a black wallet containing approximately $1,000 to $1,500 in his bedroom in a desk-type drawer.  (*See* Lodged Doc. C-2, Ex. C, at 76-77.)  Mehaffie testified that the wallet Mr. Galloway carried with him with less money was brown.  (*Id.*)  Mehaffie testified that he looked for the larger-amount wallet after the police left the house and did not find it.  (*Id.* at 76.)  He said police showed him a brown wallet with a

28

1    small amount of money, which was not the wallet where Mr. Galloway kept the

2    larger amount.  (*Id.* at 77.)  He also reported that the police told him they found a

3    wallet without any money in the bedroom, in a place where Mehaffie indicated it

4    was not normally kept.  (*Id.* at 77-78.)

### 2.    Analysis

6        The only portion of Mehaffie's testimony at Cerda's trial that could possibly

7    illustrate a falsity in Officer Holmbom's testimony to Petitioner's detriment is that

8    police found a brown wallet with a small amount of money in the house.  However,

9    the California Supreme Court could have reasonably determined that Officer

10   Holmbom's testimony, in context, indicated only that he did not find a brown

11   wallet in the southeast bedroom, not that no officer found a brown wallet anywhere

12   in the house.  "Given the ambiguity inherent in [the witness's] statement, . . . [i]n

13   contrast to the unambiguous and false statements involved in *Giglio* and *Napue*,

14   the present case permits a reasonable interpretation of the witnesses's statement

15   that is entirely consistent with" the truth.  *Pederson v. Fabian*, 491 F.3d 816, 822,

16   828 (8th Cir. 2007) (upholding denial of *Napue* claim where witness testified that

17   prosecutor did not tell him what to say, and prosecutor had provided witness with

18   "dialogue in the format of a script" summarizing his prior statements to police and

19   grand jury).  In addition, through the testimony of Officer Hoffman, evidence was

20   presented that a brown, apparently-women's wallet was found in the southwest

21   bedroom.  Mehaffie's subsequent testimony gave no indication whether the brown

22   wallet he was shown was a men's or a women's wallet.

23       The California Supreme Court could have reasonably determined, therefore,

24   that Petitioner failed to demonstrate the falsity of Officer Holmbom's testimony.

25   *See Schad*, 606 F.3d at 1037 (rejecting *Napue* claim where "it is not entirely clear

26   that [the prosecution witness] lied"); *Zuno-Arce*, 339 F.3d at 889 (rejecting same

27   where petitioner failed to demonstrate testimony at trial was "actually false");

28   *Martin (Sidney)*, 59 F.3d at 770 ("A challenge to evidence through another

witness," or "[m]ere inconsistency between witnesses' testimony . . . is insufficient to establish prosecutorial use of false testimony" (internal quotation omitted)); *Nelson*, 970 F.2d at 443 (denying *Napue* claim where the "only showing made by [petitioner] is that [the witness's] statement may have been contradicted by another witness"); *cf. United States v. Brown*, 634 F.2d at 827 ("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness").

Because the state court's decision was not an unreasonable application of Supreme Court precedent, Petitioner is not entitled to federal habeas relief on this claim. Accordingly, Claim 1(2) as to Officer Holmbom's testimony is denied.

## VII.   Claims 1(2) and 2(11) as to Testimony of Edwin Jones

### A.   Allegations and Opposition

In a portion of Claim 1(2), Petitioner alleges that the prosecution committed "*Giglio* error by knowingly using unfounded and scientifically unsupportable hair evidence presented by a purported 'expert' witness, Edwin Jones, whom the prosecutor knew to be unqualified." (Pet. at 146-47 ¶ 356 (citations omitted).) Petitioner argues that the hairs found at the crime scene were the only physical evidence that "possibly appeared to link Mr. Cain to the crimes," (Pet. at 77 ¶ 149), including the allegations of rape or attempted rape. He claims that Jones "was not sufficiently qualified to be certified as an expert testifying on the subject of hair identification and testing." (*Id.* ¶ 150.) Petitioner alleges that Jones "lied on the stand about his qualifications and abilities" to identify the hairs and to conduct an electrophoresis test, and lied about his results. (Mot. at 84-85.) He further alleges that at the time of his trial, "numerous recognized scientific and law enforcement authorities (including the Federal Bureau of Investigation) had concluded that 'leg/body' hair is of absolutely no scientific value for identifying a

30

1 specific person as the source thereof."  (Pet. at 77-78 ¶ 151(c) (emphasis

2 removed).)  Petitioner contends that the identification of "leg/body" hair,

3 eletrophoresis testing of hair, and microscopic analysis of hair "do[] not meet the

4 legal standards for admission of scientific evidence set forth in *Daubert v. Merrell*

5 *Dow Pharmaceuticals, Inc.*, 509 U.S. 579 [] (1993) and *People v. Kelly*, 17 Cal. 3d

6 24 [] (1976)."  (*Id.* at 78-79 ¶ 151 (c)-(g).)

7      Relatedly, in a portion of Claim 2(11), Petitioner argues that trial counsel

8 was ineffective for failing to challenge the scientific basis for the admission of

9 Jones' testimony, to contest Jones' qualifications as an expert, to adequately cross-

10 examine Jones about his results, to proffer any contradictory expert testimony, to

11 have tested other hairs found at the scene, and to adequately address Jones'

12 testimony in closing argument.  (Pet. at 80-81 ¶ 153, 179 ¶ 464; Mot. at 69-70.)

13      Respondent argues in opposition that hair comparison evidence that

14 identifies a suspect as a possible donor has been "routinely admitted in California

15 for many years without any suggestion that it violated *Kelly/Frye*," relying upon

16 *California v. Pride*, 3 Cal. 4th 195, 238-39 (1992) (affirming 1986 conviction).

17 (Opp. at 63-65, 78.)  Respondent also emphasizes that Petitioner "had a defense

18 criminalist, Richard Fox, present at the time that Criminalist Jones conducted the

19 'electrophoretic test' on the pubic hair.  (RT 5416.)  Petitioner has provided no

20 evidence from Criminalist Fox to challenge the validity of Jones's findings."  (*Id.*)

21     **B.**    **Background**

22     This Court ruled, as to the qualifications of Edwin Jones:

23           Since Petitioner was already provided with the means to

24           demonstrate that the pubic hairs found at the scene were

          not his [through DNA testing], there is not good cause to

25           support an attempt to discredit the testimony on the hairs

26           by examining . . . the qualifications of the technicians

          employed at the [Ventura County sheriff's office]

27           laboratory.  Rather Petitioner should be able to

28           demonstrate by the results of the DNA testing that the

1    trial testimony on the hairs was inaccurate or unreliable.

2    (Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 11.)  Jones

3    was employed at the laboratory and examined and tested the hairs at issue.  (20 RT

4    5399, 5401-16.)

5        The results of the DNA testing were provided to the Court on January 21,

6    2003.  The testing could not conclusively demonstrate that the pubic hairs found at

7    the scene were not Petitioner's or that the trial testimony on the hairs was

8    inaccurate or unreliable.  The results indicate that the root of the hair sample found

9    on Modena Galloway's underwear contained DNA that would be found in

10   approximately 1 in 210 African Americans, approximately 1 in 2,400 Caucasians,

11   and approximately 1 in 1,800 Hispanics.[5]  (Joint Presentation of Original DNA

12   Testing Results Pursuant to Ct. Order, Pet. Ex. 194, filed Jan. 24, 2003 ("DNA

13   Testing Results"), at 4.)   Based upon a comparison of the hair samples to

14   Petitioner's DNA sample, the report concluded that "Tracy Cain cannot be

15   eliminated as the source of the DNA from this sample."  (DNA Testing Results at

16   4.)

17       **C.    Jones' Testimony**

18            **1.    Qualifications and Methods**

19       Jones was a criminalist in the Ventura County sheriff's crime laboratory, in

20   the serology and trace evidence section.  (20 RT 5399.)  He testified that he had an

21   M.S. degree in forensic chemistry from the University of Pittsburgh, an M.S.

22   degree with a thesis in biochemistry from Marshall University, and a B.S. degree in

23   chemistry from West Virginia Wesleyan College.  (*Id.*)  Jones stated that he

24   worked for one year with the Georgia State Crime Laboratory in its trace evidence

25   and firearm section, for seven and one-half years at the Fountain Valley Police

26   Department performing criminalistics and crime lab work, and for five years in his

27   _____

28   [5]  By his own allegations, "[o]f the four individuals identified by various people as being involved
in the crime, . . . [o]nly one, Mr. Cain, was African-American."  (Pet. at 302-03 ¶ 817(a).)

32

current position.  (*Id.* at 5399-5400.)  He indicated that he was a member of the American Academy of Forensic Science, the California Association of Criminalists, and the Los Angeles Microscopical Society, that he had specialized training from the Federal Bureau of Investigation "in hairs," and that he had testified as a "hair expert" in Ventura County on a number of occasions.  (*Id.* at 5400.)

Jones testified that he used a "comparison microscope system," comprised of two microscopes "set up with identical optical systems on both sides," manually adjusted to provide equal lighting and connected with an optical bridge to bring both fields of view into one.  (*Id.*)  Jones stated that he compared the hairs found at the scene with hairs from known, potential sources, examining the hairs' root structure, pigment granules, medulla, cortex, cuticle, length, and diameter.  (*Id.* at 5400-07.)

Jones also testified that he performed an electrophoresis test, a chemical analysis used to determine the multiple types of enzymes within the blood of different individuals.  (*Id.* at 5415.)  He told the jury that there are "seven different systems that we use and most people are different in one or more of those systems . . . . Studies have been done to show whenever there is root sheath material on hairs, . . . [it] will display the same enzyme types or the same electrophoretic patterns as from the individual['s] . . . blood."  (*Id.*)  About the electrophoresis test, Jones relayed, "[I]t's a one-time shot.  You only get to run the hair one time," out of the "group 1," "group 2," and "PGM" subgroups.  (*Id.* at 5418.)  Jones testified that a defense criminalist, Richard Fox, was present during the electrophoresis test at Jones' request.  (*Id.* at 5416.)

## 2.    Results

Jones indicated that he found three foreign hairs on Mrs. Galloway's underwear collected at the house.  (20 RT 5403-04.)  Jones identified the longest of the three hairs as a pubic hair.  (*Id.* at 5407-08.)  He testified that the pubic hair

"could have come from Tracy Cain, and . . . [Jones] would expect to find [its cuticle structure and hair tip characteristics] in very few people in the general population." (*Id.* at 5413-14.) Jones stated that he performed an electrophoresis test and identified the phosphoglucomutase (PGM) enzyme subgroup of the hair's root sheath material as 1+. (*Id.* at 5416-17, 5421.) The 1+ subgroup could match only Modena Galloway, Floyd Clements, and Petitioner as possible sources, he said.[6] (*Id.* at 5421.) Jones eliminated Modena Galloway and Clements as potential sources through microscopic examination (*id.* at 5421-22), leaving only Petitioner as a possible source of the hair among the identified, potential donors.

Jones compared the two shorter hairs found on the underwear to leg hairs from Petitioner. (*Id.* at 5424.) He concluded that the hairs "could have come from Tracy Cain" based upon "[b]oth gross and microscopic structure." (*Id.*)

Jones also microscopically compared hairs found on Modena Galloway's pajama top, pajama bottoms, and socks to Petitioner's leg and pubic hairs. (*Id.* at 5427-36.) He found that the hair on the pajama bottoms was "similar in all respects that [he] could measure" to Petitioner's leg hair. (*Id.* at 5428.) He testified that while the pubic hair on the pajama top might look different in its microphotograph from that of Petitioner's, they had "striking" similarities in their pigment granules, their "strange" cuticular structures, and their "splitting." (*Id.* at 5431-32.) Jones indicated that the "splitting" feature is present on "25 percent of all pubic hair samples that I see. But again, that eliminates 75 percent of the population." (*Id.* at 5432.) Jones also compared six non-pubic hairs on the pajama top to Petitioner's leg hairs and found them to be "microscopically similar. That is, they could have come from Tracy Cain." (*Id.* at 5433.) He compared a seventh

---

[6] The transcription of Jones' initial testimony on these possible sources is ambiguous about whether Petitioner was included in this group. The record reflects that Jones, identifying the group, stated that it "included Tracy Cain – excuse me Floyd Clements and Modena Galloway." (20 RT 5421.) His later testimony that the hair could have come from Petitioner resolves that ambiguity, however. (*See id.* at 5436.)

non-pubic hair to Petitioner's body hair and found that it was "microscopically similar and could have come from Tracy Cain." (*Id.* at 5433-34.)  Finally, Jones compared one pubic hair fragment and two leg hairs from Modena Galloway's socks to Petitioner's corresponding hairs, and found them to be "microscopically similar.  And they could have . . . come from Tracy Cain." (*Id.* at 5434-35.)

On cross-examination, Petitioner's counsel elicited testimony from Jones that 37% of the general population in Ventura County would be identified as PGM 1+, and that PGM 1 activity is found in approximately 44% of the black population. (*Id.* at 5452-53.)  Defense counsel cross-examined Jones about the differences between class characteristics, as seen in hair analysis, and unique characteristics. (*Id.* at 5448-52.)  He repeatedly elicited testimony from Jones that while the hairs *could* have come from petitioner, his testimony was "not that in fact those hairs *did* originate from Tracy Cain." (*Id.* at 5452 (emphasis added).)  Nevertheless, on redirect examination, Jones testified that of the standard hairs he had examined from approximately 1,000 people in his career, he had never seen one that had the same cuticle characteristic as the pubic hairs taken from Petitioner and found on the underwear. (*Id.* at 5459.)  Trial counsel again questioned on recross-examination, "Notwithstanding all of your training, your education, your expertise, you still are not telling the jury that those hairs in the panties and the other hairs from the scene did in fact come from Tracy Cain, are you?" (*Id.* at 5463.)  Jones replied, "That's correct." (*Id.*)

//

### D.    Legal Standard regarding Prosecutorial Misconduct

Petitioner contends that the prosecution knowingly withheld evidence regarding Jones' lack of qualifications, constituting *Giglio* error. (Pet. at 146-47 ¶¶ 356-58 (referencing *Giglio v. United States*, 405 U.S. 150 (1972)).)  The Supreme Court analyzed the constitutional violation in *Giglio* as a *Napue* violation, holding, "A new trial is required if 'the false testimony could . . . in any reasonable

35

likelihood have affected the judgment of the jury . . . .'" *Id.* at 154 (quoting *Napue*, 360 U.S. at 271).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial . . . . [T]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (internal quotation omitted).

     **E.**    **Analysis**

     Petitioner was tried in 1988.  The California Supreme Court has since held that the microscopic comparison of hairs found at a crime scene to those of potential sources "to determine whether they were similar in length, shape, pigment, damage, and component structure," in 1986, was an established scientific technique.  *California v. Pride*, 3 Cal. 4th 195, 238 (1992).  The court held:

> Hair comparison evidence that identifies a suspect or victim as a possible donor has been routinely admitted in California for many years without any suggestion that it is unreliable under *Kelly/Frye*.  It would have been anomalous for the [trial] court to conclude that [the expert's] testimony involved an unfamiliar procedure at this late date. . . .  No *Kelly/Frye* showing was necessary [before the admission of the testimony]. . . .

*Id.* (collecting cases from 1974 to 1987, among others) (internal quotation omitted).

     The California Supreme Court could have reasonably concluded that its holding in *Pride* establishes that Petitioner's counsel could not have succeeded on a motion to exclude testimony on microscopic hair examination.  Counsel would not, therefore, have been deficient on that basis.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("trial counsel cannot have been ineffective for failing to raise a meritless objection"); *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991) (holding that because evidence was admissible, "the decision not to file a motion to suppress it was not prejudicial. . . .  [I]t is not professionally

36

1   unreasonable to decide not to file a motion so clearly lacking in merit").

2   However, while the record suggests that trial counsel retained a defense

3   criminalist, (20 RT 5416), the scope of any expert assistance counsel obtained is

4   unclear. *Compare Moore v. Gibson*, 195 F.3d 1152, 1167 (10th Cir. 1999) (noting

5   "defense counsel ably challenged . . . [the hair expert's] qualifications, and her

6   testing methods. He also had a defense expert available to guide and inform his

7   cross-examination" (citations omitted)). Whether counsel could have challenged

8   Jones' testimony that "root sheath material will display the same enzyme types or

9   the same electrophoretic patterns as from the individual['s] . . . blood" (*id.* at 5415)

10  remains an open question. Similarly, whether trial counsel adequately investigated

11  Jones' qualifications, and whether the prosecution withheld any information or

12  presented any false testimony about Jones' qualifications or test results, would be

13  clarified by a hearing.

14  If the prosecutor committed misconduct in presenting Jones' testimony or

15  trial counsel was ineffective in challenging it, Petitioner may be able to

16  demonstrate an impact on the fairness of his trial. *Cf. Moore*, 195 F.3d at 1167; *but*

17  *see Wilson v. Parker*, 515 F.3d 682, 705-06 (6th Cir. 2008) ("Absent Supreme

18  Court precedent showing a constitutional violation based on the use of hair-

19  matching evidence, we hold that [petitioner] has not demonstrated that the

20  admission of the evidence denied him a fair trial"). An evidentiary hearing is

21  necessary to resolve the "heavily fact-dependent" issues of (1) whether the

22  prosecution presented false testimony or withheld evidence regarding Jones'

23  qualifications and the electrophoresis testing he performed; (2) whether defense

24  counsel adequately investigated and challenged Jones' qualifications and his

25  electrophoresis testing; and, more generally, (3) whether defense counsel

26  adequately consulted with an independent hair analysis expert. *See Earp*, 431 F.3d

27  at 1173, 1176. The Court will, therefore, include those issues within the scope of

28  the evidentiary hearing.

**VIII.   Claims 1(2) and 2(11) as to Testimony of Bruce Woodling, M.D.**

In a portion of Claim 1(2), Petitioner alleges that the prosecution committed "misconduct by presenting the unqualified testimony of Bruce Woodling, M.D. . . ." (Pet. at 147 ¶ 359.)  Likewise, in Claim 2(11), Petitioner argues that trial counsel was ineffective for failing to challenge Dr. Woodling's qualifications. (Pet. at 179 ¶ 464; Mot. at 69-70.)

**A.    Background**

This Court found good cause for discovery on Dr. Woodling's qualifications.  (*See* Order re: Petitioner's Motion to Conduct Initial Discovery, Mar. 5, 2001, at 18-20.)  As the Court summarized:

"Petitioner claims that since Dr. O'Halloran could not support the prosecution's theory that Modena Galloway was raped, the prosecution presented the testimony of Dr. Bruce Woodling, a physician who was board certified in family practice.  RT 5679.  Dr. Woodling testified that he had been involved in forensic medicine for about fifteen years, RT 5679, and that he had probably examined over 2,000 sexual assault victims during his career.  RT 5695.  On cross-examination Dr. Woodling testified that he was not a gynecologist, nor a pathologist, nor was he certified as a forensic pathologist.  RT 5707-5708. However, he stated that while he had never performed an autopsy, he had participated in at least 25, primarily in Ventura County.  RT 5709.  Dr. Woodling testified that he believed the victim was raped, because he concluded that the tear in the victim's vagina was inflicted pre-mortem and not caused by Dr. O'Halloran's examination.  RT 5700-5703.

Petitioner contends that his investigation has revealed that Dr. Woodling's claims are false and perjurious, and that he was not qualified to opine on the post-mortem examination of a rape victim.  According to Petitioner there is no record of Dr. Woodling ever performing or attending any autopsies at any Southern California coroner's office.  This cannot be reconciled with Dr. Woodling's

1    testimony that he attended at least 25 autopsies, most of which occurred in Ventura

2    County." (*Id.* at 18.)

3        **B.    Analysis**

4        First, Petitioner concedes that "the prosecution's arguments on the vaginal

5    'tear' had been rebutted by its own coroner." (Pet. at 147 ¶ 357.)  Indeed, the jury

6    acquitted Petitioner of rape, which required "an act of sexual intercourse."  Cal.

7    Penal Code § 261(a).  The jury instead found true the special circumstance of

8    attempted rape, which required "a direct *but ineffectual* act toward its

9    commission."  *California v. Osband*, 13 Cal. 4th 622, 692 (1996) (citing *California

10   v. Memro*, 38 Cal.3d 658, 698 (1985)) (emphasis added).  Thus, the jury found that

11   Petitioner did not complete an act of sexual intercourse with Modena Galloway,

12   notwithstanding Dr. Woodling's testimony that the tear was caused from impact by

13   a penile-type object (*see, e.g.*, 21 RT 5700).

14       As to the jury's affirmative finding of attempted rape, California law

15   provides that "[a]ny sexual penetration, however slight, is sufficient to complete

16   the crime" of rape.  Cal. Penal Code § 263.  The tear Drs. Woodling and

17   O'Halloran observed was located over one centimeter inside the vagina (21 RT

18   5698; *see also* 20 RT 5381 (describing tear as "just inside the vaginal opening")),

19   and there was no evidence that any object, similar to but distinct from Petitioner's

20   penis, was involved in an attempt to rape Modena Galloway.

21       The California Supreme Court may have reasonably concluded, therefore,

22   that Petitioner failed to allege facts to show a reasonable likelihood that Dr.

23   Woodling's testimony influenced the jury's finding of attempted rape.  Thus, even

24   assuming *arguendo* that Petitioner could prove his allegations that Dr. Woodling

25   lied about his qualifications and was unqualified to offer the opinion that the tear

26   was caused from impact by a penile-type object (*see, e.g.*, 21 RT 5700),[7] the court

27   _____

28   [7] The Court notes that Dr. Woodling explained his trial testimony in his response to Petitioner's
     subpoena as follows:  "I do not have any documents or an independent recollection of the specific

39

1   could have reasonably determined that Petitioner has not demonstrated the

2   materiality of that testimony, or prejudice from counsel's failure to challenge it.

3   *See Smith v. Phillips*, 455 U.S. at 220 n.10; *Strickland*, 466 U.S. at 694.  As noted

4   above, "the touchstone of due process analysis in cases of alleged prosecutorial

5   misconduct is the fairness of the trial. . . .  Even in cases of egregious prosecutorial

6   misconduct, such as the knowing use of perjured testimony, we have required a

7   new trial only when the tainted evidence was material to the case." *Smith v.*

8   *Phillips*, 455 U.S. at 219, 220 n.10; *see also Jackson v. Brown*, 513 F.3d 1057,

9   1076 (9th Cir. 2008) (observing that materiality determination in a *Napue* violation

10   is whether "there is any reasonable likelihood that the false testimony could have

11   affected the judgment of the jury" (internal quotation omitted)).

12       The state court's decision on these points would not have been an

13   unreasonable application of Supreme Court precedent.  Petitioner is, therefore, not

14   entitled to federal habeas relief on Claims 1(2) or 2(11) as to Dr. Woodling.

15   **IX.   Claim 1(2) as to Petitioner's Statement to Police**

16       In a portion of Claim 1(2), Petitioner alleges the prosecution committed

17   misconduct in "knowingly presenting the perjured testimony of Detective Tatum

18   regarding Cain's alleged unrecorded 'confession.'"  (Pet. at 146 ¶ 353.)  In its

19   September 2002 Order, the Court addressed Petitioner's motion for discovery

20   regarding "the taped interrogation of Petitioner and the testimony of prosecution

21   witness and investigating officer, Detective Tatum."  (Order re Pet'r's Outstanding

22   Discovery Requests, Sept. 24, 2002, at 8.)  The Court explained:

23       "Det. Tatum testified that Petitioner confessed to the robbery crimes during

24

25   autopsies I previously attended or participated in prior to the trial in this matter.  However, I do
    have a recollection of having attended approximately 25 autopsies prior to the trial in this matter.

26   I do not have any documents or an independent recollection of the number or victim names of
    autopsies I attended prior to the trial in this matter."  (Pet. Ex. 190 at 24.)  In addition, the Major

27   Crimes Supervisor for the Office of the District Attorney, County of Ventura responded to
    Petitioner's subpoena that he did "not know whether Dr. Woodling attended any autopsies prior to

28   the trial of Tracy Cain – he never attended any in my presence."  (Pet. Ex. 188 at 8.)

the interrogation, but that the tape recorder 'malfunctioned' and failed to record this confession.  Petitioner has consulted with an expert in forensic analysis of tapes, Fausto Poza, who analyzed the tape and found no anomalies or any other indications that the tape recorder malfunctioned and ceased to record at any time, on either side.  Exhibit 174:  Fausto Poza Decl.  Accordingly, Petitioner states that a preliminary investigation indicates that Det. Tatum's claim of the malfunction was false and his testimony was perjurious.

The interrogation was conducted by Detectives Billy Tatum and John Garcia of the Oxnard Police Department.  During the interrogation, held on October 22, 1986, Petitioner stated that the day after the murder he, Rick, Cerda and Mendoza, went into the Galloway house to 'wipe away the fingerprints.'  Throughout the interview Petitioner maintained that he did not murder either of the victims or rape Mrs. Galloway.  At trial Det. Tatum testified that during the interview Petitioner admitted stealing $500 from the Galloways during the initial break-in to the residence on Friday, October 17, 1986.  While Det. Tatum noted that the interview was tape recorded, he claimed that due to a malfunction in the tape recorder, Petitioner's admission was not recorded.  RT 5863-64.  Det. Tatum also testified that the malfunction was not a result of the tape recorder running out of tape, but rather that 'it stopped taping on Side 1.'  RT 5870.  Det. Tatum stated that he learned of the malfunction shortly after it occurred.  RT 5870.

The Court notes that Det. Tatum reported that after informing Petitioner that Cerda had been arrested and [had] provided a statement of his involvement in the crimes, 'during this time the tape recorder malfunctioned for a short period of time as the tape was being turned over.  During this time the suspect made indications that he had entered the victims' residence and took $500; however, this portion of the recording did not come out.'  Exhibit 103:  Follow-up Report by Det. Billy Tatum, dated 10-27-86 at 3 (Murder Book).  Thus, although Det. Tatum testified that the malfunction was not due to the tape recorder running out of tape, RT 5870,

41

his contemporaneous report indicates that the malfunction might simply be a product of switching the tape from side 1 to side 2.  Exhibit 103:  Follow-up Report by Det. Billy Tatum, dated 10-27-86 at 3 (Murder Book)."  (Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 8-9 (footnote omitted).)

Petitioner's expert, Fausto Poza, reports in his declaration that:

> based on the announced times at the ending and beginning of the interview, it would appear that there was an interval of approximately twenty minutes between the end of side A and the start of side B that was not recorded. . . .  That twenty minute period, however, cannot be accounted for due to some anomalous break during the recording on either side of the interview tape.

(Pet. Ex. 174 ¶ 4.)

The Court noted that because claims of prosecutorial misconduct must be analyzed cumulatively, Detective Tatum's allegedly false trial testimony could support Petitioner's claims notwithstanding Petitioner's admission that he had gone in the victim's house "to get some money," and Mendoza's testimony that he counted $500 in Petitioner's possession after the murders.  (Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 9-10.)

Petitioner has alleged facts that, if proved, could demonstrate the falsity of Detective Tatum's testimony that because of a malfunction, beyond simply running out of tape, the tape recorder stopped taping on side 1.  An evidentiary hearing is necessary to resolve the credibility and weight of the witnesses' testimony.  *See Earp*, 431 F.3d at 1173.  Accordingly, this portion of Claim 1(2) will be included within the scope of the evidentiary hearing.

## X.   Claim 2(1) as to Conflict of Interest and Claim 11(11)

In a portion of Claim 2(1) and in Claim 11(11), Petitioner alleges that he was denied effective assistance of counsel and competent expert assistance as a result of a conflict of interest between Petitioner and his trial counsel, a member of Conflict Defense Associates ("CDA").  A second attorney from CDA represented

Petitioner's co-defendant, David Cerda.  Petitioner alleges his counsel "failed to present and emphasize significant evidence further implicating Cerda in the crimes at issue . . . includ[ing] the fact that a jail-house informant, Dale Rodabaugh, had given a taped statement" to police regarding Cerda's involvement, and "a light blue jacket, size small, was found blood-soaked at the scene, and identified as belonging to Cerda."  (Mot. at 59.)  Petitioner alleges that he received a "perfunctory representation" and that "CDA made Cain the fall guy" and did not challenge the prosecution's theory that Petitioner was the leader of the group.  (*Id.* at 60.)  Petitioner further alleges that the conflict of interest deprived him of competent expert assistance, as the same mental health expert who had evaluated Cerda, Dr. Theodore Donaldson, was asked to examine Petitioner.  (*Id.*; *see also* Pet. at 244 ¶ 661.)  Petitioner argues that "Dr. Donaldson did not address the issue of his potential conflict in evaluating two persons charged with the same crime and incorporating the results of one evaluation into the other."  (Mot. at 61.)

The Court previously considered these claims.  The Court held that "an examination of each of these alleged omissions [by trial counsel] shows that they do not constitute an adverse effect arising from the alleged conflict of interest . . . ."  (Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 17-18.)  In so ruling, the Court considered alleged omissions regarding the statement by informant Rodabaugh, the jacket found at the crime scene, and Petitioner's mental ability to be the group leader, as well as Petitioner's allegation that his representation was "perfunctory" and made him "the fall guy."  (*Id.* at 18-21.)

The Court also considered Petitioner's allegation of a conflict of interest in the use of Dr. Donaldson to evaluate both Cerda and Petitioner.  (*Id.* at 22.)  The Court held that "[u]nless Petitioner can show that attorney John Brown [who asked Dr. Donaldson to evaluate Cerda] was associated with CDA, Petitioner cannot support the allegation that the appointment of Dr. Donaldson was an adverse effect

1   arising from a conflict of interest on the part of his attorney Mr. Wiksell."  (*Id.* at

2   23.)  Petitioner presents no evidence in his Motion that John Brown was associated

3   with CDA.

4          The California Supreme Court could have reasonably denied Petitioner's

5   claims on these grounds.  Petitioner is, therefore, not entitled to federal habeas

6   relief on this portion of Claim 2(1) or on Claim 11(11).  Claim 11(11) is denied.

7   **XI.**   **Claims 2(2) and 2(14) as to Guilt- and Penalty-Phase Concessions and**

8          **Claim 10(1)**

9          Petitioner moves for an evidentiary hearing on his claims that trial counsel

10   provided ineffective assistance by admitting Petitioner's guilt and misrepresenting

11   Petitioner's personal characteristics in his guilt- and penalty-phase opening and

12   closing arguments.  (Mot. at 16-17, 74.)  Petitioner raises these allegations in his

13   Petition as Claims 2(2) (in part, Pet. at 168 ¶ 439), 2(14) (in part, Pet. at 180 ¶ 470

14   ("guilt phase closing argument . . . telling the jury that Mr. Cain was a 'bad guy'

15   who should be convicted for 'what he has done'"), and 10(1).  Petitioner's specific

16   allegations are set forth below.

17          **A.**   **Application of *Strickland* Standard**

18          So long as counsel's opening statement and closing argument do not

19   "abandon all meaningful adversarial testing of the prosecution's case," counsel's

20   performance is subject to analysis under the *Strickland* standard of error and

21   prejudice.  *United States v. Thomas*, 417 F.3d 1053, 1059 (9th Cir. 2005)

22   (distinguishing *United States v. Cronic*, 466 U.S. 648 (1984); *United States v.*

23   *Swanson*, 943 F.2d 1070 (9th Cir. 1991)); *Pizzuto v. Arave*, 280 F.3d 949, 958-59

24   (9th Cir. 2002) (applying meaningful adversarial testing standard to penalty phase

25   of capital trial), *concurring and dissenting ops. amended*, 385 F.3d 1247 (9th Cir.

26   2004).

27          The California Supreme Court could have reasonably held that counsel

28   subjected the prosecution's case to meaningful adversarial testing in his guilt-phase

1    and penalty-phase opening statements and closing arguments.

2        In his brief guilt-phase opening statement, counsel asserted that Petitioner

3    did not strike or kill the Galloways (19 RT 5214-16) and that there was no semen,

4    seminal fluid, or trauma as evidence of rape (*id.* at 5215).  In his guilt-phase

5    closing argument, counsel argued the prosecution had not proved robbery beyond a

6    reasonable doubt (23 RT 6114, 6130), asserted the evidence of rape relied upon

7    conjecture and speculation (*id*. at 6117-19, 6124, 6127-29), rebuffed the

8    qualifications of the prosecution's expert witness on rape (*id.* at 6120-24), attacked

9    Mendoza's credibility (*id*. at 6135-43), emphasized that someone else was in the

10   Galloways' house at the time of the murders (*id*. at 6143-45), maintained that

11   Petitioner did not commit the murders and the prosecution had not proved it

12   beyond a reasonable doubt (*id.* at 6145-46), argued that Petitioner was under the

13   influence of alcohol and drugs (*id.* at 6148), and contended that Petitioner lacked

14   any intent to kill necessary to prove the special circumstances beyond a reasonable

15   doubt (*id.* at 6130-33, 6147-49).

16       In his penalty-phase opening statement, counsel argued that a jury found

17   Petitioner not guilty of any felony in connection with one prior crime (24 RT

18   6543); Petitioner's family members cared about his life (*id.* at 6544); Petitioner

19   was a hard worker and a cooperative prisoner (*id.* at 6545); Petitioner was unfairly

20   singled out for the death penalty (*id.* at 6547); and the jury should make a reasoned

21   and merciful choice for a sentence of life without parole (*id.* at 6548).  In his

22   penalty-phase closing argument, counsel reminded the jury that they stated during

23   *voir dire* they would be open to a penalty other than death (*id.* at 6814-15),

24   distinguished Petitioner's crime from premeditated, "abhorrent" murders

25   committed by prior murderers (25 RT 6813, 6815-19, 6829-30, 6835), contended

26   that each alleged prior criminal activity had not been proved beyond a reasonable

27   doubt and/or should not be considered toward a death sentence (*id.* at 6819-23),

28   submitted that there was lingering doubt (*id.* at 6830-31, 6835), argued that it was

45

1    unjust and prejudicial for Petitioner to face the death penalty in comparison to the

2    others involved in the crimes (*id.* at 6831-34), asserted that Petitioner was impaired

3    from drugs (*id.* at 6816-17, 6829-30, 6835, 6843), challenged the prosecution's

4    argument that Petitioner grew up with many advantages (*id.* at 6826), presented

5    Petitioner as a hard worker with good qualities (*id.* at 6827-28, 6835, 6837, 6844-

6    46, 6848), countered any prosecution argument that Petitioner's "attitude" should

7    be considered in aggravation (*id.* at 6843-44), and maintained that a penalty of life

8    without parole would meet all of society's interests in sentencing (*id.* at 6823-25,

9    6837-43, 6847-48).

10    Thus, the state high court could have reasonably determined that counsel

11    submitted the prosecution's case to meaningful adversarial testing during guilt- and

12    penalty-phase opening and closing arguments.  To prevail on a claim of ineffective

13    assistance of counsel based on those arguments, then, Petitioner must demonstrate

14    error and prejudice under *Strickland*.  *Thomas*, 417 F.3d at 1059.

15          **B.    Guilt-Phase Arguments**

16                **1.    Allegations**

17    Petitioner argues it was ineffective assistance for counsel, during his guilt-

18    phase opening statement, to admit Petitioner's "guilt of virtually all the charges    .

19    . . [and] that he had a 'strong suspicion' that Mr. Cain was the actual killer"[8] (Pet.

20    at 168 ¶ 438).  Petitioner alleges counsel was ineffective during guilt-phase closing

21    argument for "ma[king] even more serious admissions regarding Mr. Cain's guilt,"

22    (*id*. at 168 ¶ 439), including "telling the jury that Mr. Cain was a 'bad guy' who

23    should be convicted for 'what he has done,'" (*id.* at 180 ¶ 470), and "ending with a

24    twice-repeated invitation to the jury to return a verdict finding Mr. Cain guilty" (*id.*

25    at 168 ¶ 439).

26                **2.    Legal Standard regarding Guilt-Phase Arguments**

27

28

[8]  (*See infra* p. 50 n.9 (regarding "strong suspicion" statement in closing, not opening, argument).)

"[I]n some cases a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or his guilt of one of several charges." *Swanson*, 943 F.2d at 1075-76 (holding petitioner was presumptively prejudiced where, unlike here, defense counsel "told the jury that no reasonable doubt existed as to his client's identity as the perpetrator of the only crime charged in the indictment") (internal quotation omitted).  In *Visciotti v. Woodford*, for example, the Ninth Circuit held that counsel's concession of defendant's guilt of felony murder, in an attempt to distinguish premeditated murder, was not prejudicial.  288 F.3d 1097, 1108 (9th Cir.), *rev'd on other grounds*, 537 U.S. 19 (2002).  On facts quite similar to those at hand, the court reasoned:

> One can question [counsel's] closing argument strategy . . . since the jury could convict [defendant] of first degree murder under the felony murder rule without finding premeditation or a specific intent to kill.  It is important to keep in mind, however, the context in which [counsel] was lawyering.  This was a death penalty case in which the prosecution was making a strong effort to portray the murder and attempted murder as cold-blooded [and] pre-meditated, . . . and virtually no effective defense to the felony murder charge was available for defense counsel to argue.  In that context, the focus of [counsel's] closing argument [was] on disproving premeditation and the cold-blooded nature of the murder . . . as a jury might be less likely to impose the death penalty on someone convicted of felony murder, as opposed to someone who set out to commit a pre-meditated murder."

*Id.* at 1107 (affirming denial of guilt-phase ineffective assistance of counsel claim).

The United States Supreme Court reached a similar conclusion in *Florida v. Nixon*, 543 U.S. 175 (2004).  There, the Court held that trial counsel was not ineffective for conceding guilt on capital murder charges in both opening and closing argument, where the defendant confessed to the murder to police and

others, witnesses saw the defendant with the victim and with her belongings, and the defendant's palm print was found on her car as he described.  *Id.* at 180.  The Court found it reasonable that counsel "feared that denying [defendant's] commission of the kidnaping and murder during the guilt phase would compromise [counsel's] ability to persuade the jury, during the penalty phase . . . .  [Counsel] concluded that the best strategy would be to concede guilt, thereby preserving his credibility in urging leniency during the penalty phase."  *Id.* at 181; *see also Rushing v. Butler*, 868 F.2d 800, 805 (5th Cir. 1989) (holding petitioner demonstrated neither deficient performance nor prejudice where counsel's remarks were "an accurate reflection of the record in th[e] case," and counsel conceded, "I'm not asking you to acquit this man, because he's admitted from that stand that he was there.  He was there, and he's a principal there").

### 3.    Resolution of Claim on Direct Appeal

Petitioner raised this claim on direct appeal.  *See Cain*, 10 Cal. 4th at 29-31, 79-80.  The California Supreme Court held:

> The content of defense counsel's statements can be judged from the following excerpts from his closing guilt phase argument:

> 'First of all burglary.  Did Mr. Cain go in the Galloway home to steal?  Yeah, he did.  I said so in my opening statement, but that wasn't evidence.  The evidence was from his own lips to the police.  He stole.

> What about murder?  Is the defendant guilty of murder?  Well, this may surprise you; but in my understanding of the law, yes, he is.  He is guilty of murder.  You may think:  Wow, defense lawyer up there and he's giving away the store.  He's not doing his job.  He's not representing Mr. Cain.  Well, I disagree with that.  I think I am representing him, but I'm also not going to dispute facts that are not in dispute.  Mr. Holmes [the prosecutor] is correct.  If he's engaged in a felony inherently

48

dangerous to human life and somebody dies, each
participant is guilty of murder.

I'm not saying and I won't say that the evidence is Tracy
Cain killed anybody.  My goodness.  That's a big
difference, and I tend [sic:  intend] to stress that this
afternoon.

I submit the evidence is not Tracy Cain personally killed
anybody; but I also submit ladies and gentlemen, that you
don't even get to that part when you're talking about the
murder.  That's the special circumstance, but the murder–
Is he guilty of murder?  The law is clear.  He did
something wrong, and that's burglary.  That's a given.
And somebody died during that.  So it's a given.  He's
guilty.  And he's guilty of murder.' . . .

Defendant also appears to argue his counsel's
concessions were an incompetent tactical choice.  We
disagree.  Defendant admitted to the police on tape he
was inside the victims' residence when they were
murdered and he entered the residence with the intent to
steal money.  His taped statement was played to the jury.
Defendant's admission that he entered the residence for
the purpose of stealing money proved his specific intent
to commit burglary.  Under the felony-murder rule, his
commission of burglary, together with the killing of
the victims in the commission of the burglary, made him
liable for murder.  Under these circumstances, we cannot
conclude counsel was ineffective for candidly admitting
defendant's guilt on these counts, while vigorously
arguing against defendant's guilt of the special
circumstances.

*Cain*, 10 Cal. 4th at 30 n.4, 31 (citations omitted).

### 4.   Analysis

Here, Petitioner confessed during police questioning that he went into the

Galloways' house and was present at the time of the murders and theft.  (Pet. Ex.

177 at 00528, 00535-36, 00538-41, 00547-48.)  He admitted that he "wanted to get

some money . . . ." (*Id.* at 00535.)  At one point in the interrogation, Petitioner appears to have admitted that he hit or touched Mr. or Mrs. Galloway. (*Id.* at 00538.)  Petitioner confessed that he returned to the house the next day to wipe away fingerprints. (*Id.* at 00534, 00542-45.)

In the face of these confessions, counsel conceded in his guilt-phase opening argument that Petitioner was guilty of burglary.[9] (19 RT 5214.)  He maintained, however, that Petitioner "did not inflict blows on Mr. Galloway or Mrs. Galloway" and did not kill them. (*Id.* at 5214-16.)  In his guilt-phase closing argument, counsel acknowledged that Petitioner was guilty of felony murder. (23 RT 6115.)  As the California Supreme Court held, Petitioner's "admission that he entered the residence for the purpose of stealing money proved his specific intent to commit burglary.  Under the felony-murder rule, his commission of burglary, together with the killing of the victims in the commission of the burglary, made him liable for murder." *Cain*, 10 Cal. 4th at 31 (citations omitted).  It was in that context that counsel told the jury that Petitioner was "a 'bad guy'" who should be convicted "for 'what he has done,'" namely, burglary, not premeditated murder. (Pet. at 168 ¶ 439, 180 ¶ 470; *see also* 23 RT 6149-50 ("It has to be on evidence and the special circumstance that he [] either was the actual killer or he intended to kill. . . .  I hope you don't fall into the trap . . . to let it slop over.  Yeah, he's a bad guy.  He did something wrong.  He's guilty of burglary.  He's guilty of felony murder. . . . Convict him for what he did, not for what you think he might have done").)

Counsel repeatedly argued that Petitioner was not the actual killer and did not intend for the victims to be killed, and that the jury could not find true the alleged special circumstances on that basis. (23 RT 6116, 6131-33, 6145, 6149-

---

[9] Petitioner's allegation that counsel conceded during opening argument "that he had a 'strong suspicion' that Mr. Cain was the actual killer" (Pet. at 168 ¶ 438) is misplaced.  It was during closing, not opening, argument that counsel asserted that while there was "probably [a] strong suspicion" that Petitioner killed the Galloways, that suspicion did not rise to the necessary level of proof beyond a reasonable doubt. (23 RT 6145.)

1  50.)  As in *Visciotti*, counsel's arguments that the murders were not premeditated

2  likewise furthered his penalty-phase arguments against imposition of the death

3  penalty.  By giving the jury reason to believe that "[i]f there's not an issue in

4  dispute, I'm not going to dispute it," (23 RT 6110), counsel preserved his

5  credibility in challenging the contested issues and "in urging leniency during the

6  penalty phase."  *Nixon*, 543 U.S. at 181.  The state high court was, therefore, not

7  unreasonable in holding that "[u]nder these circumstances, we cannot conclude

8  counsel was ineffective for candidly admitting defendant's guilt on these counts,

9  while vigorously arguing against defendant's guilt of the special circumstances."

10 *Cain*, 10 Cal. 4th at 31 (citations omitted).

11        **C.      Penalty-Phase Arguments**

12               **1.       Allegations**

13        Petitioner argues it was ineffective assistance for counsel, during his

14 penalty-phase opening statement, to state that Petitioner "had done 'bad and

15 terrible things' in his life."  (Pet. at 122 ¶ 283 (citing RT 6542).)  He also alleges

16 counsel was ineffective during penalty-phase closing argument for stating "no less

17 than ten times either that there was 'no excuse' for Mr. Cain's conduct, or similarly

18 that it was 'inexcusable'" (*id.* at 122 ¶ 283, 133 ¶ 315 (citing RT 6813, 6815, 6821,

19 6823, 6848)); presenting "a scenario of the crime that depicted Mr. Cain as the

20 actual killer of the Galloways" (*id.* at 122 ¶ 283, 133 ¶ 315 (citing RT 6818)); and

21 "[a]ffirming the correctness of the jury's decision to return a guilty verdict stating,

22 'I don't think that it's a decision that you arrived at lightly.  I think you weighed all

23 of the evidence, and I submit that it was a decision that you arrived at after careful

24 deliberation of that evidence'" (*id.* at 123 ¶ 283, 133 ¶ 315 (citing RT 6812)).

25               **2.       Legal Standard regarding Penalty-Phase Arguments**

26        "An attorney's decision to concede guilt in the sentencing phase of a trial is

27 not necessarily an unreasonable tactical decision.  When the evidence against a

28 defendant in a capital case is overwhelming and counsel concedes guilt in an effort

1  to avoid the death penalty, 'counsel cannot be deemed ineffective for attempting to

2  impress the jury with his candor[.]'" *Stenson v. Lambert*, 504 F.3d 873, 890 (9th

3  Cir. 2007) (holding counsel was not ineffective for acknowledging in penalty

4  opening statement that the defense accepted the verdict without reservation and

5  understood it was supported by the evidence) (quoting *Florida v. Nixon*, 543 U.S.

6  175, 192 (2004)).  In *Stenson*, the Ninth Circuit agreed with the district court that

7  "the jury might have reacted 'positively' to [counsel's] decision to concede guilt in

8  the penalty phase 'because it showed that [counsel] and [defendant] respected . . .

9  the jury's finding, thereby gaining credibility with the jury.'" 504 F.3d at 891; *see*

10  *also Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (holding same).

11        Counsel "may even concede that the jury would be justified in imposing the

12  death penalty, in order to establish credibility with the jury." *Carter v. Johnson*,

13  131 F.3d 452, 466 (5th Cir. 1997) (holding penalty-phase closing argument was

14  not ineffective where counsel urged the jury to return life imprisonment rather than

15  death, while implying that defendant may have committed other crimes,

16  questioning whether death was a worse punishment, and conceding that jury could

17  sentence death with a clear conscience); *see also Riley v. Cockrell*, 339 F.3d 308,

18  315-17 (5th Cir. 2003) (holding same, despite counsel's comment that "I'm not

19  asking you to look at mitigation.  It's not – not there.  Wouldn't lie to you,"

20  because counsel sought credibility with jury and greater emphasis on future

21  dangerousness, and argued that justice demanded a life sentence rather than death).

22  More specifically, counsel may reasonably concede the truth of the aggravating

23  factors alleged.  *Windom v. McNeil*, 578 F.3d 1227 (11th Cir. 2009) (finding no

24  deficient performance or prejudice in counsel's opening and closing penalty

25  arguments); *Brown v. Dixon*, 891 F.2d 490, 499 (4th Cir. 1989); *see also  Hooker*

26  *v. Mullin*, 293 F.3d 1232, 1247 (10th Cir. 2002) (holding counsel was not

27  ineffective in penalty-phase closing argument for conceding that photographs in

28  evidence were "especially heinous, atrocious and cruel by any stretch of the

52

imagination," "referring to some of the negative aspects of [defendant's] prior

convictions," and "acknowledg[ing] [defendant] previously killed his best friend   .

. . to retain credibility with the jurors").

### 3.    Resolution of Claim on Direct Appeal

Petitioner raised this claim on direct appeal.  *See Cain*, 10 Cal. 4th at 29-31,

79-80.  The California Supreme Court reasoned:

> Defendant [] complains of a single sentence in counsel's
> argument on premeditation that defendant interprets as a
> concession he was the actual killer.[]  After describing a
> premeditated execution-style killing, counsel argued:
> 'That's a far cry from a person who is so drug-impaired,
> he goes in there, stumbles around trying to get some
> money, and he acts in a rage reaction because that's what
> happened.'  In context, and in light of counsel's express
> reminder defendant has 'denied that [he was the killer] all
> the way through,' and counsel's urging that the evidence
> left room for lingering doubt, the remark is more
> reasonably understood as urging the jury to consider the
> mitigating circumstances of the killings even if they
> believed defendant committed them.  Such an argument
> was proper, indeed unavoidable, in light of the guilt
> phase verdicts, which strongly indicated the jurors
> accepted the prosecution theory defendant was the actual
> killer.

*Id.* at 80, 80 n.33.

That reasoning was consistent with the court's holding regarding another

statement by counsel in penalty-phase closing argument, that "'[t]hat makes this

case not excusable, *but certainly not as bad as some of these others*.' . . .

Counsel's line of argument, while ultimately unsuccessful, was reasonable and

clear.  The jurors could not have failed to understand he was arguing lack of

premeditation and deliberation was a mitigating circumstance of the crimes."  *Id.* at

79-80 (emphasis in original).

### 4.    Analysis

The state high court was not unreasonable in determining, as the courts did in *Stenson* and *Fox*, that counsel's respectful treatment of the jury's verdict was not ineffective or prejudicial.  Similarly, the court may have reasonably concluded that counsel's acknowledgment that Petitioner "had done 'bad and terrible things' in his life" was not ineffective or prejudicial in light of the jury's verdict and the prosecution's aggravating evidence.  (Pet. at 122 ¶ 283 (citing 25 RT 6542); *see also* 25 RT 6819-23 (attacking evidence offered in aggravation)); *Windom*, 578 F.3d at 1246 (holding counsel may reasonably concede aggravating factors); *Brown v. Dixon*, 891 F.2d at 499 (same); *Hooker*, 293 F.3d at 1247 (holding counsel was not ineffective for "referring to some of the negative aspects of [defendant's] prior convictions" and "acknowledg[ing] [defendant] previously killed his best friend . . . to retain credibility with the jurors").

The court could have reasonably held that, in context, counsel's "scenario" depicting Petitioner as the killer served to argue that even though the jury found either that Petitioner was the killer or intended to kill, the circumstances of the murders were "a far cry" from those of premeditated, more "abhorrent" murders that might warrant the death penalty.  (25 RT 6818.)  Likewise, the court could have taken counsel's statements that he was "not going to excuse inexcusable conduct" to be another effort to distinguish the instant murders from deliberate, premeditated murder.  Counsel argued:

> You can't excuse inexcusable conduct.  He should be
> punished for what he did, yes.  Yes, he should, and that's
> the decision that you have to make is what is the
> appropriate proper punishment.  Not as an excuse. . . . I
> could never come up with an excuse for a deliberate
> killing.  That doesn't exist.  What you have to do is
> determine whether or not this killing is the type of killing
> and this person is the type of person that should be
> executed or should he spend the rest of his life in jail.

(*Id.* at 6813-14; *see also id.* at 6823.)  In light of the jury's verdict, the court was

1    not unreasonable in holding that counsel's effort to distinguish these murders from

2    others that could deserve death as punishment was not ineffective or prejudicial.

3    *See Carter*, 131 F.3d at 466.

4         The California Supreme Court's denial of Petitioner's claim of ineffective

5    assistance of counsel in penalty-phase arguments was, therefore, not an

6    unreasonable application of Supreme Court precedent.

7         ### D.   Admissions Made Without Petitioner's Consent

8         Finally, Petitioner alleges the "admissions of guilt, and characterizations of

9    Cain's conduct, were made without Cain's prior knowledge, and without his

10   consent." (Pet. at 229 ¶ 607; Mot. at 17.)  First, as a matter of law, in the penalty

11   phase and "even during the guilt phase, an attorney is not required to obtain a

12   defendant's 'affirmative, explicit acceptance' of his strategy, so long as the

13   attorney continues to 'function in [a] meaningful sense as the Government's

14   adversary.'"  *Stenson*, 504 F.3d at 891 (quoting *Nixon*, 543 U.S. at 188, 190);

15   *compare United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005)

16   ("assum[ing] that counsel's concession of guilt without consultation or consent is

17   deficient," and finding no prejudice).  As discussed above (*supra* pp. 44-46), the

18   California Supreme Court would not have been unreasonable in holding that

19   counsel subjected the prosecution's case to meaningful adversarial testing in both

20   guilt- and penalty-phase opening and closing arguments.

21        Second, the court may have reasonably determined that Petitioner's

22   conclusory and unsupported allegation fails to establish that counsel did not inform

23   him of the strategy or seek his consent.  Petitioner did not provide a declaration in

24   support of his claim, nor did he provide a declaration from trial counsel.  He did

25   not personally verify the allegations in his Petition; the Petition is verified only by

26   habeas counsel.  Petitioner does not even suggest that he would provide his own

27   testimony at the evidentiary hearing in support of this claim.  (*Compare* Mot. at 24,

28   64 ("Petitioner intends to submit evidence on this claim at a hearing through . . .

the testimony of . . ., if necessary, Petitioner") *with* Mot. at 17 (no such proposal).)

Similarly, Petitioner does not allege, for example, what strategies, if any, counsel

did discuss with him or how frequently or infrequently he met with counsel before

trial.  The state high court would not have been unreasonable in finding

Petitioner's claim that the admissions were made without his knowledge or consent

to be without merit.

The court's resolution of these claims was not unreasonable.  Claims 2(2)

and 2(14) as to guilt- and penalty-phase concessions, and Claim 10(1) are denied.

## XII.   Claim 2(7)

In Claim 2(7), Petitioner alleges trial counsel was ineffective for failing to

conduct an adequate investigation into "many critical issues, including but not

limited to Mr. Cain's competency to provide a knowing and intelligent waiver of

his right to counsel."  (Pet. at 178 ¶ 460.)  The Petition makes no other allegations

in support of the claim.  Petitioner's Motion adds only that:

> significant evidence pre-dating trial [] was available to
> document that Cain suffers from organic brain damage,
> borderline mental retardation, mental impairments in the
> moderately severe range and learning disabilities, and is
> incapable of processing verbal information and
> accusation, particularly in a high stress environment such
> as an interrogation by police officers employing coercive
> tactics subjecting him to duress in order to obtain a
> confession.

(Mot. at 68-69.)

Petitioner fails to specify in what ways police officers "employ[ed] coercive

tactics."  (*Id.*)  Petitioner must establish coercive police conduct to be entitled to

relief.  "The sole concern of the Fifth amendment, on which *Miranda* was based, is

governmental coercion. . . .  The voluntariness of a waiver of this privilege has

always depended on the absence of police overreaching, not on 'free choice' in any

broader sense of the word."  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)

1  (holding petitioner's "perception of coercion flowing from the 'voice of God' . . .

2  is a matter to which the United States Constitution does not speak"); *California v.*

3  *Kelly*, 51 Cal. 3d 931, 951 (1990) (applying *Connelly* on direct appeal and holding

4  that "defendant's low intelligence and psychiatric symptoms, standing alone, do

5  not render his waiver of *Miranda* rights involuntary").

6          Thus, without alleging specific facts to establish police overreaching,

7  Petitioner cannot demonstrate that counsel reasonably likely could have prevailed

8  had he made a motion to exclude Petitioner's statement.  *See Jones*, 66 F.3d at 204

9  ("[C]onclusory allegations which are not supported by a statement of specific facts

10  do not warrant habeas relief" (internal quotation omitted)); *Juan H.*, 408 F.3d at

11  1273 ("trial counsel cannot have been ineffective for failing to raise a meritless

12  objection"); *Wilson*, 185 F.3d at 990 ("To show prejudice under *Strickland* from

13  failure to file a motion," petitioner must show, in part, that "had his counsel filed

14  the motion, it is reasonable that the trial court would have granted it as

15  meritorious"); *Molina*, 934 F.2d at 1447 (holding that because evidence was

16  admissible, "the decision not to file a motion to suppress it was not prejudicial. . . .

17  [I]t is not professionally unreasonable to decide not to file a motion so clearly

18  lacking in merit").  The California Supreme Court may have reasonably concluded

19  that since a motion to exclude the statement would not reasonably likely have

20  succeeded for the lack of police coercion, Petitioner was not prejudiced by any

21  error of trial counsel in not investigating his mental health at the time he waived

22  his *Miranda* rights.  *See Strickland*, 466 U.S. at 694 ("defendant must show that

23  there is a reasonable probability that, but for counsel's unprofessional errors, the

24  result of the proceeding would have been different").

25          Petitioner has, therefore, failed to allege facts that, if proved, could entitle

26  him to relief in Claim 2(7).  The California Supreme Court's rejection of this claim

27  was not an unreasonable application of Supreme Court precedent.  Accordingly,

28  Claim 2(7) is denied.

### XIII.  Claims 2(12), 2(17), and 10(13) as to Footprints, Cerda's Presence, and Petitioner's Leadership Capacity

In portions of Claims 2(12), 2(17), and 10(13), Petitioner alleges counsel was ineffective for failing to present additional evidence regarding the timing of the bloody footprints found in the Galloways' home, Cerda's presence in the home, and Petitioner's ability to be the leader of any group that committed the crimes. (Pet. at 98-99 ¶¶ 208-11, 179 ¶¶ 465-67, 181 ¶ 474 ("defense counsel's failure to present the significant evidence rebutting the prosecution's contention that Mr. Cain alone entered the house"); Mot. at 70-71, 75.)

Petitioner's claims are founded upon the misconception that "[t]he jury could only convict Cain of first degree murder and find all of the special circumstances true if it believed Mendoza's testimony and the prosecutor's theory that Cain alone entered the house." (Mot. at 70.)  In actuality, as the California Supreme Court observed, the jury could convict Petitioner of first degree murder and find the special circumstances true if it believed Petitioner intended to kill the Galloways, even if someone else was also in the house and Petitioner was not the actual killer.  *See Cain*, 10 Cal. 4th at 51; (Pet. Ex. 177 at 00528, 00535-36, 00538-41, 00547-48 (Petitioner's admission that he was in the house at the time of the murders); *see also* 23 RT 6169 (prosecution's statement in closing that "[e]ven if [Cain] isn't the killer, if he went in there and two people were killed, that multiple murder special circumstance is true").)

#### A.  Footprints

Regarding the bloody footprints, Petitioner argues that the prosecution's theory that he alone entered the house "required proof that the bloody footprints of other individuals were made significantly after the crimes . . . ."  (Mot. at 70.) Expert testimony at trial established a window of time after the crimes were committed when the pool of blood would have been wet enough to form footprints, without showing a disturbance.  Petitioner claims that the prosecutor argued that

58

the footprints were created when other individuals went into the house the following morning, still during that window of time.  Petitioner argues that trial counsel should have presented certain evidence that others did not enter the house until after the window of time had closed, and that the footprints therefore must have been made at the time of the crimes.  Specifically, Petitioner contends that trial counsel was ineffective for failing to present the testimony of nine- and ten-year-old Tammy and Jennifer O'Neil, who reported hearing voices inside the house the day after the murders.

Petitioner argues:

> The prosecution presented evidence that the crimes occurred around midnight on Friday, October 17, 1986. (RT 5482:26-5485:15.)  As previously noted, the uncontested expert testimony was that the bloody footprints at the crime scene *not* belonging to Cain were left when the blood was still wet, which had to be 8 hours or less after the murders.  (RT 5581:3-5582:11.) Therefore, the prosecutor asserted in closing argument that these footprints were made at 9:00 a.m. the next day, when other individuals went in to view the scene.  (RT 6057:26-6059:6.)  According to evidence that Mr. Cain's counsel possessed but did not present at trial, the individuals did not enter the house until noon the next day, long after the blood would have dried.  (Statements by Tammy and Jennifer O'Neil, in . . . Exhibit 103, and Selected Documents From Trial Files, Exhibits 99-101.) Accordingly, footprints not belonging to Cain *had* to be made at the time of the crime.

(Pet. at 98 ¶¶ 208-09 (emphasis in original).)  Tammy and Jennifer O'Neil told police they heard whispering inside the Galloway home when they rang the doorbell between 11:00 and 11:25 a.m. on Saturday, selling calendars.  (Pet. Ex. 103.)  The evidence was not presented at trial.

Defense counsel nevertheless succeeded at trial in casting significant doubt on the possibility that the others' footprints were made after the time of the crimes.

59

1     As Petitioner acknowledges, the prosecution "presented evidence that the murders

2     occurred around midnight . . . [and] asserted in closing argument that these

3     footprints were made at 9:00 a.m.," (Pet. at 98 ¶ 208), a span of roughly nine hours.

4     Counsel established that the window of time when the footprints could have been

5     made was likely only six hours after the murders. (*See* 20 RT 5581, 5591.)

6     Through counsel's cross-examination, the expert testified that if the footprints had

7     been made six or more hours later, he would expect to see a disturbance in the pool

8     of blood that was tracked in the footprints, and no disturbance was present. (*Id.* at

9     5591.) Counsel emphasized this point in closing argument. (23 RT 6144.) Indeed,

10    the prosecutor acknowledged that the footprints in some way supported

11    Petitioner's claim that he did not kill the Galloways, calling the footprints

12    "ambiguous support." (22 RT 6057-59.)

13          The extent to which the O'Neils' testimony could have provided additional

14    support for Petitioner's defense cannot be determined without an evidentiary

15    hearing. *See Earp*, 431 F.3d at 1173. While Petitioner concedes that counsel

16    "possessed" the evidence, it is unclear whether counsel interviewed or otherwise

17    investigated the O'Neils, and whether he made a strategic decision not to present

18    their testimony. Likewise, the nature and weight of any testimony the O'Neils

19    could have given cannot be determined on the face of the documents Petitioner

20    provides. Accordingly, the Court will include Claims 2(12), 2(17), and 10(13) as

21    to Tammy and Jennifer O'Neil within the scope of the evidentiary hearing.

22          **B.     Cerda's Presence**

23          The California Supreme Court may have reasonably determined that

24    Petitioner failed to allege facts to demonstrate prejudice from counsel's alleged

25    failure to present evidence regarding Cerda's presence in the house. Petitioner

26    asserts that trial counsel should have presented evidence from Dale Rodabaugh.

27    (Pet. at 98-99 ¶ 210, 163 ¶ 429(a).) Rodabaugh, an inmate housed with Cerda at

28    the Ventura County jail, told police that Cerda told him that he went inside the

60

Galloways' house to help Petitioner "with the intent of causing damage to the victims because he had heard [Petitioner] yell something." (Pet. Ex. 103.) Cerda purportedly told Rodabaugh that once he entered the house "he saw that both victims were dead at which time [Petitioner] and he ran." (*Id.*)

The California Supreme Court may have reasonably concluded, as this Court did in its September 2002 Order, that "[a]t best, the Rodabaugh testimony could only establish that Cerda was present in the Galloway house *after* the murders had been committed . . . ." (Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 19 (emphasis added).) The court may have reasoned that Rodabaugh's testimony could not have strengthened Petitioner's defense and could have weakened it. Accordingly, the court's determination that Petitioner failed to present any evidence that adequate counsel should have presented at trial, or to allege facts showing a reasonable likelihood of a different outcome at trial would not have been an unreasonable application of Supreme Court precedent. Claims 2(12), 2(17), and 10(13) as to Cerda's presence in the Galloways' house are denied.

## C.    Petitioner's Leadership

Finally, regarding Petitioner's capacity to be the leader of a group that committed the crimes, Petitioner alleges trial counsel failed to present evidence that Petitioner "suffered from organic brain damage, learning disabilities, and border-line retardation" that rendered him unable to be such a leader. (Mot. at 70; Pet. at 99 ¶ 211 (citing Pet. Exs. 169-172), 163 ¶ 429(b).) Petitioner argues that Petitioner's leadership status was "of paramount importance to the prosecution's theory that Cain alone committed the crimes." (Mot. at 70.) Petitioner also alleges that the prosecution's theory required "proof that the mentally impaired Cain was a 'leader' who could coerce Cerda into helping lift the garage door and threaten Mendoza into helping him dispose of the stolen property." (*Id.* at 70-71.)

As the Court observed in its September 2002 Order:

61

1      "At trial the parties stipulated to the ages of the individuals at the party at the

2   Cain house on the night of the murders, who arguably had some knowledge of the

3   murders.  Petitioner, who was almost twenty-four years old, was the oldest of the

4   group, with the others ranging in age from seventeen to twenty-two.  In his closing

5   argument the prosecutor argued that if there was a leader of the group, it would

6   have to be Petitioner.  He pointed out that the group always met at the Cain house,

7   that Petitioner initiated the group's shopping excursion, and that physically he was

8   the strongest, as well as the most aggressive.  RT 6061-63.

9      Trial counsel attempted to refute the prosecutor's theory that Petitioner was

10   the leader, pointing out that neither age nor physical size would establish

11   leadership of the group.  RT 6134.  He also argued that Petitioner was relatively

12   new to the Oxnard area, and there was no evidence that people looked up to

13   Petitioner as a leader.  RT 6134-35.  Trial counsel had already been advised by Dr.

14   Theodore S. Donaldson, Ph.D., a clinical psychologist, that there were no

15   psychological issues that would bear on the legal issues in Petitioner's case."

16   (Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 20-21.)

17      As the Court has held, it is a reasonable conclusion that the appointment of

18   Dr. Donaldson was not an adverse effect arising from a conflict of interest.  (*See*

19   *supra* pp. 43-44; Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002,

20   at 17-18.)  For that reason, this Court held that "it is highly unlikely that the

21   alleged conflict of interest resulted in trial counsel foregoing the presentation of

22   evidence that would have established that Petitioner could not have been the leader

23   . . . ."  (*Id.* at 21.)

24      However, "whether trial counsel's performance with respect to the retention

25   of Dr. Donaldson was constitutionally adequate" has not been resolved.  (*Id.* at 24;

26   *see infra* p. 106.)  Petitioner presents declarations from other mental health experts

27   to support his claim that defense counsel failed to present available evidence

28   regarding his lack of leadership capacity.  (*See* Pet. at 99 ¶ 211 (citing Pet. Exs.

169-172).)  The reports by psychiatrist Jay Jackman, M.D., and clinical
psychologist Karen Bronk Froming, Ph.D., include notations that Petitioner's
sixth-grade teacher observed that Petitioner was "[a] leader, but of those who are
'losers.'"  (Pet. Ex. 169 ¶ 32; Pet. Ex. 170 ¶ 38.)  Drs. Jackman and Froming
express no other explicit information or opinions regarding Petitioner's leadership
capability.  Dr. Donaldson, a clinical psychologist, declared in 1998 that he agreed
with the conclusions reached by Dr. Jackman.  (Pet. Ex. 172 ¶ 16.)

The report by clinical psychologist Ruth Zitner, Psy.D., contains the same
observation by Petitioner's sixth-grade teacher (Pet. Ex. 171 at 25 ¶ 44), but
ultimately concludes that Petitioner's difficulties "impair his leadership
capabilities, making him more apt to be a follower." (*Id.* at 64 ¶ 117.)  Dr. Zitner
refers to Petitioner's "extensive neurological impairments in academics, memory,
attention, problem solving, conceptualizing, as well as motor difficulties, . . .
severe enough to put him in the moderate range of global impairment [and] . . .
reflected in Tracy's difficulties navigating the world." (*Id.* at 63 ¶ 117.)  She
reports that Petitioner "has difficulty integrating complex data, and typically reacts
impulsively to frustration." (*Id.* at 63-64 ¶ 117.)  Dr. Zitner opines that Petitioner's
deficits impair his leadership ability, and that he "lacks both the intelligence and
the charisma to be a leader . . . ." (*Id.* at 64-65 ¶ 117.)

### 1.    Claims 2(12) and 2(17)

In Claims 2(12) and 2(17), Petitioner argues trial counsel was ineffective for
failing to present expert testimony regarding his lack of leadership capacity at the
guilt phase of trial.  The California Supreme Court could have reasonably
determined, however, that such evidence was inadmissible at the guilt phase of
trial.  As the state high court observed in *California v. Saille*, legislative changes to
the California Penal Code in 1981 "limited psychiatric testimony" admissible in
the guilt phase.  54 Cal. 3d 1103, 1111 (1991).  The legislature added California
Penal Code § 28 that provided, as amended in 1982 and as it does now, that

1  "[e]vidence of mental disease, mental defect, or mental disorder shall not be

2  admitted to show or negate the capacity to form any mental state," but is

3  "admissible solely on the issue of whether or not the accused actually formed a

4  required specific intent, premeditated, deliberated, or harbored malice aforethought

5  . . . ." Cal. Penal Code § 28.  The California Supreme Court could have reasonably

6  concluded that whether Petitioner could have been the leader of the group was a

7  distinct issue from whether Petitioner actually formed a required specific intent,

8  premeditated, deliberated, or harbored malice aforethought.  The court could have

9  determined, therefore, that Section 28 would have barred the admission of such

10  mental health evidence, and thus that trial counsel could not have been ineffective

11  for failing to present it.  *See Juan H.*, 408 F.3d at 1273; *Molina*, 934 F.2d at 1447;

12  *see also Fretwell*, 506 U.S. at 370.  Accordingly, this portion of Claims 2(12) and

13  2(17) is denied.

14             **2.  Claim 10(13)**

15       In Claim 10(13) (in part), Petitioner argues that counsel failed to present

16  such evidence at the penalty phase of trial, to support a lingering doubt argument in

17  mitigation.  Without further development of the record, it is impossible to

18  determine what effect, if any, counsel's presentation of expert testimony that

19  Petitioner could not have been the leader may have had on Petitioner's penalty-

20  phase trial.  *See Earp*, 431 F.3d at 1173; *Bonin v. Calderon*, 59 F.3d 815, 834 (9th

21  Cir. 1995) (holding that when a petitioner claims that defense counsel failed to

22  present evidence in mitigation, "in order to determine whether [counsel's actions]  .

23  . . might have affected the jury's decision, it is essential to compare the evidence

24  that actually was presented to the jury with the evidence that might have been

25  presented had counsel acted differently").  Accordingly, Claim 10(13) as to

26  Petitioner's leadership capacity shall be included within the scope of the

27  evidentiary hearing.

28

1  **XIV.  Claims 10(5), 10(7), 10(12), and 2(13), and Claims 2(14) and 2(17) as to**
2  **Diminished Capacity Defense**

3         In Claims 10(5) and 10(7), Petitioner alleges counsel was ineffective at the
4  penalty phase because he did not attempt to bar the special circumstance
5  instruction and finding regarding attempted rape, and its consideration as an
6  aggravating factor.  (Mot. at 20, 23; Pet. at 233 ¶ 621 (incorporating Third Claim
7  for Relief), 234 ¶ 627.)  In Claim 10(5), Petitioner incorporates the allegation that
8  the jury, through counsel's efforts, should have been instructed on "the availability
9  of intoxication as a defense" to the attempted rape special circumstance allegation.
10  (Pet. at 203 ¶ 527, 233 ¶ 621.)

11         The foundation of Petitioner's claims is that the jury was "instructed on and
12  consider[ed] a special circumstance finding of attempted rape when Cain had never
13  even been charged with attempted rape."  (Mot. at 20.)  The crime of attempted
14  rape required, as it does today, a specific intent not required for the crime of rape.
15  *Osband*, 13 Cal. 4th at 692 ("An attempt was defined, at the time defendant
16  attacked [the victim in October 1985], as an intent to commit a crime coupled with
17  a direct but ineffectual act toward its commission") (citing *Memro*, 38 Cal. 3d at
18  698); Cal. Penal Code § 21a, added by Stats. 1986, ch. 519, § 1, p. 1859 (later
19  codifying rule)); *see also* Cal. Penal Code §§ 261, 664.  Petitioner argues the lack
20  of notice of the charge "prejudiced Petitioner, since defense counsel could not
21  present a single witness regarding the 'attempted rape' allegation; did not examine
22  any of the witnesses presented on the rape allegation about the possibility of
23  'attempted rape'; and did not address the 'attempted rape' charge in either the
24  opening or closing arguments."  (Pet. at 176 ¶ 454(ii).)[10]  However, Petitioner fails

25  ─────────────────────

26  [10]  Petitioner makes this argument to support his claim that trial counsel was ineffective at the guilt
27  phase for failing to contest or defend against the attempted rape special circumstance allegation.
    (Claim 2(5)).  Petitioner moves for an evidentiary hearing on the issue only at the penalty phase of
28  trial, not at the guilt phase.  Nevertheless, the consideration of the attempted rape special
    circumstance at the penalty phase could only be the result of ineffective assistance of counsel if

65

to allege any specific facts that adequate counsel could have established at trial had Petitioner had notice of the attempted rape charge, apart from that of his intoxication at the time of the crimes.  *See United States v. Martin (Wayne)*, 783 F.2d 1449, 1453 (9th Cir. 1986) (finding no constitutional error where counsel was put on notice of charge weeks before conviction and did not move to reopen the defense, because "there was in fact no defense to the specific intent element"), *abrogated on other grounds by Schmuck v. United States*, 489 U.S. 705 (1989); *see also* L.R. 83-17.7(g) (2003) (requiring petitioner to specify factual issues and evidence to be presented at hearing); Habeas Corpus R. 2(c)(1)-(2) (requiring petitioner to specify all grounds for relief and supporting facts).

Likewise, in Claims 10(12), 2(13), 2(14) in part, and 2(17) in part, on which Petitioner moves for an evidentiary hearing, Petitioner alleges he was intoxicated and had diminished capacity at the time of the crimes, and that counsel's representation on those issues at both phases of trial was ineffective.  (Mot. at 46, 72-76; Pet. at 180 ¶¶ 469-70, 181-82 ¶ 475, 237 ¶ 636.)

### A.   Background

As the California Supreme Court aptly summarized:

"The original information, the first amended information and the second amended information charged defendant with rape and alleged a special circumstance of murder while engaged in the commission of rape.  The second amended information pleaded the rape special circumstance as follows:  'It is further alleged the murder of Modena Shores Galloway was committed by defendant, Tracy Cain, while the defendant was engaged in the commission of rape in violation of Penal Code Section 261, within the meaning of section 190.2(a)(17).'  Section 190.2, subdivision (a)(17) states in relevant part:  'The

---

counsel's performance was deficient at the guilt phase.  In determining the penalty, the jury properly takes into account any special circumstances found to be true at the guilt phase.  Cal. Penal Code § 190.3(a).

murder was committed while defendant was engaged in or was an accomplice in the commission of, *attempted commission of*, or the immediate flight after committing or attempting to commit the following felonies: . . . Rape in violation of Section 261.'

Following the prosecutor's rebuttal argument in which the prosecutor stressed a finding of attempted rape was sufficient to find defendant guilty of the rape special circumstance, the trial court raised the issue of whether the information had provided defendant with sufficient notice of the attempted rape basis of the special circumstance. The court stated its inquiry was triggered by the fact the information specifically enumerated attempted robbery in the robbery special circumstance allegation, but did not specifically enumerate attempted rape in the rape special [] circumstance allegation. Under these circumstances, the court wished to ascertain whether defense counsel believed he had been misled. The prosecutor reminded the court he had argued attempted rape in his opening statement[11] and attempted rape was included in the agreed jury instruction for the special circumstances. Defense counsel stated he was aware of the differences in the language used in the information, but he also was familiar with section 190.2. He was not surprised by the prosecutor's argument, believed the prosecutor had the right to make the argument, and believed his client was not prejudiced by the prosecutor's reliance upon attempted rape as a basis for the rape special circumstance." *Cain*, 10 Cal. 4th at 41-42 (emphasis in original, footnote added).

Specifically, trial counsel represented to the court:

---

[11] The Court notes that the prosecutor's comment, although not central to the California Supreme Court's reasoning, is inaccurate. The prosecutor made no reference to attempted rape in his opening argument. To the contrary, the prosecutor consistently argued that Petitioner raped Mrs. Galloway. (9 RT 5199, 5209, 5211, 5213.) Although the prosecutor acknowledged that the autopsy surgeon was uncertain if a rape occurred because he believed he produced the tear in the victim's vagina during examination, the prosecutor nevertheless argued, "There's evidence far beyond the tear that shows that a rape took place." (*Id.* at 5210-11.)

"[T]o be quite candid about it, I've read Section 190.2 numerous times.  I'm aware it says commission or attempted commission.  I can't in good conscience say that I am surprised at this late date.  I think it's clear the entire thrust of the testimony from all the doctors was an actual rape; but since the information is really one of notice –  I'm aware of the section.  I'm aware how it is plead, and I'm aware of these jury instructions.  And I'm not going to sit here and pretend that I'm surprised and I'm going to holler foul at the D.A. at this late time.  I'm not going to do that because I'm aware of what – and I know you're not suggesting it either.  You're just bringing it to our attention that the information appears to be defective at least because it is not explicit.  Well, I was aware of it.  I was aware and I heard him and I could have objected but I didn't because I think that he's entitled to argue under Section 190.2 commission or attempted commission.  That's about as plain as I can put it.  I didn't – I didn't address it in my – in my argument because of reasons I think are sound.  I think that involves a great deal of speculation on the jury.  One can have an attempt.  That just involves a great deal of conjecture.  I didn't want to go into that whole other topic.  I wanted to concentrate solely on the rape because I thought I had a very strong defense witness.  But I don't think Tracy Cain and the defense is prejudiced.  Obviously, we'd like to have every count knocked out. . . .  Very sensitive to that rape count, but I cannot in good conscience look for that kind of loophole and try to drive through it."  (23 RT 6195-96.)

**B.**     **Claims 10(5) and 10(7)**

**1.**     **Legal Standard regarding Constitutional Adequacy of Notice**

As the United States Supreme Court observed:

> It is the ancient doctrine of both the common law and of our Constitution that a defendant cannot be held to answer a charge not contained in the indictment brought against him.  This stricture is based at least in part on the right of the defendant to notice of the charge brought

against him.  Were the prosecutor able to request an
instruction on an offense whose elements were not
charged in the indictment, this right to notice would be
placed in jeopardy.

*Schmuck*, 489 U.S. at 717-18 (citations omitted)*; see also In re Oliver*, 333 U.S.
257 (1948).  The Ninth Circuit has held that "a defendant can be adequately
notified of the nature and cause of the accusation against him by means other than
the charging document."  *Calderon v. Prunty*, 59 F.3d 1005, 1009 (9th Cir. 1995)
(finding constitutionally adequate notice where defendant learned of the
prosecution's charges through its opening statement and evidence before the
defendant testified).

An information's "mere citation to a statutory section" that lists several
possible types of violations does not provide adequate notice of the charge.  *Givens
v. Housewright*, 786 F.2d 1378, 1381 (9th Cir. 1986) (regarding embezzlement,
sale, disposal, or receipt of government property); *United States v. Rojo*, 727 F.2d
1415, 1418 (9th Cir. 1983) ("The citation did not inform [defendant] which of
these violations [forms of first-degree murder] he allegedly committed and he
should not have to speculate in this regard"); *cf. Russell v. United States*, 369 U.S.
749, 765 (1962) ("the language of the statute may be used in the general
description of an offense, but it must be accompanied with such a statement of the
facts and circumstances as will inform the accused of the specific offense, coming
under the general description, with which he is charged," "without uncertainty or
ambiguity;" "it must state the species – it must descend to particulars" (internal
quotations omitted)).

Moreover, where counsel "had no occasion to defend against the [crime]
during the evidentiary phase of the trial[,] . . . affect[ing] the composition of the
record," and "[d]efense counsel would have added an evidentiary dimension to his
defense" with adequate notice, the error cannot be found to be harmless.  *Sheppard
v. Rees*, 909 F.2d 1234, 1237 (9th Cir. 1990).  On the other hand, where the

1   defendant is put on notice before conviction that he may be convicted of a specific

2   intent crime, instead of the general intent crime in the indictment, and defendant

3   does not seek to present any evidence in opposition, the court may "conclude that

4   there was in fact no defense to the specific intent element" and no constitutional

5   violation.  *Martin (Wayne)*, 783 F.2d at 1453; *see also United States v. Velasco-*

6   *Medina*, 305 F.3d 839, 847 (9th Cir. 2002) (finding any defect in the indictment

7   harmless where defendant concedes trial counsel "was aware of the nature of the

8   alleged offense and knew that the government needed to prove specific intent").

### 2.   California Supreme Court Ruling on Direct Appeal

10   Considering whether Petitioner received sufficient notice of the attempted

11   rape special circumstance allegation, the California Supreme Court held, "We find

12   no statutory error in the language used to allege the rape special circumstance.

13   Although consistency in the form of charging special circumstances is preferable,

14   the rape special circumstance as alleged satisfactorily 'charged' defendant and was

15   not misleading.  (§§ 190.1, subds. (a) & (c), 190.4, subd. (a).)  Under the statute,

16   the rape special circumstance specifically includes that the crime was committed

17   during the 'attempted commission of a rape.'  (§ 190.2, subd. (a)(17).)  The

18   information specifically referred to the statute defining the special circumstance.

19   Under these circumstances, the rape special-circumstance allegation provided the

20   express notice of the charges against defendant required under state law in a capital

21   case. . . .  Furthermore, since the information was sufficient to provide the required

22   notice, and defendant's counsel stated defendant was neither surprised nor

23   prejudiced by the argument and instructions relating to attempted rape as the basis

24   of the rape special circumstance, defendant's constitutional right to notice of the

25   charges against him was not compromised."  *Cain*, 10 Cal. 4th at 42.

26   The court went on to hold, as to counsel's performance on the attempted

27   rape special circumstance, that "because we find neither error nor prejudice,

28   defendant's ineffective assistance of counsel claim must be rejected also.  We

doubt, moreover, whether the principal 'error' alleged, i.e., counsel's failure to claim surprise and prejudice where there was none, could be considered constitutionally deficient performance even if prejudicial. Effective assistance does not require counsel to refrain from frankness and honesty in his or her dealings with the court." *Id.* at 42 n.17.

### 3. Analysis

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (internal quotation and citation omitted). Here, fairminded jurists could differ about whether Petitioner had adequate notice of the attempted rape special circumstance allegation. Petitioner's counsel represented to the trial court that he was aware that the prosecutor could argue attempted rape and he did not want to delve into that allegation for strategic reasons. It is true that the adequacy of counsel's performance, in claiming that he had notice of the attempted rape allegation and in not presenting evidence or argument on the allegation after the court's inquiry, could be questioned. The California Supreme Court found counsel's performance to be adequate, however, and even if fairminded jurists could disagree about the correctness of that decision, that does not make it unreasonable. *See id.* at 785-86. Thus, in light of the deference afforded the state high court, this Court concludes that the court was not unreasonable in holding that Petitioner had adequate notice.

Independently, as discussed below, the California Supreme Court could have reasonably concluded that trial counsel reasonably relied on expert opinion in not presenting an intoxication or diminished capacity defense, or that Petitioner failed to allege facts to demonstrate any mental state evidence that competent counsel with adequate notice should have presented at trial. Thus, even if the charging document were insufficient, the California Supreme Court could have reasonably

71

1  found any resulting error to be harmless beyond a reasonable doubt.  Accordingly,

2  Claims 10(5) and 10(7) are denied.

3  **C.**   **Claims 10(12) and 2(13), and Claims 2(14) and 2(17) as to**

4        **Diminished Capacity Defense**

5        **1.**   **Legal Standard regarding Intoxication and Diminished**

6              **Capacity Defense**

7        In the years prior to Petitioner's offenses and trial, the defense of diminished

8  capacity was abolished, expert witnesses were prohibited from testifying as to

9  whether a defendant possessed a requisite mental state, and evidence of mental

10 illness or intoxication could be introduced only to show whether the defendant

11 "*actually formed* a required specific intent," not whether he or she had "the

12 *capacity* to form [that] mental state." *Saille*, 54 Cal. 3d at 1111-12 (emphasis in

13 original).  Nevertheless, a defendant remained "free to show that because of his

14 mental illness or voluntary intoxication, he did not *in fact* form the intent" required

15 for the crime.  *Id.* at 1116-17 (emphasis in original).

16       **2.**   **California Supreme Court Ruling**

17       Concerning Petitioner's argument that counsel "did not present 'even a

18 minimally effective argument on the undisputed use of alcohol and drugs on the

19 night in question,'" the court noted on direct appeal that counsel "did briefly argue

20 there was no intent to kill because defendant 'was obviously under the influence of

21 alcohol and drugs.'" *Cain*, 10 Cal. 4th at 52.  The court opined that "[b]elaboring

22 this point would have risked appearing to concede defendant was the killer, which

23 would have conflicted with and detracted from counsel's primary argument, that

24 (consistent with his police statement) defendant had not killed anyone, planned to

25 kill anyone or assisted in killing anyone in the burglary." *Id.*  While the court

26 recognized that "almost no evidence was presented regarding the quantity and

27 effects of the drugs consumed by defendant on the night of the murders or the

28

1    effect consumption had on defendant," it did not consider on direct appeal whether

2    the lack of such evidence at trial was the product of deficient performance. *Id.*

3         The court may have reasonably concluded on habeas review that counsel

4    reasonably relied on expert opinion in not presenting an intoxication or diminished

5    capacity defense. Before trial, counsel asked Dr. Donaldson to consider "any

6    mental state defenses at the guilt phase," and Dr. Donaldson reported only that

7    Petitioner denied using any illegal drugs or alcohol in junior high or high school.

8    (Pet. Exs. 46, 172 ¶ 6.)[12]  Trial counsel may reasonably rely on expert opinion in

9    not presenting a diminished capacity defense. *See Williams v. Woodford*, 384 F.3d

10   567, 610-11 (9th Cir. 2004) (holding counsel made reasonable strategic choice not

11   to investigate further or pursue a mental state defense where some experts found no

12   support for a diminished capacity defense, and one "*noted the possibility*" that

13   defendant's mental capacity to form the required specific intent was diminished

14   from drug use but did not "have sufficient tangible evidence to support that

15   conclusion;" such evaluations "did not support a mental-state defense") (internal

16   quotation omitted, emphasis added); *Hendricks v. Calderon*, 70 F.3d 1032, 1038

17   (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of

18   mental health experts in deciding whether to pursue a[]  . . . diminished capacity

19   defense"); *Morgan v. Bunnell*, 24 F.3d 52 (9th Cir. 1994).  Similarly, counsel could

20   

21   _____

22   [12]  The record also indicates that trial counsel retained an expert, Ronald Siegel, Ph.D., to test
     samples of Petitioner's hair for the presence of controlled substances.  (*See* Pet. Ex. 46.)  Dr.

23   Siegel's report, dated May 9, 1988, states that he interviewed and examined Petitioner on April
     17, 1988.  Trial counsel delivered his guilt-phase closing argument on April 20, 1988.  Dr.

24   Siegel's report states, "Prior to the events of October 1986, the defendant reported to me that he
     was high on beer and marijuana, but denied recent use of other substances.  The analyses of hair

25   samples indicated no detectable amounts of marijuana, cocaine, or other substances for the past
     2.5 years (going back to approximately January 1986).  While the defendant may have been

26   exposed to marijuana and cocaine prior to October 1986, the amounts were not significant to be
     detected and, as verified by the defendant's own statements to me, of little behavioral

27   consequence.  I also feel that his alcohol use prior to the instant offense was of little behavioral
     significance."  (*Id.*)  Thus, Dr. Siegel detected no controlled substances and opined that any

28   marijuana, cocaine, or alcohol use was of little behavioral significance.

have reasonably strategized that casting doubt upon whether Petitioner formed the requisite specific intent would be more effective than attempting to prove Petitioner's intoxication. *See Richter*, 131 S. Ct. at 790 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates").

In the alternative, and independent to the reasoning above, the court may have reasonably determined that Petitioner failed to allege facts to demonstrate prejudice from any deficient performance by counsel. The evidence of intoxication presented at trial and on habeas review is set forth below.

### 3. Evidence regarding Petitioner's Mental State at the Time of the Offenses

#### a. Evidence Presented at Trial

As the Court observed in its June 2003 Order:

"[T]he trial record reveals little evidence regarding what Petitioner actually ingested before the commission of the murders.

At the party on the evening of the murders there was alcohol and cocaine and marijuana being used. RT 5512-13. Mendoza testified that beers were being drunk one after another, so there was no need to keep them in the refrigerator. RT 5514-15. Mendoza testified that he saw Petitioner smoke some cocaine. RT 5475-76. But Mendoza explained that Albis, Clements and himself all smoked cocaine at some point on Friday or Saturday, so he wasn't sure of the exact day that he saw Petitioner use cocaine. RT 5476. Clements confirmed that there was beer at the party. RT 5768.

Clements said he drank about twelve beers. RT 5769. He testified that everyone was also smoking marijuana, although he clarified that Albis was not. RT 5769. Clements admitted that he was drinking pretty heavily and smoking heavily at the party on Friday night, so the details of the party were a little fuzzy to

74

him.  RT 5782-83.  Clements testified that it seemed like everyone at the party had a beer in their hand throughout the evening.  RT 5783.  He testified that there was enough marijuana to go around, RT 5783, but he did not see any cocaine at the party.  RT 5784.  During an interview with David Stone, an investigator for the Ventura County District Attorney's Office, Clements said he had consumed a six pack of beer at the party.  RT 5891.  However Clements reported that he was not intoxicated because he had consumed the beer over the entire evening.  RT 5891.

Rick Albis testified that he did not remember if he drank any beer at the party.  RT 5813.  Albis said he did not use any cocaine or marijuana on that evening, but he could not remember if anyone else at the party used those substances.  RT 5814.

Mark Pina ('Pina'), who lived across the street from Petitioner, testified that after 12:30 a.m., on the night of the murders, Petitioner carne to his house to buy a free base pipe.  RT 5607-09.  Pina said that at the time Petitioner looked like 'he'd been doing some cocaine.'  RT 5610.  However, there was also testimony that Petitioner wanted to buy marijuana on the night of the murders, but was unable to do so because he lacked the funds.  RT 5624-25.  Petitioner asked Richard Willis ('Willis') if he knew where Petitioner could sell a home entertainment system, so that he could get some money to buy marijuana.  RT 5628.  Willis testified that he did not sell marijuana or any other illegal substance to Petitioner or Mendoza on that Friday night.  RT 5638.  Thus, the jury could have inferred that Petitioner was not able to obtain a sufficient amount of marijuana to intoxicate himself.

A review of the record evidence adduced at trial shows there was no evidence that Petitioner consumed any specific amount of alcohol or other controlled substances.  Nor is there any evidence that his consumption of such substances affected . . . [any] specific intent to kill the Galloways."  (Order Re: Respondent's Motion for Judgment on the Pleadings on Claims 4, 5, 6, 7 and 14, June 12, 2003, at 17-18 (internal quotation and citation omitted).)

75

### b.    Evidence Presented On Habeas Review

### (1)    Lay Witnesses

First, Petitioner relies in part upon testimony from Darnell "Danny" Cain, in an April 1997 declaration, that he talked to Petitioner on the night of the murders and "Tracy sounded high.  Normally he is a quiet and reserved person.  However, that night he seemed in a more joking, humorous mood.  It was similar to the way he used to become when he smoked PCP."  (Pet. Ex. 157 ¶ 13.)  Danny declares that he "was never interviewed by any member of Tracy's defense team" and would have provided this information had he been asked to testify.  (*Id.* ¶ 14.)  A transcript of a May 1987 interview of Danny by Petitioner's trial counsel and investigator, however, contradicts those statements.  (*See* Pet. Ex. 20.)  In that interview, Danny said that when Wilma Cain told him about the accusations against Petitioner, "the first thing that registered in my mind is that the man must have been out of his mind.  The first thing, if he did it, is exactly why I said – if he did it, he was on dope.  He was out of his mind.  He wasn't hisself 'cause that's not Tracy.  My mom [Wilma] say, 'I agree totally.'"  (*Id.* at 34.)  Danny said that he had seen Petitioner high on marijuana, when he would be "pretty mellow," and had never seen Petitioner high on cocaine, sherms, or PCP.  (*Id.* at 47-48.)  He said Petitioner "wouldn't mess with that type of stuff around me."  (*Id.* at 48.)  He reported that Petitioner's father told him that Petitioner was using cocaine and drinking.  (Pet. Ex. 20 at 16.)

Petitioner also presents statements from Val Cain, Cerda, and Clements.  In an interview with Petitioner's investigator, Val said that he was "pretty drunk" at the party, but he did not see any cocaine that night.  (Pet. Ex. 57 at 6-7.)  Val said that Petitioner "was drinking," and he implied that Petitioner was smoking marijuana.  (*Id.* at 7.)  Cerda declared that he, Petitioner, and others at the party "spent the night smoking weed and drinking beer."  (Pet. Ex. 160 at 1.)  Clements declared the same, as he testified at trial.  (Pet. Ex. 162 at 1.)

Additionally, Petitioner presents police interviews with Mark Pina and Rick Albis.  As he testified at trial, Pina said that early in the morning of the murders, Petitioner asked for and got a freebasing pipe from him.  (Pet. Ex. 103.)  Pina said that Petitioner looked "sprung," or high, from "'basing' (smoking cocaine) or smoking 'primos' (marijuana).  In his opinion, Tracy was out of it.  He was talking fast and he was talking thick."  (*Id.*)  Albis said in his police interview that Petitioner and Mendoza asked to borrow money from him to buy cocaine.  Albis told police that after he loaned Petitioner $5, Petitioner and Mendoza left to buy cocaine, and returned five minutes later.  (*Id.*)

Finally, Petitioner offers declarations from Clarence Wade and Kathy Lazoff.  Neither provides information regarding Petitioner's mental state at the time of the offenses, however.  Wade visited Petitioner shortly before Petitioner moved next door to the Galloways.  (Pet. Ex. 168 at 2.)  He declared that "[d]uring the two days we spent together I saw Tracy getting high on weed and sherm."  (*Id.*)  While Lazoff's declaration is ambiguous in parts, she does not suggest any information about Petitioner's condition at the time of the murders.  (Pet. Ex. 165.)  She declared that she did not go to the party, and she does not indicate that she had any contact with Petitioner that night.  (*Id.* ¶ 5.)  At most, Lazoff declared that she saw Petitioner "drinking a lot of beer" the day after the murders, that Petitioner was friends with Mendoza, and that Mendoza's friends "liked to drink and smoke marijuana and crack cocaine."  (*Id.* ¶¶ 3, 6, 8.)

### (2)   Expert Witnesses

Petitioner presents a declaration from Stanley J. Huey, Jr., Ph.D.  (Pet. Ex. 223.)  Dr. Huey declares that while "[l]iving in Oxnard with his father[,] . . . Tracy quickly fell into drinking and smoking PCP on nearly a daily basis.  On the weekend the Galloways were killed, . . . Tracy spent the weekend at home, drinking and smoking drugs, including freebasing cocaine . . . ."  (*Id.* at 30.)  In support of that statement, Dr. Huey cited only the declarations of Clements and

77

Lazoff and the police interviews of Albis and Pina (*id.*), discussed above.

Clements testified only that Petitioner was drinking beer and smoking marijuana,

as he testified at trial.  Lazoff and Albis provided no information about Petitioner's

intoxication at the time of the offenses.  Pina stated, as he testified at trial, that

Petitioner looked high and seemed "out of it."

Petitioner also submits a declaration from psychiatrist Jay Jackman, M.D.

(Pet. Ex. 169.)  Dr. Jackman declares:

> Evidence also suggests that Mr. Cain became dependent
> on alcohol and psychotropic drugs early in his teen years.
> Friends report that he consumed nearly fatal quantities of
> PCP, alcohol, and cocaine as an adolescent. . . .  Clarence
> Wade, a contemporary and friend of Tracy's states that
> Tracy was constantly high on 'sherm,' (PCP). . . .
> Reports from friends that he habitually drank and used
> drugs excessively *suggest* that he was either intoxicated
> at the time of the offense or that he was in withdrawal
> from intoxicants at the time of the offense.  Floyd E.
> Clements, who was present with Tracy on the night the
> Galloways were killed, states that . . . everybody 'smoked
> weed and drank beer that night.'

(*Id.* ¶ 55 (emphasis added).)

The declaration of Ruth Zitner, Psy.D., (Pet. Ex. 171), echoes the language

of Dr. Jackman.  She declares:

> There is also evidence from Tracy's history that he
> became dependent on psychotropic drugs early in his
> teen years.  Friends report that he consumed nearly fatal
> quantities of PCP, alcohol, and cocaine as an adolescent
> . . . .  Reports from friends that Tracy habitually drank
> and used drugs excessively *suggest* that he was either
> intoxicated at the time of the offense or that he was in
> withdrawal from intoxicants at the time of the offense.

(*Id.* at 62-63 (emphasis added).)

Petitioner also presents a declaration from Dr. Donaldson.  (Pet. Ex. 172.)

Dr. Donaldson declares that he was retained by trial counsel in February 1987 and

interviewed Petitioner that month.  (*Id.* ¶¶ 4, 7.)  He states that "it appears from my report that the existence of any mental state defenses at the guilt phase of Mr. Cain's trial was the scope of the referral question to me.  I would have closely followed the referral question given to me in conducting my interview with Mr. Cain."  (*Id.* ¶ 6.)  Nevertheless, Dr. Donaldson reports no findings regarding any intoxication at the time of the offenses.  (Pet. Ex. 46.)  Dr. Donaldson states only that Petitioner denied using illegal drugs or alcohol in junior high or high school.  (*Id.*)  While Dr. Donaldson states later that a detailed social history would have been "extremely helpful" to him in evaluating Petitioner (Pet. Ex. 172 ¶ 8), there is no indication that Dr. Donaldson requested any such information from trial counsel.  *See Murtishaw v. Woodford*, 255 F.3d 926, 945 (9th Cir. 2001) ("In the absence of a specific request, an attorney is not responsible for gathering background material that might be helpful to a psychiatrist evaluating his client" (internal quotation omitted)); *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir. 1997) ("[C]ounsel does not have a duty to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert" (internal quotation omitted)).  Dr. Donaldson declared that he agreed with the conclusions in Dr. Jackman's declaration.  (*Id.* ¶ 16.)

//

### 4.   Analysis

The California Supreme Court may have reasonably concluded that the statements provided by the lay and expert witnesses do not reveal any mental state evidence that competent counsel should have presented at trial.  As to the lay witnesses, defense counsel interviewed Danny Cain before trial.  It would have been a reasonable conclusion that trial counsel performed competently in not presenting Danny's speculative statement that Petitioner must have been out of his mind on dope, when Danny also said Petitioner was mellow when high on

marijuana, and he had never seen Petitioner use cocaine, sherms, or PCP.  *See*
*Chatman*, 38 Cal. 4th at 382 ("No witness may give testimony based on conjecture
or speculation"); *Babbitt*, 45 Cal. 3d at 681 (holding trial court "has no discretion
to admit irrelevant evidence.  Speculative inferences . . . cannot be deemed to be
relevant to establish the speculatively inferred fact").  The California Supreme
Court may have also reasonably determined that Pina's opinion that Petitioner
seemed high from smoking cocaine or marijuana was inadmissible speculation.
Wade, Lazoff, and Albis's declarations provide no information about Petitioner's
mental state at the time of the offenses, and the account provided in Clements'
declaration was presented at trial.  Similarly, while Val Cain and Cerda declare that
Petitioner was drinking and smoking marijuana on the night of the murders, the
California Supreme Court could have reasonably determined that their statements
do not speak to whether Petitioner did in fact form the requisite specific intent.  *See*
*Saille*, 54 Cal. 3d at 1117.

The California Supreme Court would have also been reasonable in
determining that the opinions proffered by Petitioner's experts on habeas review
are speculative.  Dr. Huey indicated that his opinion was based on the statements of
Clements, Lazoff, Albis, and Pina, which the court may reasonably have found to
be speculative themselves.  Likewise, Drs. Jackman, Zitner, and Donaldson opined,
at most, that Petitioner's friends' reports "suggest" that Petitioner was "either"
intoxicated or in withdrawal at the time of the crimes.  As shown here, a
psychologist's conclusion that petitioner "*may* not have been able to form the
required intent for the crime for which he was convicted" or that it was "quite
unlikely that he formed the specific intent necessary for the crime . . . is speculative
on its face."  *Griffin v. Johnson*, 350 F.3d 956, 965 (9th Cir. 2003) (holding
petitioner had not demonstrated actual innocence and was not entitled to an
evidentiary hearing) (internal quotation omitted, emphasis in original); *cf.*
*Crittenden v. Ayers*, 624 F.3d 943, 961 (9th Cir. 2010) (finding no prejudice in

1  light of overwhelming evidence of deliberation and premeditation, where experts

2  opined that killings "most likely" or "might very well have" lacked specific intent);

3  *Franklin v. Johnson*, 290 F.3d 1223, 1234 (9th Cir. 2002) (holding counsel was

4  objectively unreasonable for failing to investigate mental state defense while aware

5  of substance abuse problems, pedophilia, and suicide attempts by defendant

6  accused of sodomizing his stepson, but prejudice had not been established because

7  the "post-conviction record contains no testimony whatsoever, expert or otherwise,

8  concerning the impact of any mental disease or defect on [his] commission of the

9  crime").

10      Accordingly, the California Supreme Court's decision was not an

11  unreasonable application of Supreme Court precedent.  Claim 10(12), Claim 2(13),

12  and Claims 2(14) and 2(17) as to diminished capacity are denied.

13  **XV.   Claim 2(14)**

14      In Claim 2(14), Petitioner alleges trial counsel was ineffective because his

15  guilt-phase closing argument:  (a) "virtually ignored a principal stated defense,

16  diminished capacity due to drug and alcohol intoxication;" (b) "lacked a coherent

17  theory of defense;" (c) "was rife with both factual and legal errors;" and (d) told

18  the jury that "Mr. Cain was a 'bad guy' who should be convicted for 'what he has

19  done.'"  (Pet. at 180 ¶ 470; Mot. at 75.)

20  //

21      Petitioner does not make any more specific factual allegations in support of

22  those claims.  In his Motion, he adds that "[m]any of the facts supporting this

23  subclaim are summarized above in the discussion of the penalty phase ineffective

24  assistance claim."  (Mot. at 74.)  Petitioner indicates that at an evidentiary hearing,

25  he would present the evidence identified in support of Claim 2(13) (alleging

26  counsel failed to present evidence supporting a diminished capacity defense).

27  (Mot. at 72-73, 75.)

28      **A.   Diminished Capacity Defense**

1   The Court denied this portion of Claim 2(14) above.  (*See supra* p. 81.)

2       **B.**    **Coherent Theory of Defense**

3       This portion of Claim 2(14) will be considered in Petitioner's broader claim

4   that trial counsel failed to develop and present a coherent guilt-phase theory of the

5   case, Claim 2(17).  (*See supra* pp. 58-66, 72-81; *infra* pp. 83-86.)

6       **C.**    **Factual and Legal Errors**

7       Petitioner does not specify what "factual and legal errors" counsel allegedly

8   made in his closing statement, nor does he specify any evidence he would present

9   at an evidentiary hearing that would support this claim.  (*See* Pet. at 180 ¶ 470;

10   Mot. at 74); Habeas Corpus R. 2(c)(1)-(2) (requiring petitioner to specify all

11   grounds for relief and supporting facts); L.R. 83-17.7(g) (2003) ("Any request for

12   evidentiary hearing . . . shall include a specification of the factual issues and the

13   legal reasoning that require a hearing and a summary of the evidence of each claim

14   the movant proposes to offer at the hearing"); *Ortiz*, 149 F.3d at 934 (upholding

15   denial of evidentiary hearing on ineffective assistance of counsel claim where

16   petitioner failed "to allege specific facts which, if true, would entitle him to relief"

17   (internal quotation and citation omitted)).  The California Supreme Court may have

18   reasonably determined that Petitioner's conclusory allegation fails to demonstrate

19   that counsel's performance was objectively unreasonable.  *See Jones*, 66 F.3d at

20   205; *James*, 24 F.3d at 26.  Accordingly, this portion of Claim 2(14) is denied.

21       **D.**    **Concessions**

22       The Court denied this portion of Claim 2(14) above.  (*See supra* p. 56.)

23   **XVI. Claims 2(2) and 2(17) as to *Voir Dire***

24       In portions of Claims 2(2) and 2(17), Petitioner alleges that "[i]f defense

25   counsel intended to admit Mr. Cain's involvement in some of the crimes but

26   contest his innocence of the murders, his conduct in repeatedly emphasizing and

27   stressing the brutality of the crimes to the jury members during *voir dire* was

28   inconsistent with such a purported strategy."  (Pet. at 181 ¶ 474; *see also id.* at 168

¶¶ 437-38; Mot. at 75.)  Petitioner alleges that "[w]hile questioning virtually every juror during *voir dire*, defense counsel repeatedly emphasized that the crimes charged against Mr. Cain were 'terrible,' 'horrible,' 'shocking,' and 'inexcusable.'"  (Pet. at 168 ¶ 438.)

### A.    Factual Background

In one representative exchange with a potential juror regarding the possible death penalty, trial counsel stated:

> [I]n California . . . they don't have a death penalty for anything short of murder. . . .  In this particular case, Mr. Cain is accused of breaking into his neighbors' home.  His neighbors were white.  They were a married couple.  The man was in his late fifties, and the woman was in her early sixties.  He's accused of robbing them.  He's accused of raping the female.  He's accused of beating her to death and he's accused of beating her husband to death.  Those are horrible charges.  I don't think there is a reasonable person that would say they're anything other than shocking, which brings us to a possible second phase, given these charges, because they are shocking.  Some people have expressed to us the idea that they would never vote for the death penalty [and others have said that if they convicted on those charges,] . . . he's going to the gas chamber, I'm not interested in his background, mental state, anything else.  So I want to put it to you.  These are terrible charges.  You can't sugarcoat them.  Would you have an open mind as to either punishment, assuming he's guilty? . . .
>
> Talking about this mitigation, if we get to that second phase – and it's awfully awkward for me as his defense lawyer to assume we get there.  Assume we get to a second phase. . . .  I wouldn't – I would never attempt to excuse this kind of crime because you can't excuse a crime.  There's no evidence in the world that I would offer as an excuse.  What I would be doing would be offering evidence and reasons why he should be punished in a fashion other than death.  Do you see the distinction .

83

1    . . ?"
2    (17 RT 4541-43.)

3        In another representative exchange during *voir dire*, counsel stated:

4        Some of you we've talked about . . . the possible brutality
5        that you may witness in photographs. . . .  Is there
         anything about the nature of the charges, the murder,
6        alleged rape, the allegations that these people were
7        beaten to death, that people could not – any of you could
         not evaluate the evidence? . . .  And they're bad.  The
8        photographs of people who are dead are bad.  These
9        pictures are in color, and they're bloody.  They're not
         going to be introduced to make you angry at one side or
10       the other.  They're going to be introduced for specific
11       evidentiary value.  For example, where the injuries
         occurred, manner of death, cause of death, perhaps time
12       of death.  You have to decide those issues and you don't
13       do it unless you have evidence and evidence is
         photographs and testimony.  A number of people – I'm
14       one of them – don't like to do it.  They're not pleasant.
15       . . . As a result they couldn't handle any type of this
16       evidence.  That's fine.  But we have to know it now."

17   (18 RT 4963-65.)

18       **B.    Legal Standard**

19       "A fair trial in a fair tribunal is a basic requirement of due process. . . .  [A

20   juror's] verdict must be based upon the evidence developed at the trial.  This is

21   true, regardless of the heinousness of the crime charged . . . ."  *Morgan v. Illinois*,

22   504 U.S. 719, 727 (1992) (holding capital defendant has a right to inquire whether

23   a prospective juror would, upon conviction, automatically vote for death penalty)

24   (internal quotations omitted).  A juror who would automatically vote for a capital

25   sentence after convicting a defendant on certain allegations would fail to consider

26   evidence of aggravating and mitigating circumstances in good faith, as the court's

27   instructions would require him or her to do.  *Id.* at 729.

28       Accordingly, "a judge does not plainly err by making a statement in the

84

1course of voir dire to determine whether a prospective juror can be fair and
2impartial in relation to a charge made in the indictment." *United States v. Mitchell*,
3502 F.3d 931, 958 (9th Cir. 2007) (finding no error in asking prospective jurors in
4capital trial whether graphic photographs or testimony would affect their ability to
5be fair and impartial).  In *Mitchell*, the Ninth Circuit noted with approval that
6"[i]ndeed, [defendant's] counsel himself prefaced juror voir dire by relating his
7'impression that there are certain crimes which, like many people, you would find
8very troubling and very disturbing to hear about. . . .  And among them might be a
9crime involving the murder of two people, a nine-year-old and a 65-year-old.'"  *Id.*
10at 958.

11As at issue in the instant case, in *Fox v. Ward*, the Tenth Circuit held trial
12counsel was not ineffective for asking questions on *voir dire* that may have
13portrayed defendant in a negative light.  200 F.3d at 1295.  Counsel's questions,
14inquiring whether jurors could be open minded about life imprisonment if the
15defendant were convicted, led one member of the venire to "form[] an opinion as to
16[defendant's] guilt based on the voir dire. . . .  Moreover, the trial court expressed
17the opinion that [defendant's] counsel had gone too far in this line of questioning,
18to the detriment of his client."  *Id.* at 1294-95.  Nonetheless, the
19Tenth Circuit held that counsel, "recognizing that [state] law requires the same jury
20to sit for both guilt and penalty phases . . . chose to focus on whether the jurors
21could be fair during the sentencing phase.  This was neither unreasonable nor
22prejudicial, especially in view of the evidence that counsel . . . [knew] would later
23be admitted."  *Id.* at 1286, 1295.

24**C.    Analysis**

25The California Supreme Court may have reasonably concluded that
26counsel's questions at *voir dire* were strategic.  The court reasonably could have
27determined that Petitioner failed to overcome the "strong presumption that
28counsel's conduct falls within the wide range of reasonable professional assistance

1  . . . [and] might be considered sound trial strategy." *Strickland*, 466 U.S. at 689

2  (internal quotation omitted).  Counsel's questions served to identify prospective

3  jurors who would automatically vote for the death penalty upon convicting a

4  defendant of the charges Petitioner faced, regardless of any mitigating

5  circumstances.  (*See, e.g.*, 17 RT 4541-43); *see also Morgan*, 504 U.S. at 727;

6  *Mitchell*, 502 F.3d at 958; *Fox*, 200 F.3d at 1295.  The questions also aided in

7  identifying prospective jurors who could not reach a verdict by "evaluat[ing] the

8  evidence," including graphic photographs.  (18 RT 4963-65); *see also Morgan*,

9  504 U.S. at 727; *Mitchell*, 502 F.3d at 958.  To the extent that counsel noted the

10  severity of the charges and the explicitness of the photographs to encourage the

11  prospective jurors to answer thoughtfully, the California Supreme Court could

12  have reasonably determined that counsel provided reasonable professional

13  assistance.  Accordingly, Claims 2(12) and 2(17) as to *voir dire* are denied.

14  **XVII.  Claim 3(1)**

15       In Claim 3(1), Petitioner contends that "the system established between

16  CDA and the County of Ventura for the representation of . . . indigent defendants

17  ensured that Mr. Cain would receive representation from overworked and conflict-

18  burdened counsel.  As a result, the counsel appointed to represent Mr. Cain

19  pursuant to these contracts labored under an actual conflict of interest."  (Pet. at

20  183-84 (citation omitted).)[13]

21       The Court has previously held that "[t]his is a conclusory claim for which

22  Petitioner provides no support, legal or otherwise."  (Order re Pet'r's Outstanding

23  Discovery Requests, Sept. 24, 2002, at 24.)  The Court ruled that "these allegations

---

[13]  Petitioner states in his Motion that the "factual disputes at issue in this claim are set forth above and a corresponding hearing is requested concerning those subclaims.  Therefore, Petitioner does not request an additional hearing on the issue of due process or equal protection [alleged in Claim 3(1)], but instead requests that this Court reserve any ruling" until after the hearing.  (Mot. at 67.)  Petitioner nevertheless includes Claim 3(1) in his motion for an evidentiary hearing on counsel's alleged conflict of interest.  (*Id.* at 52; Notice of Mot. and Mot. for Evid. Hr'g at 1.)

1    cannot be the basis for good cause such that discovery is warranted."  (*Id.*)

2    Petitioner provides no further support for Claim 3(1) in his Motion.  Accordingly,

3    Petitioner has not "allege[d] facts that, if true, would entitle him to habeas relief."

4    *West v. Ryan*, 608 F.3d 477, 485 (9th Cir. 2010).  The California Supreme Court's

5    rejection of this claim was reasonable, and Claim 3(1) is denied.

6    **XVIII.  Claim 8(4)**

7            In Claim 8(4), Petitioner alleges that unless and until California properly

8    formulates and implements standards for an appropriate lethal injection protocol,

9    "imposition of the lethal injection method would deprive [Petitioner] of his right to

10   due process of law [and] threaten him with the infliction of cruel and unusual

11   punishment."  (Mot. at 94-95; Pet. at 210 ¶ 555.)  At the time of his Motion,

12   Petitioner noted that "California has not yet enacted a protocol for executing the

13   condemned and there is no protocol in place . . . .  This claim is not ripe, and

14   Petitioner raises it at this time to preserve his rights to federal habeas review if it

15   ripens."  (Mot. at 95.)

16           Following the district court's ruling in *Morales v. Tilton*, 465 F. Supp. 2d

17   972 (N.D. Cal. 2006), "there was a de facto moratorium on all executions in

18   California."  *Morales v. Cate*, 623 F.3d 828, 830 (9th Cir. 2010).  California

19   enacted a lethal injection protocol effective August 29, 2010, and scheduled the

20   execution of Albert Greenwood Brown.  Brown challenged the new protocol and

21   moved to intervene in the *Morales* action.  Holding that "Brown's federal claims

22   are virtually identical to those asserted" by Morales, the court granted the motion

23   to intervene.  *Morales v. Cate*, 2010 WL 3751757, at *1 (N.D. Cal. Sept. 24,

24   2010).

25           Considering Brown's challenge to the new protocol and motion to stay

26   execution, the Northern District of California expressed that it "always has

27   understood, apparently incorrectly, that executions could not resume until it had an

28   opportunity to review the new lethal injection protocol in the context of the

1  evidentiary record developed during the 2006 proceedings." *Id.*  The court

2  conditionally denied a stay of execution on the basis that "there is no way that the

3  Court can engage in a thorough analysis of the relevant factual and legal issues in

4  the days remaining before [petitioner's] execution date." *Id.* at *5.

5        The Ninth Circuit remanded, directing the district court, "in light of . . . the

6  court's findings regarding the risk of unconstitutional pain inhering in the prior

7  three-drug protocol, . . . to determine whether, under *Baze*, [petitioner] is entitled to

8  a stay of his execution as it would be conducted under the three-drug protocol now

9  in effect." *Morales v. Cate*, 623 F.3d at 831.  The district court lifted a stay of

10  discovery in the matter on December 10, 2010.  *Morales v. Cate*, 2010 WL

11  5138572, at *9 (N.D. Cal. Dec. 10, 2010).

12        In light of the ongoing *Morales* litigation and Petitioner's indication that he

13  raises the claim "to preserve his rights to federal habeas review" (Mot. at 95),

14  Claim 8(4) shall not be included within the scope of the evidentiary hearing at this

15  time.  Petitioner's motion for hearing on the claim is denied without prejudice.

16  Petitioner may renew his request for evidentiary hearing on Claim 8(4) if and when

17  he deems appropriate.

18  **XIX.  Claims 10(2) and 10(3)**

19        In Claim 10(2), Petitioner contends trial counsel was ineffective for failing

20  to object to the use in aggravation of an allegedly unconstitutional prior conviction

21  in Arizona.  (Pet. at 230-31 ¶¶ 609-14.)  In Claims 10(2) and 10(3), Petitioner

22  alleges counsel was ineffective for advising him to stipulate to the facts underlying

23  the conviction without informing him that the conviction could be used in

24  aggravation in support of a death penalty.  (*Id.* at 230-32, ¶¶ 609-14, 617.)

25        **A.     Factual Background**

26        Petitioner contends his prior conviction was unconstitutional based upon

27  "the conflict of attorney Paul Hunter, and his abandonment of Mr. Cain . . . ." (*Id.*

28  at 230 ¶ 611.)  Petitioner challenged the constitutionality of the conviction in

1    postconviction proceedings in Arizona on the same basis.  (State Habeas Pet. Ex.

2    49, lodged Jan. 12, 1998, at 000868-70.)  He alleged "that his case was not

3    properly presented and that his Attorney represented both himself and a brother-in-

4    law, who was in fact guilty of the crime of Auto Theft."  (*Id.* at 000879.)  The court

5    appointed attorney George Rouff to represent Petitioner in his postconviction

6    proceedings.  (*Id.* at 000875.)  Rouff filed an Attorney's Supplement to Petitioner's

7    Petition for Post Conviction Relief stating that he had reviewed "all available

8    materials in the file of this case with the Clerk of Court together with an entire

9    reading of the Transcript on Appeal, all appellate briefs and the entire file of

10   Attorney Paul Hunter."  (*Id.* at 000869.)  Rouff found it "noteworthy that in the

11   severed trials of the defendants Robert Ross and Tracy Darrel Cain that attorney

12   Paul Hunter successfully defended defendant Robert Ross and obtained an

13   acquittal.  This attorney sees no conflict of interest in the severed trial of defendant

14   Tracy Darrel Cain . . . ."  (*Id.* at 000870.)  The Arizona court denied the petition

15   without elaboration.  (*Id.* at 000864.)

16          **B.     Analysis**

17                 **1.     Challenge to Use of Arizona Conviction**

18          First, the California Supreme Court may have reasonably determined that

19   counsel was not ineffective for failing to object to the use of the Arizona

20   conviction in aggravation.  Contrary to Petitioner's allegations, trial counsel did

21   object to its presentation on the ground that it was unconstitutional.  Counsel based

22   his objection on the court's review of the "voluminous" documents concerning the

23   conviction and did not argue it further.  (22 RT 5899, 5911; 2 CT 272.)  The trial

24   court held:

25                 [W]ith respect to . . . the reservation of the defendant's
                   right to attack the [] constitutionality or legality of the
26                 Arizona conviction, I paid particular attention to those
                   court documents from the Arizona Superior Court of the
27                 County of Yuma.  I'm satisfied that the defendant was
                   duly arraigned.  There were hearings for suppression of
28

1
2
3
4
5
6

> evidence on a number of – at least one issue, including *Miranda*.  I'm satisfied that the defendant's constitutional rights were scrupulously protected throughout these proceedings, that he had a fair trial.  I see absolutely no constitutional or legal infirmity with the jury's verdict or with the conviction or with the sentence that was imposed.

(22 RT 5912.)

7
8
9

The state high court may have reasonably concluded that counsel was not ineffective for failing to present additional evidence or argument to the trial court.  When a California defendant:

10
11
12
13
14
15
16

> challenges the validity of a prior conviction [used in aggravation], he or she bears the burden of establishing its constitutional invalidity.  To meet this burden, it is not enough for a defendant simply to make some showing that a constitutional error occurred in the prior proceedings.  A prior conviction carries a *strong presumption of constitutional regularity*, and the defendant must establish a violation of his or her rights that so departed from constitutional requirements as to justify striking the prior conviction.

17
18
19
20
21
22
23
24

*California v. Horton*, 11 Cal. 4th 1068, 1136 (1996) (emphasis in original, internal quotation omitted).  The claim of error must be based upon one of certain "*fundamental* constitutional flaws," such as a denial of the right to appeal or a complete denial of representation at a critical stage of trial.  *Id.* at 1135.  Where a postconviction court of a "sister state[]" has reviewed and denied the claim of error, a California capital defendant may challenge the constitutionality of the prior conviction where an error "appears on the face of the judgment itself . . . ."  *Id.* at 1138.

25
26
27
28

Here, the California Supreme Court may have reasonably determined that the alleged ineffective assistance of Petitioner's Arizona counsel was not a complete denial of representation.  Petitioner has not alleged any other fundamental constitutional flaw.  It is reasonable that Petitioner's unsupported

1    allegation that "his case was not properly presented and that his Attorney

2    represented both himself and" a guilty co-defendant (State Habeas Pet. Ex. 49 at

3    000879), would not meet Petitioner's burden in the California court of establishing

4    "a violation of his [] rights that so departed from constitutional requirements as to

5    justify striking the prior conviction." *California v. Horton*, 11 Cal. 4th at 1136.

6    Moreover, to the extent that the Arizona postconviction court reviewed and denied

7    Petitioner's claim, the California Supreme Court could reasonably have concluded

8    that no error appears on the face of its judgment.  The court, therefore, could

9    reasonably hold that Petitioner has not demonstrated that counsel would have been

10   reasonably likely to succeed on a competently argued objection to the use of the

11   Arizona conviction in aggravation.  *See Juan H.*, 408 F.3d at 1273; *see also*

12   *Fretwell*, 506 U.S. at 370 (holding that where a defendant "claims a right the law

13   simply does not recognize  . . . [he has been] deprived of neither a fair trial nor any

14   of the specific constitutional rights designed to guarantee a fair trial, [and] he has

15   suffered no prejudice") (discussing and quoting *Nix v. Whiteside*, 475 U.S. 157,

16   186-87 (1986) (Blackman, J., concurring)).

                        **2.    Stipulating to Arizona Conviction**

18         Second, the California Supreme Court may have reasonably concluded that

19   counsel was not ineffective for advising his client to stipulate to the judgement or

20   for so stipulating.  It would not be unreasonable to hold that stipulating to the

21   conviction was strategically sound to avoid the presentation of testimony from

22   prosecution witnesses, who may have included the victim or co-defendants.  *See*

23   *Dyer v. Calderon*, 122 F.3d 720, 737 (9th Cir. 1997) (holding that if counsel had

24   not stipulated to prior conviction, the prosecution "could have called the victim   .

25   . . to the stand to testify.  Wanting to avoid this potentially damaging testimony,

26   [counsel's] stipulation was reasonable"), *vacated on reh'g en banc on other*

27   *grounds*, 151 F.3d 970 (1998); *Hooker*, 293 F.3d at 1246-47.  In *Hooker*, for

28   example, petitioner argued that trial counsel was ineffective for stipulating to two

prior violent felony convictions.  293 F.3d at 1246-47.  The Tenth Circuit rejected

petitioner's claim.  *Id.*  The circuit court agreed with the state supreme court that:

> 'the decision to enter the stipulations was part of a
> calculated strategy to alleviate the potential harm that
> might occur if the State were allowed to put on its proof
> regarding the two prior violent felony convictions.' . . .
> Moreover, we conclude the jury would have found these
> two aggravating circumstances regardless of the
> stipulation.  Accordingly, counsel retained credibility
> with the jury by stipulating to the aggravators.

*Id.* at 1246, 1246 n.15 (internal citations omitted).  Here, too, the California

Supreme Court may have reasonably concluded that Petitioner has failed to

establish that the jury would not have found the Arizona conviction as an

aggravating circumstance absent the stipulation.  It was, therefore, not an

unreasonable application of Supreme Court precedent to hold that, to the extent

that counsel advised Petitioner to stipulate to the Arizona conviction without

informing him that the conviction could be used in aggravation in support of a

death penalty, counsel did not err, and Petitioner was not prejudiced.  Accordingly,

Claims 10(2) and 10(3) are denied.

//

//

## XX.  Claim 10(4)

Petitioner seeks an evidentiary hearing on Claim 10(4), regarding counsel's

alleged failure to object to an uncharged assault allegation by Anita Parker as a

factor in aggravation, to interview Ms. Parker about the assault allegation, and to

request proper penalty-phase jury instructions about the allegation.  (Mot. at 19-

20.)  Petitioner withdrew this subclaim on August 1, 2001, after the Court found

the subclaim to be unexhausted.  (Order re Respt.'s Mot. to Dismiss 2d Am. Pet.,

July 23, 2001, at 14-15.)  Since the subclaim is unexhausted and has been

withdrawn, no hearing will be held on Claim 10(4).

## XXI.  Claim 10(8)

In Claim 10(8), Petitioner alleges trial counsel was ineffective for failing to "educat[e] and assist[] Cain in presenting the best possible appearance to the jury," and for "allowing" Petitioner to be presented to the jury in prison attire during the penalty phase of trial.  (Pet. at 235 ¶ 630; Mot. at 23-24.)

Petitioner's appearance in jail attire at the penalty phase was not his first. Just before the jurors delivered their guilt-phase verdicts, and before the jurors were present in the courtroom, the trial court observed that Petitioner appeared that day dressed in his jail uniform.  (23 RT 6294.)  The court noted that it had "discussed this on one prior occasion" with Petitioner.  (*Id.*)  The court stated to Petitioner that he may:

> wear whatever clothing you feel is suitable, and I want to make sure that it is your choice to appear in jail blues today.  Is that how you want to be dressed –
>
> The Defendant:  Yeah.
>
> The Court:  – for today's hearing?
>
> The Defendant:  Yes.
>
> The Court:  You understand you may wear civilian clothes, as you have done throughout the trial, if you want to?
>
> The Defendant:  Yeah.
>
> The Court:  And that it [sic] your choice to appear clothed in the jail uniform today?
>
> The Defendant:  Yes.
>
> The Court:  Mr. Steinfeld [Petitioner's counsel during Wiksell's absence], have you had an opportunity to talk with Mr. Cain about this?
>
> Mr. Steinfeld:  Yes, your Honor.
>
> The Court:  You're satisfied this is his decision and that any efforts that you or I might make is not going to

93

change his mind?

Mr. Steinfeld:  That's my opinion.

(23 RT 6294-95.)

The "prior occasion" on which the court discussed Petitioner's clothing with him was before jury selection began.  (*See* 2 RT 56-60.)  Trial counsel, Wiksell, raised the issue:

> Mr. Wiksell:  Now, I have discussed with Mr. Cain at length his clothing attire during times when the jury is present.  I have advised him that in my view preceptions [sic] by the jury are important.  They will undoubtedly know that he is in custody, but being dressed in civilian clothes does, in view, make some what [sic] of a difference.  It could make a difference in this case.  I also told him that I would secure his own clothing for him.  If that was unavailable, I would purchase clothes for him that fit in any manner that he would so choose as long as it wasn't offensive.  But, Mr. Cain has told me, and we have had more than one discussion about this, that he wishes to be in court dressed as he is now in front of the Jury throughout the trial; am I correct in that? . . .
>
> Defendant Cain:  Yes.

(*Id.* at 56-57.)

The trial court then advised Petitioner at length about his right to appear in civilian clothes.  The court added:

> [I]t seems to me you might be better off if you were dressed as I have advised rather than jail clothes . . . . It seems to me you might want to make a good impression on some of those folks [the jurors].  It is up to you, and clothes do make an impression, good or bad depending on what you wear . . . .

(*Id.* at 59-60.)

94

The record thus indicates that Petitioner was educated about wearing civilian clothes and was advised to wear them before the penalty phase of trial, and he chose to do otherwise. *Cf. California v. Bradford*, 15 Cal. 4th 1229, 1363 (1997) (holding defendant's stated preference to appear in jail clothing, after he was advised of his right to do otherwise, defeated his claim that he was compelled to do so by the trial court). The California Supreme Court may have reasonably determined that Petitioner presents no evidence to support his conclusory allegation that counsel did not advise him to wear civilian clothing at the penalty phase of trial, or that he was unaware that wearing civilian clothing could be beneficial to him.

The court may have reasonably concluded, in addition, that Petitioner's state and federal constitutional rights were not implicated by his appearance in jail clothing during the penalty phase of trial. "[R]equiring a defendant to wear prison clothes during sentencing is not prejudicial and does not violate due process." *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995); *Bradford*, 15 Cal. 4th at 1363 ("[T]he rule that a defendant may not be compelled to attend trial in jail or prison garb is premised upon the notion that doing so might subvert the presumption that an accused is innocent until proved guilty. . . . Because the presumption of innocence already had been rebutted and defendant had been found guilty beyond a reasonable doubt, there was no reasonable probability that the jury would base its penalty decision on the factor of defendant's attire").

Petitioner has, therefore, failed to allege facts that, if proved, would entitle him to relief in Claim 10(8). *See West*, 608 F.3d at 485. The California Supreme Court's rejection of this claim was not unreasonable. Accordingly, Claim 10(8) is denied.

## XXII.  Claim 10(9) (in part) and Claim 10(10)

In Claim 10(9) in part and Claim 10(10), Petitioner alleges trial counsel was ineffective for failing to investigate and present mitigation evidence regarding

1  Petitioner's mental impairments and life history.  (Mot. at 26-44; Pet. at 236-37

2  ¶¶ 632(d), 634.)

3      **A.      Factual Allegations**

4      Petitioner contends that trial counsel failed to interview a number of

5  witnesses who could have provided information about Petitioner's life history.

6  (*See* Mot. at 30 (citing Pet. Exs. 153 ¶ 17, 154 ¶ 14, 157 ¶ 14,[14] 163 ¶ 15, 164 ¶ 20,

7  168 ¶ 10).)  Petitioner also alleges that the "mental health expert retained by trial

8  counsel, Dr. Theodore Donaldson, reports that counsel never provided the life

9  history information necessary . . ., but instead provided only 'scant' information

10  based wholly on police reports and an investigation by the district attorney's

11  office."  (*Id.* (citing Pet. Ex. 172 ¶¶ 8, 16) (emphasis omitted).)  Dr. Donaldson

12  also declared that "it appears from my report that the existence of any mental state

13  defenses at the guilt phase," and not mitigation evidence for any penalty phase, "of

14  Mr. Cain's trial was the scope of the referral question to me."  (Pet. Ex. 172 ¶ 6.)

15      Petitioner argues that had trial counsel performed adequately, he would have

16  discovered and presented evidence of Petitioner's separation from his mother at

17  age three or four, his emotional disruption from the separation, and her substance

18  abuse and prostitution.  (Mot. at 31-32.)  Petitioner alleges that his stepmother

19  physically and emotionally abused him and his siblings, beat them daily and

20  unpredictably, told them they were worthless, made Petitioner and his brother help

21  her shoplift, smoked crack cocaine, and had an affair with a drug dealer.  (*Id.* at

22  35.)  Petitioner alleges his father emotionally abandoned him, his brothers were

23  poor role models who used drugs and had criminal records, and his sister was a

24  poor role model who became homeless and gave her child up for adoption.  (*Id.* at

25  32-33.)  Petitioner alleges a family history of substance abuse, including PCP,

26

27  ───────────────────

28  [14]  As noted above, the transcript of a May 1987 interview of Danny Cain by Petitioner's trial
counsel and investigator (Pet. Ex. 20) contradicts his statement that he "was never interviewed by
any member of Tracy's defense team."  (Pet. Ex. 157 ¶ 14.)

marijuana, and alcohol, and alleges that his brother provided drugs to relatives. (*Id.* at 37.)  Petitioner also claims that his grandmother and brother suffered from mental illness, for which his grandmother took medication.  (*Id.*)

Petitioner contends that he had multiple head injuries, including being knocked unconscious from falling into a cement drainage ditch around age ten, hitting his head on the street when he fell off his bike around the same age, being hit in the head repeatedly by his stepmother, being hit in the head with a door, and losing consciousness after falling against a truck bumper.  (*Id.* at 38.)  Petitioner offers testimony from Dr. Karen Bronk Froming, who interviewed and tested Petitioner and reviewed evidence of his personal history, that Petitioner's intellectual performance is in the borderline retarded range and Petitioner has moderate brain impairment.  (*Id.* at 38-39 (citing Pet. Ex. 170).)  Petitioner also offers testimony from Dr. Jay Jackman regarding Petitioner's significant psychiatric and neurologic dysfunction (*id.* at 39 (citing Pet. Ex. 169)), and from Dr. Zitner regarding Petitioner's extensive neurological impairments and cognitive deficits (*id.* (citing Pet. Ex. 171)).  Petitioner refers to school documents showing his recommendation for special education classes and his learning disabilities.  (*Id.* at 38 (citing, *inter alia*, Pet. Ex. 45).)  Petitioner also alleges he was likely exposed to alcohol *in utero* (*id.* at 38); used PCP, cocaine, alcohol, and marijuana as an adolescent and young adult and became dependent on alcohol and psychotropic drugs in his early teen years (*id.* at 39-40); and suffered racial harassment from neighbors that had lasting effects (*id.* at 41).  Finally, Petitioner alleges that trial counsel failed to investigate and present evidence of his good traits and demeanor, including Petitioner's cooperation and personableness at the Adobe Mountain School, his good performance at his construction job, and his reputation as a gentle, quiet, and reserved person.  (*Id.* at 40-41.)

**B.    Legal Standard**

The Supreme Court has long held that investigation is one of the hallmarks of adequate representation at the penalty phase of a capital murder trial.  *See, e.g.*, *Wiggins*, 539 U.S. at 523 (considering the reasonableness of counsel's penalty-phase investigation); *Williams (Terry)*, 529 U.S. at 393, 395-96 (holding petitioner had a constitutionally protected right "to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer" and cataloging mitigating evidence the jury did not hear); *Strickland*, 466 U.S. at 691 (holding, in ineffective assistance of counsel challenge to capital sentencing proceeding, that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *cf. Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (noting that "it is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence"), *abrogated on other grounds by Atkins*, 536 U.S. 304.

"It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.  'The Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy.'"  *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (quoting *Hendricks*, 70 F.3d at 1044).

//

Evidence of childhood abuse, for example, is an important factor in mitigation "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *Penry*, 492 U.S. at 319 (internal quotation omitted); *see also, e.g.*, *Williams (Terry)*, 529 U.S. at 370; *Lambright v. Schriro*, 490 F.3d 1103, 1123 (9th Cir. 2007); *Silva v. Woodford*, 279 F.3d 825, 847 n.17 (9th Cir. 2002); *Jackson v. Calderon*, 211 F.3d 1148, 1163 (9th Cir. 2000).

Evidence of the defendant's mental health history may also be central to his or her mitigation case. *See, e.g.*, *Penry*, 492 U.S. at 319; *Williams (Terry)*, 529 U.S. at 370; *Lambright*, 490 F.3d at 1124-25; *Silva*, 279 F.3d at 847 n.17; *Jackson v. Calderon*, 211 F.3d at 1163. "Evidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase." *Hendricks v. Calderon*, 70 F.3d at 1043. Thus, "an investigation sufficient to foreclose the possibility of a mental defense" does not "necessarily foreclose[] the possibility of presenting evidence of mental impairment as mitigation in the penalty phase," *id.* at 1043-44, or satisfy counsel's duty to investigate such evidence. *See also Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) (holding competent counsel preparing for penalty phase must investigate potentially mitigating evidence and bring it to the attention of appropriate experts).

"Although trial counsel is typically afforded leeway in making tactical decisions regarding trial strategy, counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (holding that because trial counsel's investigation of witnesses' motives for testifying was insufficient, her decision not to cross-examine them on that point could not have been strategic). "Defense counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Alcala v. Woodford*, 334 F.3d 862, 891 (9th Cir. 2003) (internal quotation omitted, emphasis in original). "The Supreme Court has conveyed a clear, and repeated, message about counsel's sacrosanct duty to conduct a full and complete mitigation investigation before making tactical decisions, even in cases involving . . . egregious circumstances." *Earp*, 431 F.3d at 1175 (finding abuse of discretion in trial court's denial of evidentiary hearing on ineffective assistance of counsel claim regarding mitigating evidence). Indeed, "the Supreme Court has

1    made clear that counsel's failure to present mitigating evidence can be prejudicial

2    even when the defendant's actions are egregious."  *Stankewitz v. Woodford*, 365

3    F.3d 706, 723 (9th Cir. 2004).

4         **C.     Analysis**

5         It is unclear to what extent counsel investigated Petitioner's life history and

6    alleged mental impairments for the penalty phase of trial.  Moreover, without

7    knowing the strength of any missing mitigation evidence, the Court cannot

8    accurately assess what impact the evidence may have had on the jury's penalty

9    decision.  *See Hendricks v. Vasquez*, 974 F.2d 1099, 1110 (9th Cir. 1992)

10   ("[W]ithout an evidentiary hearing, we cannot determine whether counsel's

11   performance had a probable effect on the outcome of the penalty phase"); *see also*

12   *Bonin*, 59 F.3d at 834 ("[I]n order to determine whether [counsel's actions] . . .

13   might have affected the jury's decision, it is essential to compare the evidence that

14   actually was presented to the jury [in mitigation] with the evidence that might have

15   been presented had counsel acted differently").  Because an evidentiary hearing is

16   needed in order to resolve these factual questions, the California Supreme Court's

17   decision summarily rejecting this claim[15] was based on an unreasonable

18   determination of the facts.  *Earp*, 431 F.3d at 1173, 1176 (holding evidentiary

19   hearing was required to determine "heavily fact-dependent" issue of whether

20   counsel sufficiently investigated mitigating factors, and state court's decision

21   without hearing was therefore based on an unreasonable determination of the

22   facts).

---

25   [15]  While the California Supreme Court on direct appeal considered Petitioner's argument that trial
                                                   CONTINUED

27   CONTINUED
28   counsel was ineffective in his penalty-phase argument for failing to assert Petitioner's lack of
     premeditation as a mitigating factor, *Cain*, 10 Cal. 4th at 79-80, the court did not hold a hearing on
     the instant claim.

1   For these reasons, the Court will hold an evidentiary hearing on Claim

2   10(10) and this portion of Claim 10(9) (Pet. at 236 ¶ 632(d)).

3   **XXIII.   Claim 10(6) and Claim 10(9) (in part)**

4   In Claim 10(6) and Claim 10(9) in part, Petitioner alleges trial counsel was

5   ineffective for failing to contest the prosecution's arguments regarding Petitioner's

6   "lack of remorse" as an aggravating factor.  (Pet. at 233 ¶¶ 622-26, 236 ¶ 632(c);

7   Mot. at 21-22, 24-26.)

8   **A.      Failure to Exclude Petitioner's Statement to Police**

9   Petitioner argues that counsel was ineffective for failing to challenge the

10  introduction of Petitioner's taped statement to police that "provided an evidentiary

11  basis" for the prosecution's arguments.  (Pet. at 233 ¶ 623.)

12  **1.      Detective Tatum's Testimony**

13  First, Petitioner claims that counsel should have sought to exclude the

14  statement on the basis that Detective Tatum "lied about any malfunction and about

15  Cain's alleged confession during that time."  (Mot. at 21.)  Petitioner fails to

16  indicate how Detective Tatum's testimony about alleged statements made beyond

17  the scope of the recording forms any basis for the exclusion of statements within

18  the scope of the recording.  *Cf. California v. Fauber*, 2 Cal. 4th 792, 828-29 (1992)

19  (finding no error in denial of defendant's motion to suppress witness testimony

20  where prosecutor refused to tape entire witness interview); *California v. Siripongs*,

21  45 Cal. 3d 548, 573-74 (1988) (rejecting defendant's argument that probative value

22  of tape was outweighed by its prejudicial effect because it "contained too many

23  pauses, deletions, and gaps" (internal quotation omitted)).  Moreover, as

24  Respondent correctly notes, "Detective Tatum testified that Petitioner . . . admitted

25  stealing $500 . . . at the point where the tape stopped recording.  This particular

26  information was not used by the prosecutor to demonstrate Petitioner's lack of

27  remorse."  (Opp. at 25 (citation omitted).)  The California Supreme Court may

28

101

1    have reasonably determined on these grounds that counsel was not ineffective for

2    failing to challenge the introduction of Petitioner's statement.

3                    **2.      Petitioner's Mental State**

4            Second, Petitioner contends that counsel should have sought to exclude the

5    statement because his "mental state impaired this interview.  It was apparent to the

6    detectives interviewing Cain that he had used cocaine extensively prior to the

7    interview and, as a result, was highly suggestible.  Detective Tatum conceded this

8    when he told Cain during the interview that []he thought Cain was on 'dope.'"

9    (Mot. at 21.)

10           The Ninth Circuit has held:

11                    While it is true that a waiver of one's *Miranda* rights
                      must be done intelligently, knowingly, and voluntarily,
12                    the Supreme Court has never said that impairments from
13                    drugs, alcohol, or other similar substances can negatively
                      impact that waiver. . . .  [A]n intoxicated individual can
14                    give a knowing and voluntary waiver, so long as that
                      waiver is given by his own free will.
15

16   *Matylinsky v. Budge*, 577 F.3d 1083, 1095 (9th Cir. 2009) (citations and

17   parenthetical omitted).  The Circuit held in *United States v. Banks* that a suspect

18   allegedly under the influence of narcotics and alcohol made a knowing and

19   voluntary waiver where, among other factors, he did "not appear to have been

20   'incapacitated' by his use of drugs and alcohol," selectively answered questions,

21   was able to provide a lock combination, and requested that his girlfriend be

22   contacted to secure his apartment.  282 F.3d 699, 706 (9th Cir. 2002), *rev'd on*

23   *other grounds*, 540 U.S. 31 (2003).  Likewise, the California Supreme Court "has

24   repeatedly rejected claims of . . . incompetence to waive *Miranda* rights premised

25   upon voluntary intoxication or ingestion of drugs, where . . . there is nothing in the

26   record to indicate that the defendant did not understand his rights and the questions

27   posed to him."  *California v. Clark*, 5 Cal. 4th 950, 988 (1993), *disapproved on*

28   *other grounds*, *California v. Doolin*, 45 Cal. 4th 390 (2009); *see also California v.*

*Frye*, 18 Cal. 4th 894, 988 (1998), *disapproved on other grounds*, *Doolin*, 45 Cal. 4th 390.

The California Supreme Court could have reasonably determined that Petitioner makes no factual allegations, and there is nothing in the record to indicate, that he did not understand his rights and the questions posed to him. Petitioner merely alleges that he was "highly suggestible," not that he did not understand his rights, or the questioning, as a result.  (Mot. at 21.)  To the contrary, during the police interview, Petitioner provided detailed responses to questions, including the street names of friends' houses (Pet. Ex. 177 at 3, 9, 15, 17), a friend's car make and model (*id.* at 11), his probation officer's name (*id.* at 45), the amount of his most recent paycheck (*id.* at 12), and the times he began and finished work (*id.* at 19).  Petitioner fabricated a story to his benefit (*see id.* at 12-20, 24) and asked the police questions about the evidence they had gathered against him (*id.* at 24, 30, 33-34).  He asked whether the police were detaining other suspects (*id.* at 46; *cf.* 27-31), and he reasoned about the charges he would face in light of his record and his relative age (*id.* at 42).

The California Supreme Court would not have been unreasonable, therefore, in determining that the record indicated that Petitioner understood his rights and the questions asked of him, and that he gave a knowing and voluntary waiver by his own free will.  As a result, the court could have reasonably determined that Petitioner has not demonstrated deficient performance or prejudice from trial counsel's failure to challenge the introduction of his statement on the basis of his alleged intoxication.  *See Juan H.*, 408 F.3d at 1273; *Wilson*, 185 F.3d at 990; *Molina*, 934 F.2d at 1447.

**B.**     **Failure to Present Evidence regarding Mendoza's Credibility**

Petitioner also argues that counsel was ineffective for failing to present "additional available evidence which challenged the credibility of Mendoza, the only other basis for Mr. Cain's alleged 'lack of remorse.'"  (Pet. at 233 ¶ 624, Mot.

at 21-22 (citing allegations in Claim 1(1)), 25.)  First, the California Supreme

Court could have reasonably held that counsel was not ineffective for failing to

present evidence that police did not collect, of stolen items allegedly present at

Mendoza's home.  (*See supra* p. 17; *see also supra* pp. 10, 14-15.)  Instead,

counsel presented comparable evidence that was reasonably available through

other means.  (*Id.*)  Second, it would be reasonable to conclude that Petitioner

cannot establish that counsel was ineffective for failing to present evidence that

Mendoza received an inducement for his testimony.  Petitioner has failed to present

more than mere speculation that any such inducement existed.  (*See supra* pp. 15,

17.)  Third, to the extent that counsel was allegedly ineffective for failing to

investigate and present Mendoza's criminal history and testimony from Lazoff and

Clements that Mendoza sought to create an alibi for the night of the murders, those

claims will be included within the scope of the evidentiary hearing.  (*See supra* pp.

16, 21.)

### C.    Failure to Present Evidence regarding Mental Impairments

Finally, Petitioner argues that counsel was ineffective for failing to present:

> the significant evidence regarding Cain's severe mental
> impairments and his abusive and chaotic upbringing.  If
> counsel had presented this information, it would have
> allowed the jury to more accurately evaluate whether
> Cain's statements actually indicated a lack of remorse by
> an average 'reasonable' person, or whether they were
> simply the statements of a mentally and emotionally
> impaired individual who could not comprehensibly
> express remorse under the limited circumstances
> presented by the prosecution.

(Mot. at 22, Pet. at 233 ¶ 625.)

In support of this claim, Petitioner seeks to present at an evidentiary hearing

the same testimony upon which he relies in Claim 10(10).  (Mot. at 22-23 (citing

Pet. Exs. 1-69, 71, 83-85, 153-72, 184, 223).)  While Drs. Jackman and Bronk

Froming make no statements in their declarations directly bearing upon Petitioner's

1   alleged lack of remorse, Dr. Zitner reports that Petitioner "was provided with no

2   moral rudder from which to decipher right from wrong." (Pet. Ex. 171 at 64 ¶

3   117.) Because an evidentiary hearing is needed to clarify the nature and weight of

4   the expert testimony regarding Petitioner's alleged remorselessness,[16] *see Earp*,

5   431 F.3d at 1173, the Court will include this subpart of Claims 10(6) and 10(9)

6   within the scope of the evidentiary hearing.

7   **XXIV.  Claim 10(11) and Claim 2(1) (in part)**

8          In Claims 10(11) and 2(1) (in part), Petitioner argues that counsel was

9   ineffective for failing to "obtain the assistance of an appropriate and competent

10  conflict-free mental health professional in the preparation and presentation of the

11  mitigating case on behalf of Mr. Cain." (Pet. at 237 ¶ 635; *see also* Pet. at 164-67

12  ¶¶ 431(c)-432; Mot. at 60-65.) Petitioner alleges that Dr. Donaldson was

13  inadequately informed about Petitioner's case and failed to properly identify

14  Petitioner's mental health problems. (Mot. at 44.) Petitioner claims, among other

15  issues, that had counsel obtained appropriate mental health expert assistance, he

16  would have identified and could have presented mitigating evidence of

17  "longstanding mental health disabilities, including organic non-psychiatric deficits,

18  psychiatric impairment, and symptoms of the overwhelming trauma he has

19  experienced, which affect his behavior and functioning." (*Id.* at 45.)

20         This Court has held that because Petitioner has presented no evidence that

21  the attorney who retained Dr. Donaldson to examine Cerda was associated with

22  CDA, as was Petitioner's trial counsel, it is reasonable to hold the appointment of

23  Dr. Donaldson was not an adverse effect arising from a conflict of interest. (*See*

24

25

26  [16] While the California Supreme Court on direct appeal considered Petitioner's argument that the

27  prosecutor committed misconduct in arguing remorselessness as an aggravating factor, *Cain*, 10
     Cal. 4th at 76-78, the court did not hold a hearing on the instant claim, that trial counsel

28  erroneously failed to present evidence of Petitioner's mental impairments to counter the alleged
     evidence of remorselessness.

*supra* pp. 43-44; Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 17-18.)  However:

> the issue of . . . whether trial counsel's performance with respect to the retention of Dr. Donaldson was constitutionally adequate [remains a separate matter].  Dr. Donaldson declares that it appears the scope of the referral question given to him was solely the existence of any mental state defenses at the guilt phase of the trial. Donaldson Decl. at ¶ 6.  Dr. Donaldson also declares:  'I believe that I was not informed at the time, nor was I aware until meeting present counsel, that Mr. Cain had been capitally charged.'  Donaldson Decl. at ¶ 7.

(Order re Pet'r's Outstanding Discovery Requests, Sept. 24, 2002, at 24.)

In support of Claims 10(11) and 2(1) (in part), Petitioner seeks to present at an evidentiary hearing the same testimony upon which he relies in Claim 10(10). (Mot. at 45-46, 64 (citing Pet. Exs. 1-69, 71, 83-85, 153-72, 184, 223).)  Because a hearing is needed to clarify the nature and weight of the evidence regarding whether counsel obtained appropriate mental health expert assistance and whether Petitioner was prejudiced by any deficiency, *see Earp*, 431 F.3d at 1173, the Court will include Claim 10(11) and this portion of Claim 2(1) within the scope of the evidentiary hearing.

## XXV.  Claim 10(9) as to Fontes Incident and Petitioner's Employment Status

In Claim 10(9) (in part), Petitioner alleges counsel was ineffective at the penalty phase of trial for failing to rebut aggravating factors argued by the prosecution by presenting evidence (a) "to show that Mr. Cain did not assault anyone with a deadly weapon during the Fontes incident;" and (b) to demonstrate that Petitioner "was a good, capable and conscientious worker who was always willing to work at an available job" and did not "live[] at home off of his father." (Pet. at 235-36 ¶ 632(a)-(b).)

### A.    Fontes Incident

As to the Fontes incident, Petitioner alleges, "After failing to obtain admission of any such evidence" that Mr. Cain did not assault anyone with a deadly weapon during the Fontes incident "through the testimony of Richard Clayton," counsel did not attempt to admit such evidence through other means. (*Id.* at 235 ¶ 632(a).)  The record, and Petitioner's own allegations elsewhere, contradict the factual basis for this claim.  Petitioner acknowledges, "A primary issue in the trial on this incident was whether a 'deadly weapon' was utilized in the assault, either an iron bar or a rock.  *Clayton denied the use of any rock by Mr. Cain* . . . ."  (*Id.* at 115 ¶ 257 (emphasis added).)  Indeed, Richard Clayton testified repeatedly on examination by defense counsel that Petitioner did not use a rock during the incident:

> Q.  You're well aware, are you not, of this accusation that Mr. Cain hit somebody with a rock?
> A.  Yes, I am.
> Q.  Is that true?
> A.  No, that is not true.  Not at all.
> Q.  Did you hear anybody say anything about rocks?
> A.  . . . [T]he big, big lady, the mother [of the victim], had her – her hand on my chest, pushing on me, going, 'Get a rock.  Get a rock.'  Was her exact words.
> Q.  And she's yelling?
> A.  The rock was their [the victim's family's] idea, yeah.  Exactly. . . .
> Q.  And there was a – you never saw Tracy Cain hit anybody with a rock; is that correct?
> A.  No.  There were no rocks involved. . . .
> Q.  He [Mr. Cain] didn't hit anybody with a rock?
> A.  No, he didn't.

(24 RT 6557-58.)  Although Clayton testified on cross-examination that he "was not standing there watching Tracy Cain" during the fight, he reaffirmed on redirect that he did not "see or hear anything to substantiate the accusation that Tracy Cain

1  *used a rock or any other weapon.*" (*Id.* at 6562-64 (emphasis added).)[17]  Thus,

2  contrary to Petitioner's claim, trial counsel did elicit testimony from Clayton that

3  Petitioner did not "assault anyone with a deadly weapon during the Fontes

4  incident." (Pet. at 235 ¶ 632(a).)  The California Supreme Court's rejection of this

5  portion of Petitioner's claim was therefore reasonable.

6  **B.    Employment Evidence**

7  Petitioner next alleges that counsel was ineffective for failing to present

8  evidence "rebutting [the] allegedly aggravating factor[] urged by the prosecution  .

9  . . that Mr. Cain lived at home off of his father . . . ." (*Id.* at 235-36 ¶ 632.)  On

10  direct appeal, the California Supreme Court considered a related claim that in

11  arguing that Petitioner "lived in his father's home while working only

12  sporadically[,] . . . the prosecutor inadvertently strayed from [] permissible

13  argument into suggesting laziness and selfishness were aggravating factors." *Cain*,

14  10 Cal. 4th at 79, 79 n.32.  The court concluded that "any error was harmless.

15  There is no reasonable possibility the jury was moved to sentence defendant to

16  death because he lacked permanent employment and lived with his father." *Id.* at

17  79 n.32.

18  Defense counsel presented some evidence of Petitioner's employment.  At

19  the penalty phase, Clayton, a general engineering contractor, testified that

20  Petitioner was working for him in 1985 at the time of the Fontes incident. (24 RT

21  6552-53.)  The jury also learned during the guilt phase that Petitioner was

22  employed by Manpower Temporary Service in 1986 and sent to various jobs (21

23  RT 5661-65; *see also* Pet. Ex. 177 at 2-3 (discussed at 21 RT 5850)), but that

24  employment was not presented or emphasized at the penalty phase.

25

26

27  [17]  On defense counsel's motion, the trial court excluded any evidence suggesting that Petitioner had used an iron bar. (24 RT 6486-87.)  The prosecutor did not argue, and no evidence was

28  presented, that Petitioner used an iron bar or any weapon other than a rock in the incident. (*See* 24 RT 6446, 6485-86.)

Although the California Supreme Court considered Petitioner's prosecutorial misconduct claim on direct appeal, the ineffective assistance of counsel claim at hand turns on other evidence.  An evidentiary hearing is needed to weigh the employment evidence that trial counsel could have offered in mitigation, and counsel's investigation and strategy surrounding that evidence.  *See Bonin*, 59 F.3d at 834 (holding that when a petitioner claims that defense counsel failed to present evidence in mitigation, "in order to determine whether [counsel's actions] . . . might have affected the jury's decision, it is essential to compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently"); *Earp*, 431 F.3d at 1173.  Accordingly, the Court will include this portion of Claim 10(9) within the scope of the evidentiary hearing.

**XXVI.  Claim 10(14)**

In Claim 10(14), Petitioner alleges trial counsel was ineffective for failing to argue the absence of premeditation as a factor in mitigation.  (Pet. at 238 ¶ 638; Mot. at 47-48.)  Petitioner alleges that testimony from "mental health experts regarding Petitioner's capacity (or lack thereof) to premeditate and deliberate" would support his claim.  (Mot. at 49 (citing Pet. Exs. 169-71).)

Petitioner raised this claim on direct appeal.  The California Supreme Court reasoned:

"Defendant contends his attorney incompetently and prejudicially neglected to argue his lack of premeditation was a mitigating circumstance of the offense.  The record belies this claim.  The lack of premeditation and deliberation was counsel's primary argument as to the circumstances of the capital crimes.  He argued: '[T]here was no preplanning for killing.  There was no talking about killing.  There was no arming yourselves with a weapon.  There was no deliberate killing.'  He then described several capital cases with which he was familiar that involved preplanning and deliberation.  He concluded: 'To compare this with this was a spontaneous act.  There was no preplanning whatsoever.  The lack of

1    premeditation. . . .  That makes this case not excusable, *but certainly not as bad as*

2    *some of these others*.'  Counsel then tied the lack of premeditation to the defense

3    theory defendant was impaired by drug use and was desperate for money with

4    which to obtain more drugs:  '*Mitigation*, ladies and gentlemen -- another part of

5    *mitigation* is intoxication. . . .  We know he was intoxicated. . . .  He was using

6    crack.  The compunction, ladies and gentlemen, to use cocaine was certainly there.

7    I submit, ladies and gentlemen, that he could no more control that urge for cocaine

8    than probably you and I can control being right-handed. . . .  That's a far cry from a

9    person who is sober, who looks around, who creeps in, who tapes somebody up

10   and kills them with an axe.  It's a far cry from the kind of person who arms

11   themselves with a gun and deliberately shoots and kills.'

12       Counsel's line of argument, while ultimately unsuccessful, was reasonable

13   and clear.  The jurors could not have failed to understand he was arguing lack of

14   premeditation and deliberation was a mitigating circumstance of the crimes."

15   *Cain*, 10 Cal. 4th at 79-80 (emphasis in original).

16       On habeas review, Petitioner alleges that mental health expert testimony

17   would support his claim that counsel's performance was deficient.  (Mot. at 49

18   (citing Pet. Exs. 169-171).)  Specifically, Petitioner seeks to present evidence from

19   Dr. Jay Jackman (Pet. Ex. 169), Dr. Karen Bronk Froming (Pet. Ex. 170), and Dr.

20   Ruth Zitner (Pet. Ex. 171) regarding his lack of capacity to premeditate and

21   deliberate.  Dr. Bronk Froming draws no conclusions, general or specific,

22   regarding Petitioner's capacity to premeditate and deliberate.  (*See* Pet. Ex. 170.)

23   Dr. Jackman makes only one statement potentially relevant to the claim, that "Mr.

24   Cain has significant psychiatric and neurologic dysfunction that affected his

25   behavior at the time of the offense for which he has been sentenced to death."  (Pet.

26   Ex. 169 at 26.)  Similarly, Dr. Zitner states only that "[i]t is reasonable to believe

27   that the combination of Tracy's head traumas, chronic ingestion of alcohol and

28   drugs and in utero alcohol exposure caused brain damage that has effected [sic] his

110

behavior and mental functioning throughout his entire life, including the time of his crime."  (Pet. Ex. 171 at 64.)

While the expert declarations do little to address directly Petitioner's capacity to premeditate and deliberate, an evidentiary hearing is necessary to determine what evidence Petitioner's counsel may have been able to present in mitigation, whether he investigated adequately, and whether he made a strategic decision not to present such evidence.  *See Bonin*, 59 F.3d at 834 (holding that when a petitioner claims that defense counsel failed to present evidence in mitigation, "in order to determine whether [counsel's actions] . . . might have affected the jury's decision, it is essential to compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently"); *Earp*, 431 F.3d at 1173, 1175.  Accordingly, the Court will include Claim 10(14) within the scope of the hearing.

**XXVII.  Claim 10(15)**

In Claim 10(15), Petitioner alleges trial counsel was ineffective for failing to object to numerous instances of prosecutorial misconduct.  (Pet. at 238 ¶ 639; Mot. at 48.)  Specifically, Petitioner alleges counsel erroneously failed to object to:

> (a)  the presentation of evidence in aggravation regarding a prior felony of which Petitioner was acquitted;
>
> (b)  the admission of an alleged "lack of remorse" as an aggravating factor;
>
> (c)  the presentation of an invalid attempted rape finding as a basis for imposing the death penalty;
>
> (d)  the admission of a non-violent and unconstitutional felony conviction;
>
> (e)  the admission of an uncharged, unadjudicated, and unreliable allegation of assault; and
>
> (f)  false, inaccurate, and inflammatory statements by the prosecution during argument.

(*Id.* (referencing Ninth Claim for Relief, Pet. at 217-18).)

111

To establish ineffective assistance of counsel, Petitioner must show that it is reasonable that the trial court would have sustained the objection or granted the motion as meritorious. *Wilson*, 185 F.3d at 990 ("To show prejudice under *Strickland* from failure to file a motion," petitioner must show, in part, that "had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious"); *Juan H.*, 408 F.3d at 1273 ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection"); *Molina*, 934 F.2d at 1447 (holding that because evidence was admissible, "the decision not to file a motion to suppress it was not prejudicial. . . . [I]t is not professionally unreasonable to decide not to file a motion so clearly lacking in merit").

**A.     Presentation of Evidence in Aggravation regarding Prior Felony**

Petitioner alleges counsel failed to object to prosecutorial misconduct in the presentation of evidence that Petitioner used a rock as a weapon during the Fontes incident. (Pet. at 218 ¶¶ 575-77, 238 ¶ 639.) Petitioner argues that the evidence impermissibly suggested that Petitioner had used a deadly weapon in the incident, a felony offense of which he was acquitted, or, alternatively, improperly presented evidence of a misdemeanor conviction. (*Id.* at 575 (citing Cal. Penal Code § 190.3(c)).)

Contrary to Petitioner's allegation, trial counsel brought a motion to exclude evidence regarding the rock and the Fontes incident before any such evidence was presented. (*See* 1 CT 87 ("The motion of counsel for the defendant to exclude the testimony of Mrs. Fontes and said incident is taken under submission by the court"); 2 RT 188, 213.) Counsel explained that Petitioner was acquitted on charges of assault with a deadly weapon and using force or violence resulting in serious bodily injury, and was convicted only of a lesser included offense of misdemeanor battery. (24 RT 6471.) Counsel argued that because the jury found Petitioner not guilty on the felony charges, the jury must have found that Petitioner did not use the rock. (24 RT 6470-87.) He explained that:

112

> the defense position, as an offer of proof, is that . . . [a]
> fight broke out between these other two people.  Later on
> Mr. Cain went over to help and he hit somebody but he
> didn't hit anybody with a rock.  That was the theory
> advanced at the trial . . . .  [H]e certainly wasn't
> convicted of using a weapon, a bar or a rock or anything
> else.  So now at a penalty phase, when it says you can't
> present evidence of an offense for which the defendant
> was prosecuted and acquitted, how can [] they have
> another bite of the apple when she [Fontes] can come in
> here and testify that he hit somebody with a rock?

(*Id.* at 6482.)

The trial court denied counsel's motion.  (*Id.* at 6486.)  The court reasoned that the only evidence "presented at that trial, upon which a jury could make any finding, was that Mr. Cain hit him with a rock.  Then they had to have found the guilty verdict on those facts."  (*Id.* at 6483.)  The court ruled that Fontes's testimony would "be limited solely to those facts from which the reasonable inference of a misdemeanor battery could be drawn since he was acquitted of the other.  But I think that does include the striking with a rock . . . ."  (*Id.* at 6486.)  Counsel preserved his objection to the admission of Fontes's testimony when she was found unavailable and her testimony was read to the jury.  (*Id.* at 6520-21.)

Counsel, therefore, did not fail to object to the introduction of evidence that Petitioner used a rock during the Fontes incident, as Petitioner alleges.  (Pet. at 218 ¶¶ 575-77, 238 ¶ 639.)  The California Supreme Court's rejection of Petitioner's claim of ineffective assistance of counsel on that basis was not unreasonable.  This portion of Claim 10(15) is denied.

### B.    Argument regarding Lack of Remorse

Next, Petitioner alleges that trial counsel failed to object to the prosecutor's misconduct in arguing lack of remorse as an aggravating factor.  (Pet. at 220 ¶ 581, 238 ¶ 639.)  Contrary to Petitioner's contentions, counsel did move to "exclude evidence or argument regarding Defendant's lack of remorse."  (2 RT 44; *see also*

2 RT 3, 45-55; 18 RT 4873-74, 4879, 4884-89; 19 RT 5097-5144; 24 RT 6403-04; 25 RT 6717-55; 1 CT 47-50 (Notice of Motion to Exclude Evidence or Argument regarding Defendants [sic] Lack of Remorse and Points and Authorities); 1 CT 219-22 (Supplemental Points and Authorities to Exclude Evidence or Argument regarding Defendants [sic] Lack o[f] Remorse).)  Counsel repeatedly argued that (1) "lack of remorse is a nonstatutory factor outside the permissible scope of Penal Code section 190.3," (1 CT 48), and (2) allowing such an argument would permit the jury to "infer[] lack of remorse from the exercise of constitutional rights," such as pleading not guilty and declining to testify.  (*Id.* at 48-49 (internal quotation omitted).)  Counsel argued that "where there's no confession and no acknowledgment of guilt, where the defendant did not take the stand, that it's [not] permissible to argue that he feels no remorse."  (25 RT 6722.)  He emphasized that "you can only be remorseful if you're guilty.  The fact that the jury says he's guilty doesn't mean he's guilty.  They say there's proof beyond a reasonable doubt of his guilt.  And that's different."  (*Id.* at 6737.)

The trial court agreed that "[i]n the absence of an acknowledgment by the defendant that he has done anything to be sorry for, . . . remorse should not be permitted to be argued nor should a finder of fact be permitted to infer a lack of remorse . . . ."  (*Id.* at 6744.)  The court denied counsel's motion, however, because it found that Petitioner did:

> acknowledge[] and admit[] perpetrating crimes upon the Galloways and assisting others in perpetrating crimes upon the Galloways as a result of which the Galloways died.  Whether he admits killing them personally or not, he acknowledges being present when the acts were done . . . .  [A]ny person under like circumstances could be expected . . . to manifest in his behavior either a feeling of remorse or a lack of feeling of remorse. . . .  If one does not express remorse or sympathy or pity or concern, then he is not sorry for what he personally has done.  And such presence or absence of remorse from the facts of

114

> this case are matters which the jury can consider in
> determining the appropriate punishment. . . .  I think that
> is a matter that properly can be argued as a factor in
> aggravation. . . .  The district attorney may argue that
> such facts show lack of remorse because there was
> reasonable opportunity given to the defendant to display
> such emotion, had he chosen to do so.

(*Id.* at 6746-51.)

Counsel, therefore, did not fail to object to the introduction of evidence or argument that Petitioner lacked remorse, as Petitioner alleges.  (Pet. at 220 ¶ 581, 238 ¶ 639.)  The California Supreme Court's rejection of Petitioner's claim of ineffective assistance of counsel on that basis was not unreasonable.  This portion of Claim 10(15) is denied.

## C.    Inclusion of Attempted Rape Special Circumstance in Aggravation

Petitioner alleges counsel failed to object to prosecutorial misconduct in the inclusion of the attempted rape special circumstance finding as an aggravating factor.  (Pet. at 224-25 ¶ 588, 238 ¶ 639.)  As noted above (*supra* p. 66 n.10), at the penalty phase of trial, the jury properly takes into account any special circumstances found to be true at the guilt phase.  Cal. Penal Code § 190.3(a).  The California Supreme Court could reasonably have concluded that because the jury found true the attempted rape special circumstance allegation (2 CT 411), counsel could not have been ineffective for failing to object to its consideration at the penalty phase.  *See Juan H.*, 408 F.3d at 1273; *Wilson*, 185 F.3d at 990; *Molina*, 934 F.2d at 1447.  This portion of Claim 10(15) is therefore denied.

## D.    Inclusion of Automobile Theft Conviction in Aggravation

Petitioner alleges counsel failed to object to prosecutorial misconduct in the introduction of evidence in aggravation of Petitioner's conviction for automobile theft at age eighteen.  (Pet. at 225 ¶ 589, 238 ¶ 639.)  Petitioner claims that the

1  prosecutor's introduction of the conviction was misconduct because (1) a "prior

2  non-violent felony conviction of an 18-year[-]old does not bear the necessary

3  relationship to the capital offense that is required in order that the penalty

4  determination be a reliable one" (*id.* at 225 ¶ 592) and (2) "the prosecutor's use of

5  this conviction violated the Double Jeopardy clause." (*Id.* at 226 ¶ 594.)

6       The California Supreme Court considered the first of Petitioner's arguments

7  on direct appeal. *Cain*, 10 Cal. 4th at 75-76. The court held:

> In his facial challenge, defendant asserts the existence of
> prior nonviolent felony convictions does not rationally
> assist the jury in deciding which capital defendants are
> worthy of the death penalty. We have held that prior
> felony convictions not involving force or violence are
> relevant to demonstrate that the capital offense was
> undeterred by prior successful felony prosecutions. Prior
> convictions tend to show the capital offense was the
> culmination of habitual criminality – that it was
> undeterred by the community's previous criminal
> sanctions. Defendant offers no authority for his view that
> consideration of such convictions renders the penalty
> decision unfair or unreliable. . . .
>
> As to the specific use of defendant's auto theft
> conviction, defendant argues his conviction for 'teen-age
> participation in a car theft' was irrelevant or unreliable as
> a factor in the penalty decision. Taken alone, of course, a
> prior auto theft, by a teenager or anyone else, would not
> be a reason for choosing a death sentence. The
> conviction here, however, was not taken alone; it was but
> one fact in defendant's background the jury could
> consider in assessing his character and culpability.
> Together with the evidence of later violent conduct . . . as
> well as the capital crimes, it tended to show a pattern of
> criminal behavior undeterred by penal sanctions.

*Id.* (internal quotations and citations omitted).

     The state high court did not unreasonably apply Supreme Court precedent in

holding that the jury could properly consider a non-violent felony in aggravation.

116

*See Barclay v. Florida*, 463 U.S. 939, 945, 956 (1983) (holding, in capital case, that "nothing in the United States Constitution prohibited the trial court from considering [defendant's] criminal record" including "breaking and entering with intent to commit the felony of grand larceny, [about which] the trial judge did not know whether it involved the use or threat of violence"). The jury could also properly consider the felony in aggravation notwithstanding Petitioner's age of eighteen years at the time of the offense. *Cf. Cox v. Ayers*, 613 F.3d 883, 889 (9th Cir. 2010) (affirming denial of capital habeas relief where the "prosecutor presented aggravating factors in the form of evidence about two robberies in which Petitioner had participated as a juvenile"). Finally, as to Petitioner's second argument raised here, the consideration of the prior conviction in aggravation did not violate Petitioner's double-jeopardy protections. *Cf. Sattazahn v. Pennsylvania*, 537 U.S. 101, 105, 116 (2003) (holding prosecution may seek death penalty based on aggravating prior felony convictions, against double-jeopardy challenge raised on other grounds).

The California Supreme Court's denial of this claim, on habeas review and in part on direct appeal, was therefore not unreasonable. Claim 10(15) as to ineffective assistance of counsel on this basis is denied.

### E.   Presentation of Evidence of Alleged Assault on Parker

Petitioner alleges counsel failed to object to prosecutorial misconduct in "pressuring [] witness Anita Parker to provide factually inaccurate and incomplete information, and [making] constitutionally impermissible use of the totally unreliable and uncharged allegation of assault" by arguing it as a factor in aggravation. (Pet. at 227 ¶ 596; *see also id.* at 113 ¶¶ 247, 249; 238 ¶ 639.) Specifically, Petitioner alleges:

> [T]he district attorney's investigator and [Parker's] father (who hated Mr. Cain) colluded to force her testify [sic] about the alleged assault with the tire iron, and that she was pressured into giving this testimony. . . . [T]he

1
2
3
4
5
6
7

> prosecutor in Mr. Cain's case, and his agents, pressured
> Ms. Parker into presenting [the incident]. . . .
> Furthermore, the prosecutor did not have the witness
> testify truthfully about her lengthy history of assaults on
> boyfriends in general and Mr. Cain in particular, in spite
> of his knowledge of these facts, and instead presented a
> truncated and factually inaccurate account of this
> incident.  Then, the prosecutor relied extremely heavily
> on this purported 'crime' as factor [sic] in aggravation
> justifying imposition of the death penalty.

8

(Pet. at 113 ¶¶ 247, 249.)  Petition makes no other factual allegations in support of

9

this claim.

10

    This Court has ruled that Petitioner's claim that counsel failed to object to

11

the prosecutor's use of the Parker incident is unexhausted.  (Order re Respt.'s Mot.

12

to Dismiss 2d Am. Pet., July 23, 2001, at 14 ("Petitioner['s] claim[] that trial

13

counsel was ineffective because he did not object to the use of the assault incident

14

involving Anita Parker as an aggravating factor . . . was not presented" to the state

15

court.)  That allegation is not appropriate for an evidentiary hearing.

16

    As to Petitioner's claim that the investigator and Parker's father "colluded"

17

to pressure or force Parker to testify, the California Supreme Court could have

18

reasonably determined that the allegation is not supported by her declaration or by

19

any other evidence.  Parker declares:

20
21
22
23
24

> I remember the day that the District Attorney's
> investigator came to interview me about Tracy's case.
> My father was present for the entire interview.  My father
> hated Tracy and he answered all of the questions that the
> investigator asked of me.  I didn't have [a] chance to
> answer the questions.

25
26
27
28

> The investigator wanted to know about the time that
> Tracy and I had a fight and Tracy hit me with a tire iron.
> My father told him the story and I didn't have a chance to
> answer.  After my father told the story, I felt I had to
> stick with it because both my father and the investigator

would have been really angry if I changed it.

(Pet. Ex. 178 ¶¶ 8-9.)  There is nothing in Parker's declaration to indicate any collusion between the police and her father.  Parker makes no statement that the investigator and her father had any agreement or arrangement whatsoever.  Any common interest between the investigator and Parker's father in aiding Petitioner's prosecution does not show prosecutorial misconduct.

Similarly, the court could have reasonably determined that Parker's statements provide no support for Petitioner's allegations that the prosecutor pressured her into testifying, falsely or otherwise.  Parker says that her father, not the investigator, kept her from answering the investigator's questions.  She provides no basis for her statement that the investigator "would have been really angry" if she told a different story from her father's.  (Pet. Ex. 178 ¶ 9.)  Parker's potentially unreasonable belief, absent any supporting allegations, cannot establish prosecutorial misconduct.  The court was also reasonable to reject Petitioner's claim that the prosecutor presented untruthful and inaccurate testimony from Parker.  Petitioner's only specific allegation in support is that "the prosecutor did not have [Parker] testify truthfully about her lengthy history of assaults on boyfriends in general and Mr. Cain in particular," leading to an inaccurate portrayal of the incident.  (Pet. at 113 ¶ 249.)  Trial counsel had successfully moved, however, to exclude evidence regarding all incidents of violence surrounding Parker besides that involving the tire iron (*see* 2 RT 177-78, 181-82; 24 RT 6460-66), a motion Petitioner does not challenge as ineffective.  Those incidents included one in which Parker stabbed Petitioner in the arm with a steak knife, because he was holding her sister on the ground.  (2 RT 150; *see also id.* at 177-78.)  Nevertheless, on cross-examination trial counsel elicited testimony from Parker that she once cut Petitioner on the arm with a knife.  (24 RT 6457.)  The prosecutor was barred from presenting that incident, or any others, by the trial court's ruling.  Finally, the California Supreme Court could have reasonably

1   determined both that there is no evidence in the record of any assaults by Parker on

2   other boyfriends and that the prosecutor would have had no duty to question Parker

3   about any such assaults.

4         Thus, the state high court would have been reasonable in concluding that

5   Petitioner's allegations of prosecutorial misconduct toward Parker are unsupported,

6   and as a result, that his claim of ineffective assistance of counsel for failing to

7   object does not merit relief.  *See Juan H.*, 408 F.3d at 1273.  Accordingly, this

8   portion of Claim 10(15) is denied.

9         **F.     False, Inaccurate, and Inflammatory Statements in Argument**

10        Petitioner alleges counsel failed to object to the prosecutor's misconduct in

11  making "false, inaccurate and inflammatory statements" in his penalty-phase

12  arguments.  (Pet. at 227 ¶ 597, 238 ¶ 639; *see also* Pet. at 120 ¶ 277.)  Petitioner

13  claims the prosecutor (1) improperly referred to Petitioner's "'attitude' and failure

14  to express numerous vague emotions as a 'strong aggravating factor;'" (2)

15  provided a "personal interpretation" of the evidence; (3) "testif[ied]" about his own

16  life to derogate Petitioner's mitigation evidence; and (4) made "false and

17  inflammatory statements regarding the evidence presented and Mr. Cain

18  personally."  (*Id.* at 227 ¶ 597.)

19              **1.     Legal Standard**

20        "In evaluating allegations of prosecutorial misconduct," including claims

21  "that the prosecution made [improper] statements in summation," the Court must

22  "consider whether the prosecution's actions 'so infected the trial with unfairness as

23  to make the resulting conviction a denial of due process.'"  *Hein v. Sullivan*, 601

24  F.3d 897, 912 (9th Cir. 2010) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181

25  (1986)).  "It is not enough that the prosecutors' remarks were undesirable or even

26  universally condemned."  *Darden*, 477 U.S. at 181.  Petitioner must demonstrate

27  that the prosecutor's error was not "harmless," but "had substantial and injurious

28  effect or influence in determining the jury's verdict," or leaves "grave doubt" about

whether the error affected the jury.  *Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008) (internal quotation omitted).  In determining whether a comment rendered a trial constitutionally unfair, the court may consider:

> whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence.

*Hein*, 601 F.3d at 912-13 (citing *Darden*, 477 U.S. at 182).

"Because many lawyers refrain from objecting during . . . closing argument, absent egregious misstatements, the failure to object during closing argument . . . is within the 'wide range' of permissible legal conduct."  *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993).

### 2.     California Supreme Court Determination

The California Supreme Court considered Petitioner's claim on direct appeal.  The court held:

> The prosecutor did not misconduct himself in giving his interpretations of two statements made by defendant ('That's on them' and 'They laugh at shit like that, man'); although the meaning of these phrases was less than absolutely clear, the prosecutor's interpretations were reasonable.  Nor did he go beyond the evidence in arguing defendant had led a selfish and brutal life, had used his physical strength to intimidate and frighten others and had lived in his father's home while working only sporadically.  Finally, the prosecutor's passing reference to the death of his own maternal grandparents when his mother was only 13 years old bore no reasonable possibility of influencing the penalty verdict. Since all these asserted instances of unobjected-to misconduct were either proper or clearly harmless, we . . . reject defendant's claim counsel's failure to object constituted ineffective assistance.

*Cain*, 10 Cal. 4th at 78-79 (citations and footnote omitted).

### 3.    Analysis

#### a.    Comments on Petitioner's Attitude

First, Petitioner argues counsel was ineffective for failing to object to the prosecutor's discussion of Petitioner's attitude and emotional response to the crimes.  (Pet. at 118-19 ¶¶ 268-71, 238 ¶ 639.)

The prosecutor referred to Petitioner's "attitude after the crime is committed."  (25 RT 6788.)  He discussed Petitioner's alleged:

> (a)  statements that "I knocked them smooth out" and "I got thousands," saying Petitioner "brags about such things" (*id.*);

> (b)  reentry into the Galloways' home, saying it "doesn't horrify him.  That doesn't make him feel:  Oh, what have I done?  No.  He goes out after that, goes on a shopping spree."  (*Id.* at 6789).  "That's pretty cold."  (*Id.*);

> (c)  purchase of a newspaper to "read[] about his exploits.  Cold-hearted."  (*Id.*);

> (d)  statement to the television reporter, "den[ying] knowing anything about it.  No respect for the truth.  No, you know, go talk to somebody else.  No, I'm going to be on TV.  I'm a big man.  Absolutely extraordinary.  No sense of decency.  No shame."  (*Id.* at 6789-90);

> (e)  statement, when asked if he killed the Galloways, "'That's on them.'  That's their tough luck. . . .  They're fake, they're dead, they're gone.  That's their problem."  (*Id.* at 6790);

> (f)  statement to police, when asked if he felt anything for the Galloways when he reentered the house, that he "'was scared.'  Look out for number one.  The hell with anybody else. . . .  'They laugh at shit like that, man.'  Who does Tracy blame it on?  Everybody else? . . .  He

122

> can't bring himself to recognize them as human beings
> . . . . He's given every opportunity to express sorrow,
> sympathy, pity, remorse. Nothing. . . . Just a fear that
> he'd be caught. Selfish. Remorseless. You know, in a
> sense it's not the defendant's size that frightens you. . . .
> It's his attitude toward other human beings."

(*Id.* at 6790-91.)

Counsel moved to exclude evidence or argument regarding Petitioner's lack of remorse before the prosecutor's argument. (*See supra* p. 114.) The trial court denied counsel's motion, ruling:

> [A]ny person under like circumstances could be expected
> . . . to manifest in his behavior either a feeling of remorse
> or a lack of feeling of remorse. . . . And such presence or
> absence of remorse from the facts of this case are matters
> which the jury can consider in determining the
> appropriate punishment. . . . I think that is a matter that
> properly can be argued as a factor in aggravation. . . .
> The district attorney may argue that such facts show lack
> of remorse because there was reasonable opportunity
> given to the defendant to display such emotion, had he
> chosen to do so.

(*Id.* at 6746-51.)

Counsel objected in advance to the arguments regarding lack of remorse; he was not ineffective for failing to object. The California Supreme Court may have reasonably found that the record demonstrates it is not reasonable that the trial court would have sustained a second objection to the prosecutor's arguments, and thus that Petitioner cannot establish prejudice. *See Wilson*, 185 F.3d at 990 ("To show prejudice under *Strickland* from failure to file a motion," petitioner must show, in part, that "had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious"). Because the court's denial of Petitioner's claim was not unreasonable, Claim 10(15) as to arguments on lack of remorse is denied.

123

**b.      Personal Interpretation of the Evidence**

**(1)      Allegations**

Next, Petitioner argues trial counsel erroneously failed to object to the prosecutor's personal interpretations of the evidence.  (Pet. at 119-20 ¶ 274, 238 ¶ 639.)  Specifically, Petitioner alleges that:

> the prosecutor first deliberately misstated the testimony regarding the hearsay question that Mr. Cain's brother supposedly asked, and claimed that the question specifically asked Mr. Cain if he killed the Galloways. (RT 6790[].)
>
> The prosecutor then compounded this misconduct by repeatedly stating his own personal interpretations of Mr. Cain's alleged answer . . . .  This argument . . . consisted of pure speculation.  An equally valid interpretation of the phrase is that Mr. Cain was asserting ignorance as to the condition of the individuals in question, or that the 'them' referred to other individuals who had perpetrated the crime.

(Pet. at 119-20 ¶ 274.)  Petitioner takes issue with the prosecutor's argument that Petitioner's alleged statement, "That's on them," (20 RT 5498), meant, "That's their [the Galloways'] tough luck. . . . They're fake, they're dead, they're gone. That's their problem."  (25 RT 6790.)

//

//

**(2)      Analysis**

The prosecutor asked Mendoza on direct examination:

> Q.      Well, did anybody ask him [Petitioner], 'Did you kill anybody?'
> A.      Yes.
> Q.      Who asked him that?
> A.      Humm – Val.
> Q.      What did Val ask him?
> A.      What did he do with the people.

124

1      Q.     And what did the defendant say?

2      A.     'That's on them.' . . .

3  (20 RT 5498.)

4      In his closing argument, the prosecutor told the jury that Val asked

5  Petitioner, "'Did you kill those people?'"  (25 RT 6790.)  Given that Mendoza

6  affirmed that Val asked Petitioner, "Did you kill anybody," the California Supreme

7  Court may have reasonably determined that the prosecutor did not misstate the

8  evidence.

9      As to the prosecutor's interpretation of "That's on them," the California

10  Supreme Court held that "the prosecutor's interpretations were reasonable."  *Cain*,

11  10 Cal. 4th at 78.  The court may have reasonably determined that this argument by

12  the prosecutor also stated a "reasonable inference" based on the record.  *See United*

13  *States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996); *cf. United States v. Young*,

14  470 U.S. 1, 8 n.5 (1985) (quoting American Bar Association's "useful guideline[]"

15  that "[t]he prosecutor may argue all reasonable inferences from evidence in the

16  record").  On facts similar to those at hand, the defendant in *Atcheson* alleged that:

> 17    the prosecutor argued outside the record when referring
> 18    to [defendant's] failure to deny his involvement in the
>     crime to his cousin, Jeff Ettleman.  Ettleman testified that
> 19    he read to [defendant] a newspaper article naming him as
> 20    one of the perpetrators of the crime.  Ettleman further
>     testified that [the defendant] interrupted him as he read
> 21    the first names of the other suspects and that [the
>     defendant] supplied the last names of the suspects.  The
> 22    Government, in referring to this testimony, argued as
> 23    follows:  'But what's more important about Ettleman's
>     testimony is what [the defendant] didn't say to him.  [The
> 24    defendant] didn't say, "Are you kidding me?  They got
> 25    me charged with a crime that serious?"  And "I didn't do
> 26    it."'

27  94 F.3d at 1244.  The Ninth Circuit held that "it was reasonable for the prosecutor

28

1    to infer from Ettleman's testimony that [the defendant] did not deny his

2    involvement in the crime to his cousin." *Id.* at 1244.

3          The California Supreme Court may have reasonably determined that the

4    prosecutor's comment here, as in *Atcheson*, was a reasonable inference from the

5    record.  Indeed, Petitioner himself implicitly concedes that the prosecutor's

6    interpretation was "equally valid" to the one posited in his Petition.  (Pet. at 119-20

7    ¶ 274.)  Counsel cannot be ineffective for failing to raise an objection to an

8    unobjectionable comment.  *See Juan H.*, 408 F.3d at 1273.  Accordingly, the

9    California Supreme Court was not unreasonable in denying this portion of Claim

10   10(15).

11                    **c.      Testimony about Prosecutor's Life Experiences**

12         Third, Petitioner argues trial counsel failed to object to the prosecutor's

13   "testimony" about his life experience to derogate Petitioner's mitigation evidence.

14   (Pet. at 120 ¶¶ 275-76, 238 ¶ 639.)  Petitioner alleges that "[i]n denigrating the

15   effect of Mr. Cain's mother committing suicide in the Jonestown tragedy when he

16   was only a teenager, the prosecutor testified regarding his own response to the

17   death of both his maternal *grandparents* when he was only 13.  (RT 6805[]).''  (*Id.*

18   ¶ 275 (emphasis in original).)  Petitioner claims the prosecutor committed

19   misconduct in attempting "to rebut a mitigating circumstance with his own

20   personal history outside the record."  (*Id.* ¶ 276.)

21         Petitioner misstates the prosecutor's argument slightly.  The prosecutor

22   remarked upon his mother's parents' deaths by the time his mother was 13, not by

23   the time he was 13, and he said nothing about his or his mother's response to their

24   deaths.  He argued:

25               So what effect does his natural mother dying in
                 Jonestown have?  We all had bumps along the road.  We
26               all have – my mother's parents were both dead by the
                 time she was 13.  You know, we could all think of
27               examples of things that have gone wrong.  Is life perfect?
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The answer is no.

(25 RT 6805-06.)

The California Supreme Court held that "the prosecutor's passing reference to the death of his own maternal grandparents when his mother was only 13 years old bore no reasonable possibility of influencing the penalty verdict." *Cain*, 10 Cal. 4th at 79.  That conclusion is not unreasonable, taking the statement in isolation.  On habeas review, however, this Court must "first analyze the prosecutorial misconduct challenges to assess whether they alone so infected the trial with unfairness as to make the resulting conviction a denial of due process.  If the prosecution's comments alone do not meet this standard, we analyze them together" with any allegations of prosecutorial misconduct in failing to disclose evidence to the defense, "to determine whether there is a reasonable probability that without those violations the result of the proceeding would have been different.  In doing so, we concentrate on the touchstone of *Brady*'s materiality standard:  that, even with the trial errors, petitioners received 'a trial resulting in a verdict worthy of confidence.'"  *Hein*, 601 F.3d at 915-16 (quoting *Kyles*, 514 U.S. at 434).

Before the Court would reach any prejudice analysis here, however, Petitioner would have to demonstrate that the California Supreme Court's application of the deficient performance prong of the *Strickland* standard was unreasonable.  *See Richter*, 131 S. Ct. at 784 (holding petitioner must show "there was no reasonable basis for the state court to deny relief," regardless of "whether or not the state court reveals which of the elements in a multipart claim it found insufficient").

The *Richter* Court noted:

> Although courts may not indulge *post hoc* rationalization
> for counsel's decisionmaking that contradicts the
> available evidence of counsel's actions, neither may they
> insist that counsel confirm every aspect of the strategic

127

1
2
3
4

> basis for his or her actions.  There is a strong
> presumption that counsel's attention to certain issues to
> the exclusion of others reflects trial tactics rather than
> sheer neglect. . . .  *Strickland* . . . calls for an inquiry into
> the objective reasonableness of counsel's performance,
> not counsel's subjective state of mind.

5
6
7
8
9
10
11
12

*Id.* at 790 (internal quotations and citations omitted).  There is no available evidence suggesting that counsel's non-objection to the prosecutor's statement was not a reasonable trial tactic.  "Because many lawyers refrain from objecting during . . . closing argument, absent egregious misstatements, the failure to object during closing argument . . . is within the 'wide range' of permissible legal conduct."  *Necoechea*, 986 F.2d at 1281.  The California Supreme Court, therefore, could have reasonably determined that trial counsel's performance in not objecting to the prosecutor's statement was objectively reasonable.

13
14

Accordingly, Petitioner is not entitled to federal habeas relief on this portion of Claim 10(15).

15
16

### d.    False and Inflammatory Statements regarding Evidence and Petitioner

17
18
19
20
21

Fourth, Petitioner argues trial counsel failed to object to the prosecutor's false and inflammatory statements regarding the evidence and Petitioner himself. (Pet. at 120-22 ¶¶ 277-82, 238 ¶ 639.)  The California Supreme Court held on direct appeal that the prosecutor did not "go beyond the evidence" in any of the arguments Petitioner challenges here.  *Cain*, 10 Cal. 4th at 79.

22
23
24
25
26
27
28

At the outset, Petitioner alleges that the prosecutor "repeatedly referred to Mr. Cain's physical size, and asserted that Mr. Cain had 'built himself up' just so he could 'frighten and intimidate people.'"  (Pet. at 120 ¶ 278 (citing 25 RT 6791, 6797, 6807).)  Petitioner contends that the statements were unsupported because Petitioner's size was "simply not that remarkable," there was evidence at trial that Petitioner had done physical labor and construction work and no evidence of body-building or exercising, and there was no evidence that Petitioner had ever used his

128

size or alleged strength to frighten or intimidate anyone.  (*Id.*)

The prosecutor argued:

> You know, in a sense it's not the defendant's size that
> frightens you.  It's his attitude.  It's his attitude toward
> other human beings.  He's a big man, but it's his attitude
> that's frightening. . . .  On the prior history, remember,   .
> . . [t]he defendant is in a juvenile detention facility in
> Arizona, and he belts the guard.  And it was even brought
> out, you know, hey didn't your glasses have a lot to do
> with your injury?  Well, is that a mitigating factor, if you
> slug a guy and he has glasses or doesn't have glasses
> when you're as big as the defendant is, you're going to
> produce an injury, now it may be a little bit worse? . . .

> There's no excuse for what he did.  Not at all.  You know,
> the one improvement he's made in life.  He didn't improve
> himself as vis-a-vis schooling.  He didn't improve himself
> by saying, I'm going to best welder [sic], I'm going to best
> plumber [sic] or I'm going to be an architect.  What did he
> do?  He did that he built himself up for, extraordinary
> strength.  What was the reason for it?  Did he get into body
> building championships because he wanted to show
> people, Hey, stay off drugs, live healthy, be happy?  Did
> he do that?  No.  He did this.  So he could frighten and
> what he's used this for is to frighten and intimidate

> people, not to give them a message to lead a healthy life
> and stay in good shape . . . .

(25 RT 6791, 6797, 6807.)

The California Supreme Court reasonably could have found evidence in the
record established that Petitioner had a substantially muscular physique.  Four
photographs of Petitioner, from the waist up and without clothing, were admitted
as evidence at trial.  (Pet. Exs. 123-26.)  The juvenile detention officer, Perez, also
testified that Petitioner at age sixteen was "[w]ell built."  (24 RT 6504.)  The
California Supreme Court was not unreasonable in determining that it was a

1   reasonable inference from that evidence that Petitioner had "built himself up," was

2   "a big man," or had "extraordinary strength."  There was also evidence that

3   Petitioner used his physical size or strength to frighten and intimidate people.

4   Mendoza testified, for example, that Petitioner said he had lost $10 and that "if

5   somebody didn't come up with it, he was going to beat all our ass."  (20 RT 5470.)

6   He also testified that Petitioner was angry that others were in a room with two girls

7   and he was not, and Petitioner kicked a hole in the door.  (*Id.* at 5471-72.)  The

8   girls came out a few minutes later, Mendoza testified, and looked nervous and

9   scared.  (*Id.* at 5473.)  The California Supreme Court was not unreasonable in

10   determining that it was a reasonable inference from that evidence that Petitioner

11   used his physical size or strength to frighten and intimidate people.

12       Petitioner also alleges the prosecutor improperly argued that Petitioner had

13   "led a life of brutality and selfishness."  (Pet. at 121 ¶ 280 (citing 25 RT 6799,

14   6809).)  The prosecutor argued:

15             And all of these times [after incidents of violence], he's

16             given all of this chance to rehabilitate himself.  Nothing
              works.  Going to state prison doesn't work.  The jail

17             doesn't work.  Nothing works.  He keeps on the same

18             pattern. . . .  When given every chance by the police, he
              tried to lie his way out of it instead of facing it, and he's

19             led a life of brutality and selfishness.  That culminated in

20             this trial.

21   (25 RT 6799, 6808-09.)

22       Evidence was presented at trial that Petitioner had committed prior incidents

23   of violence:  at age 16, repeatedly striking a juvenile detention officer in response

24   to his instruction to go into the dorm area, breaking a bone and requiring six

25   stitches (24 RT 6496, 6498-99, 6503); kicking and twice hitting a man in the head

26   with an eight inch rock (*id.* at 6529-30, 6540); and hitting a woman in the head

27   with a tire iron from his pants and telling her to run (*id.* at 6452-53).  The

28   California Supreme Court was not unreasonable in determining that it was a

1    reasonable inference from that evidence that Petitioner had "led a life of brutality,"

2    or that "selfishness" was a reasonable inference from Petitioner's behavior with the

3    girls at his house (20 RT 5471-73) or his attempts to deny his involvement in the

4    crimes (*see, e.g.*, Pet. Ex. 177 at 00512-36).

5         Finally, Petitioner takes issue with counsel's failure to object to the

6    prosecutor's arguments that Petitioner "lives at home off his father.  Doesn't have a

7    regular job," and "works sporadically when he damn well felt like it."  (Pet. at 121

8    ¶ 281 (citing 25 RT 6784-85, 6802).)  Evidence at trial established that Petitioner

9    lived at the house of his father (21 RT 5742, Pet. Ex. 177 at 00505), who had given

10   Petitioner and his brother approximately $50 for the weekend while he was gone,

11   in addition to the food that was at the house (21 RT 5742).  Evidence was also

12   presented that Petitioner worked "various places" intermittently through

13   Manpower Temporary Service, working seven days out of a twenty-eight day

14   period, for one to three days at a time.  (*Id.* at 5661-66.)   The California Supreme

15   Court was not unreasonable in determining that the prosecutor's arguments were

16   reasonable inferences from that evidence.  *See Atcheson*, 94 F.3d at 1244; *cf.*

17   *Young*, 470 U.S. at 8 n.5.  Because counsel could not have been ineffective for

18   failing to object to such arguments, *Juan H.*, 408 F.3d at 1273, the California

19   Supreme Court's denial of this portion of Claim 10(15) was not unreasonable.

20        Claim 10(15) is, therefore, denied.

21   **XXVIII.  Claim 10(16)**

22        In Claim 10(16), Petitioner alleges trial counsel was ineffective at the

23   penalty phase of trial for failing to request appropriate jury instructions and to

24   object to an inappropriate instruction.  (Pet. at 238-40 ¶¶ 641-52, Mot. at 49-50.)

25        **A.    Special Instruction No. 1**

26        First, Petitioner alleges trial counsel erroneously failed to object to "Special

27   Instruction No. 1" regarding the empaneling of an alternate juror between the guilt

28

and penalty phases of trial.[18]  (Pet. at 238 ¶ 642 (referring to Claim 11(17)).)
Although his Petition refers the Court to his discussion of Claim 11(17) in support,
Petitioner seems to intend Claim 11(15)(A), in which he argues that the special

_____

[18]  The court instructed the jury, in relevant part:

        "After the guilt phase of this trial is [sic] concluded and the jury returned its verdicts, one
of your number was excused for legal cause and replaced with an alternate juror for the penalty
phase of the trial.  [¶]  The alternate juror has been present during all evidence and the reading of
all instructions on the law in both phases of the trial.  However, the alternate juror did not
participate in the jury deliberations and voting which resulted in the verdicts returned as to the
guilt and innocence of the defendant of the charge set forth in the information and as to the
truthfulness of the special circumstance allegations set out in the information.  [¶]  For the
purposes of this penalty phase of the trial, the alternate juror must accept the verdicts and finding
rendered by the jury in the guilt phase of the trial.  That is, the alternate juror must accept that the
defendant has been proved guilty beyond a reasonable doubt of the charges of murder in the first
degree[,] burglary in the first degree and robbery as set forth in the information.  [¶]  The alternate
juror must accept that the special circumstance allegations have been proved to be true beyond a
reasonable doubt, namely, that two murders were committed while the defendant was engaged in
the commission of burglary and robbery and attempted rape as set forth in the information.  [¶]
The alternate juror must accept the verdict that the defendant is not guilty of rape as charged in the
information.  [¶]  If you have any lingering doubt concerning the guilt of the defendant as to any
of those charges of which he was found guilty or if you have any lingering doubt concerning the
truthfulness of any of the special circumstance allegations which were found to be true, you may
consider that lingering doubt as a mitigating factor or circumstance.  [¶]  A lingering doubt is
defined as any doubt, however slight, which is not sufficient to create in the minds of the jurors a
reasonable doubt.  [¶]  The People and the defendant have the right to a verdict on the matter of
penalty which is reached only after a full participation of the 12 jurors who ultimately return the
verdict.  [¶]  This right may be assured in this phase of the trial only if the alternate juror
participates fully in the deliberations including such review as may be necessary of the evidence
presented in the guilt phase of the trial.  [¶]  Therefore, the reasonable doubt of guilt and
truthfulness of the charges and special circumstances as to which verdicts have been returned shall
not be reexamined by the jury.  [¶]  However, for the purpose of determining if there is a lingering
doubt concerning the guilt of the defendant on any charge as to which he has been found guilty or
                                                                    CONTINUED

CONTINUED
a lingering doubt as to the untruthfulness of any special allegation which has been found to be
true, the jury shall begin its deliberations from the beginning with respect to the evidence
presented in the guilt phase of the trial.  [¶]  You are all instructed to set aside and disregard all
past deliberations, if any, concerning whether there is any lingering doubt as to the guilt of the
defendant or truthfulness of any special allegation and begin deliberating anew.  This means that
each remaining original juror must set aside and disregard any earlier deliberations concerning a
possible lingering doubt as if they had not taken place."  (25 RT 6862-65.)
        Trial counsel did not object to the instruction.  (*Id.* at 6851; *see also id.* at 6851-53
(explanation of trial court's reasoning for giving special instruction).)

1    instruction violated his state constitutional and statutory rights and his federal

2    constitutional rights.  (Pet. at 246-51 ¶¶ 669-74.)

3            The California Supreme Court considered Petitioner's argument on direct

4    appeal.  *Cain*, 10 Cal. 4th at 64-68.  It held that the instruction was not improper as

5    a matter of state law.  *Id.*  The court, on habeas review, could also have reasonably

6    determined that the instruction did not violate Petitioner's federal constitutional

7    rights.  *Cf. United States v. Honken*, 541 F.3d 1146, 1166 (8th Cir. 2008) (holding

8    in federal capital trial that "it was not error for the district court to replace a juror

9    with an alternate and instruct the jury to begin penalty phase deliberations anew");

10   *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000) (affirming conviction

11   and death sentence where alternate juror was substituted at beginning of penalty

12   phase, and noting that it was "[t]rue, the *entire* deliberations did not recommence;

13   but the issues of guilt and of punishment are sufficiently distinct that the alternate

14   didn't have to hear the deliberations on the former issue in order to be able to

15   participate meaningfully in the deliberations on the latter issue.  He had sat through

16   the entire trial, which is the important thing").  The court, therefore, could have

17   reasonably determined that counsel was not deficient for not objecting to the

18   instruction at trial.  *See Juan H.*, 408 F.3d at 1273; *Molina*, 934 F.2d at 1447.  This

19   portion of Claim 10(16) is denied.

20          **B.    Instruction on Elements and Defenses for Assault and Battery**

21          Petitioner alleges trial counsel was ineffective for failing to request

22   instructions on the elements of and defenses to the alleged assaults and battery

23   presented in aggravation.  On direct appeal, the California Supreme Court

24   considered a related argument that the trial court erred in failing to give the

25   instructions *sua sponte*.  The court held:

26                  That rule [that there is no duty for a court to instruct on
                    the elements of crimes alleged in aggravation absent a
27                  request] is based in part on a recognition that, as a tactical
                    matter, the defendant may not want the penalty phase
28

133

1
2
3
4
5

    instructions overloaded with a series of lengthy
    instructions on the elements of alleged other crimes
    because he may fear that such instructions could lead the
    jury to place undue emphasis on the crimes rather than on
    the central question of whether he should live or   die. . .
    .

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

    [Those] tactical considerations . . . were potentially
    present here . . . .  In argument, the prosecutor devoted
    little time to the Fontes incident, conceding it was a
    relatively minor episode:  'I'm not asking you to say that
    it's the strongest aggravating factor.  It's kind of a – it's a
    minor deal, but it shows a continuing pattern of
    violence.'  Defense counsel, although he had called
    Clayton to present a version of the events more favorable
    to defendant than Fontes's, also deemphasized the
    incident in his summation.  Like the prosecutor, he
    discussed it very briefly, pointing out defendant had not
    been involved in instigating the fight and had acted only
    to assist Miller.  He also noted a previous jury had
    assessed only misdemeanor liability on defendant and
    argued the incident was so minor, it should not 'have any
    bearing at all on whether or not Mr. Cain ought to die.'
    The record thus supports an inference counsel adopted
    the reasonable tactic of treating the Fontes incident as so
    minor the jury should not consider it at all in their
    decision.  Detailed instructions on the possible crimes
    committed and legal defenses thereto could have
    frustrated this defense approach.

22

*Cain*, 10 Cal. 4th at 72-74 (internal quotation omitted).

23
24
25

     As the United States Supreme Court held in *Richter*, "[i]n light of the record
here there [is] no basis to rule that the state court's determination was
unreasonable." 131 S. Ct. at 790.  This Court would:

26
27
28

    err[] in dismissing strategic considerations like these as
    an inaccurate account of counsel's actual thinking.
    Although courts may not indulge *post hoc* rationalization
    for counsel's decisionmaking that contradicts the

1
2
3
4
5
6

> available evidence of counsel's actions, neither may they insist that counsel confirm every aspect of the strategic basis for his or her actions.  There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect. . . .  *Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

7   *Id.* (internal quotations and citations omitted).  The California Supreme Court,

8   therefore, could have reasonably determined that trial counsel's performance in not

9   requesting jury instructions on the aggravating offenses' elements and defenses

10   was objectively reasonable.  Accordingly, Petitioner is not entitled to federal

11   habeas relief on this portion of Claim 10(16).

12          **C.     Instruction regarding Rape-Related Evidence**

13          Petitioner alleges trial counsel was ineffective for failing to request an

14   instruction that the jury "not consider any evidence relating to the rape as a factor

15   justifying imposition of the death penalty."  (Pet. at 239 ¶ 643(b).)

16          On direct appeal, the California Supreme Court considered whether the trial

17   court erred in failing to give such an instruction *sua sponte*.  *Cain*, 10 Cal. 4th at

18   69.  Denying that claim, the court emphasized that:

19
20
21
22
23
24
25
26

> [a]s defendant concedes, the evidence relevant to the rape charge was the same evidence from which the jury had found Mrs. Galloway's murder was committed during an attempted rape.  The jury was properly instructed to consider the attempted rape under factor (a). Moreover, since the jury was instructed under factor (a) to consider only the circumstances of crimes 'of which the defendant was *convicted* in the present proceeding,' there is no reasonable likelihood they were misled to believe they should ignore their own not guilty verdict on the rape charge.

27   *Id.* (citations omitted, emphasis in original).

28          The factor (a) instruction told the jury to consider "[t]he circumstances of

135

the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true." (24 RT 6858.) The instruction did not explicitly refer to "attempted rape." The California Supreme Court could have reasonably determined that counsel was objectively reasonable in strategically preferring to keep the word "rape" out of the list of factors the jury should consider and to avoid emphasizing the attempted rape. *See Richter*, 131 S. Ct. at 790. Moreover, in light of the court's holding, and defendant's concession that the evidence relating to the rape was the same evidence from which the jury found an attempted rape, the court could have reasonably determined that Petitioner suffered no prejudice from the absence of such an instruction. In the alternative, the court could have reasonably reached the same determination it did for the related claim on direct appeal. Namely, the court could have held that Petitioner suffered no prejudice from the absence of the instruction because there was no reasonable probability that the jury considered any evidence relating to the rape, when it was instructed to consider the circumstances of the crime "of which the defendant was *convicted* in the present proceeding" and any special circumstance "found to be *true*." (25 RT 6858 (emphasis added).)

Accordingly, Petitioner is not entitled to federal habeas relief on this portion of Claim 10(16).

### D.    Instruction on Intoxication as a Mitigating Factor

Petitioner also alleges trial counsel was ineffective for failing to request an instruction "elaborating on the relevance of the effect of intoxication as a mitigating factor, as recognized by Cal. Penal Code § 190.3(h)." (Pet. at 239 ¶ 643(c).)

The jurors were instructed that they:

> shall consider[,] take into account and be guided by . . .,
> if applicable . . . [w]hether or not at the time of the
> offense the capacity of the defendant to appreciate the
> criminality of his conduct or to conform his conduct to

136

1
2

the requirements of the law was impaired as a result of   .
. . the effects of intoxication.

3    (25 RT 6858-59.)

4         Petitioner fails to specify what sort of instruction trial counsel should have

5    requested to elaborate on the given instruction, or how the failure to do so falls

6    below prevailing professional norms.  *See* L.R. 83-17.7(g) (2003) ("Any request

7    for evidentiary hearing . . . shall include a specification of the factual issues and the

8    legal reasoning that require a hearing and a summary of the evidence of each claim

9    the movant proposes to offer at the hearing").  Petitioner's conclusory allegation

10   fails to demonstrate that counsel's performance was objectively unreasonable.  *See*

11   *Jones*, 66 F.3d at 205; *James*, 24 F.3d at 26.  To be entitled to federal habeas relief,

12   Petitioner must show that the state court would have been unreasonable in

13   determining that trial counsel's performance was objectively reasonable and that

14   Petitioner did not suffer any prejudice.  *See Richter*, 131 S. Ct. at 784.  Petitioner

15   has not done so.  Accordingly, this portion of Claim 10(16) is denied.

16        **E.    Instruction regarding "Double-Counting"**

17        Petitioner further alleges trial counsel was ineffective for failing to request

18   an instruction "pursuant to *People v. Melton*, advising the jury not to double-count

19   the element of 'circumstances of the crime' which were also 'special

20   circumstances.'"  (Pet. at 239 ¶ 643(d) (citation omitted).)  Petitioner alleges that

21   such an instruction would have "substantially reduced the aggregate 'weight' of the

22   aggravating factors."  (*Id.* ¶ 644(b).)

23        The California Supreme Court rejected this claim on direct appeal.  The

24   court held that, "[c]ontrary to defendant's claim, counsel did not render ineffective

25   assistance by failing to request" an instruction that the jury not "'double count' the

26   same facts as circumstances of the crime and as special circumstances.  (*See People*

27   *v. Melton* (1988) 44 Cal. 3d 713, 768 (noting 'theoretical' problem of double

28   counting but finding 'possibility of actual prejudice . . . remote')).)"  *Cain*, 10 Cal.

137

4th at 68. The court reasoned that "[s]ince the instruction given was not reasonably likely to have been understood as inviting the jurors to 'weigh' each special circumstance twice, it was neither deficient performance on counsel's part, nor prejudicial to defendant's case, to forego a special instruction." *Id.* at 68 n.24 (citation omitted).

The court's denial of this claim was not an unreasonable application of Supreme Court precedent. The Supreme Court has held that the effect "that the jury would count the nature of the crime twice if it were instructed to consider both the facts of the crime and the eligibility [or special] circumstances . . . cannot fairly be regarded as a constitutional defect in the sentencing process." *Brown v. Sanders*, 546 U.S. 212, 222 n.8 (2006) (discussing *Zant v. Stephens*, 462 U.S. 862, 894 (1983)) (internal quotations omitted). The Supreme Court confirmed in *Sanders* that such an instruction under California Penal Code § 190.3(a) does not unconstitutionally lead the jury to give greater weight to the facts underlying the special circumstances. *Id.* The California Supreme Court could have reasonably determined that Petitioner could not have been prejudiced, as a matter of law, by counsel's failure to request an instruction to the contrary. *See Fretwell*, 506 U.S. at 370 ("[A]s a matter of law, counsel's conduct . . . cannot establish the prejudice required for relief under the second strand of the *Strickland* inquiry . . . [where petitioner] was deprived of neither a fair trial nor any of the specific constitutional rights designed to guarantee a fair trial" (internal quotation omitted)). Accordingly, this portion of Claim 10(16) is denied.

### F.    Instruction on Lack of Premeditation as a Mitigating Factor

Finally, Petitioner alleges that trial counsel was ineffective for failing to request an instruction on "the effect of the mitigating factor of the lack of premeditation." (Pet. at 239 ¶ 643(e).)

The jurors were instructed that they "shall consider all of the evidence which has been received during any part of the trial . . .[,] [t]he circumstances of the crime

1    . . . [, and] [a]ny other circumstance which lessens the gravity of the crime, even

2    though it is not a legal excuse for the crime . . . ."  (25 RT 6858-60.)  The

3    California Supreme Court may have reasonably held that those circumstances

4    would include any lack of premeditation the jurors saw in the evidence.  The jurors

5    were also instructed that they "may reject death if the evidence arouses sympathy,

6    mercy or compassion" and that they "are free to assign whatever moral or

7    sympathetic value [they] deem appropriate to each and all of the various factors

8    [they] are permitted to consider."  (*Id.* at 6860, 6867.)

9         Here, too, Petitioner fails to specify what sort of instruction trial counsel

10   should have requested regarding premeditation as a mitigating factor.  Petitioner's

11   conclusory allegation fails to demonstrate that counsel's performance was

12   objectively unreasonable.  *See* L.R. 83-17.7(g) (2003); *Jones*, 66 F.3d at 205;

13   *James*, 24 F.3d at 26.  To be entitled to federal habeas relief, Petitioner must show

14   that the state court would have been unreasonable in determining that trial

15   counsel's performance was objectively reasonable and that Petitioner did not suffer

16   any prejudice.  *See Richter*, 131 S. Ct. at 784.  Because Petitioner has not done so,

17   this portion of Claim 10(16) is denied.

18   //

19   **XXIX.  Claim 13**

20        In Claim 13, Petitioner alleges that he was denied his constitutional right to

21   the effective assistance of a mental health expert in the preparation and

22   presentation of his defense.  (Pet. at 268 ¶ 712 (citing, *inter alia*, *Ake v. Oklahoma*,

23   470 U.S. 68, 74 (1985)); Mot. at 65-67.)  Petitioner contends that he was

24   prejudiced by the failure of a competent mental health expert to discover his

25   incompetence to waive constitutional rights before giving a statement to police, his

26   susceptibility to duress and coercive police tactics, his mental state defenses, and

27   mitigating mental health evidence.  (*Id.* at 268-69 ¶ 715.)  Petitioner does not

28   allege that the state denied him access to a mental health expert.  Rather, he alleges

139

1   that the expert that was provided, Dr. Donaldson, "failed to identify the numerous

2   available mental health issues, and operated under a conflict of interest that

3   destroyed his competency."  (*Id.* at 268 ¶ 714.)

4        In *Ake*, the Supreme Court held that "when a defendant has made a

5   preliminary showing that his sanity at the time of the offense is likely to be a

6   significant factor at trial, the Constitution requires that a State provide access to a

7   psychiatrist's assistance on this issue if the defendant cannot otherwise afford

8   one." 470 U.S. at 74.  The Court reached "a similar conclusion in the context of a

9   capital sentencing proceeding, when the State presents psychiatric evidence of the

10  defendant's future dangerousness." *Id.* at 83.  "[T]he State must, at a minimum,

11  assure the defendant access to a competent psychiatrist who will conduct an

12  appropriate examination and assist in evaluation, preparation, and presentation of

13  the defense." *Id.*

14       To establish a constitutional violation, Petitioner must, therefore,

15  demonstrate that the state denied him *access* to a competent psychiatrist and

16  appropriate examination and assistance.  *Harris v. Vasquez*, 949 F.2d 1497, 1516

17  (9th Cir. 1991).  In *Harris*, the Ninth Circuit found no constitutional violation

18  "because the state did in fact provide Harris with psychiatric assistance.  The state

19  provided Harris with *access* to any competent psychiatrist of his choice when it

20  gave Harris the funds to hire two psychiatrists from the general psychiatric

21  community.  The state did not limit Harris's access to psychiatric assistance in any

22  way."  949 F.2d at 1516 (emphasis in original).

23       The California Supreme Court could have reasonably concluded here, as the

24  Circuit did in *Harris*, that the state provided Petitioner with funds to retain

25  psychiatric assistance from the general psychiatric community.  Petitioner has

26  made no allegations to the contrary.  Accordingly, Petitioner is not entitled to

27  federal habeas relief on Claim 13.

28  **XXX.  Claims 2(18), 8(3)(A), 10(17), 10(18) and 18**

1    Petitioner moves for an evidentiary hearing on Claims 2(18), 10(17), 10(18),

2    and 18, alleging varieties of cumulative error as to the guilt phase, penalty phase,

3    and entire trial, and abandonment of counsel in the penalty phase.  (Mot. at 50-52,

4    76-77, 93.)  Petitioner also moves for an evidentiary hearing on Claim 8(3)(A),

5    alleging that the imposition of the death penalty is cruel and unusual punishment

6    because it is disproportionate to his role in the crimes.  (Pet. at 207 ¶¶ 539-542,

7    Mot. at 90-91.)

8    In Claim 2(18), Petitioner alleges that "[e]ven if each individual incident of

9    counsel's ineffectiveness does not require relief on its own, the cumulative impact

10   of these errors rendered Mr. Cain's counsel so ineffective that it tainted the entire

11   guilt phase and mandates relief from that verdict."  (Pet. at 182 ¶ 479.)

12   In Claim 10(17), Petitioner alleges that "[e]ven if each individual incident of

13   counsel's ineffectiveness is not independently sufficient to require relief from the

14   death penalty, the cumulative impact of these errors rendered Mr. Cain's counsel

15   so ineffective that it tainted the entire penalty phase and mandates relief from that

16   verdict."  (*Id.* at 240 ¶ 646.)

17   In Claim 10(18), Petitioner alleges that "[t]he extensive failures of defense

18   counsel during the penalty phase of Mr. Cain's trial, especially in light of the

19   similar extensive failures during the pre-trial and guilt phases, go beyond mere

20   ineffectiveness, and rise to the level of actual abandonment by counsel."  (*Id.* at

21   240 ¶ 647.)

22   In Claim 18, Petitioner alleges that the cumulative effect of "the totality of

23   errors, by their number and importance, . . . [produced] a trial that was so

24   fundamentally unfair, involving as it did numerous constitutional violations, that

25   setting aside the guilt and penalty phase verdicts is required."  (*Id.* at 299 ¶ 806.)

26   In Claim 8(3)(A), Petitioner alleges that it is disproportionate to sentence

27   Petitioner to death when "[t]here was significant evidence presented at trial, and

28   even further evidence that was either not presented due to the ineffectiveness of

[counsel] or due to the fact that it was not investigated and/or was suppressed by the prosecution indicating that persons other than Mr. Cain were responsible for the crimes." (*Id.* at 207 ¶ 540.)

In support of each of these claims, Petitioner seeks to present "all the evidence" identified in his Motion in support of his guilt- and/or penalty-phase claims, along with the testimony of a *Strickland* expert (apart from Claim 8(3)(A)) and trial counsel.

All claims of ineffective assistance included in Petitioner's Motion for which the Court found the adequacy of counsel's performance to be unresolved have been included within the scope of the evidentiary hearing. To the limited extent that the alleged facts supporting Petitioner's cumulative error and abandonment of counsel claims will be heard through those underlying claims, Petitioner's request for evidentiary hearing on Claims 2(18), 8(3)(A), 10(17), 10(18), and 18 is granted. Likewise, all unresolved claims of prosecutorial misconduct have been included within the scope of the evidentiary hearing. The alleged facts supporting those claims will also be heard in support of Claim 8(3)(A).

//

## XXXI. Order

For the foregoing reasons, the Court hereby orders as follows:

1. Petitioner's Motion for an Evidentiary Hearing is **GRANTED IN PART**. The Court will hold an evidentiary hearing on:

a. Claims 1(2) and Claim 2(11) as to hair comparison evidence;

b. Claims 2(1), 10(6), 10(9), 10(10), 10(11), 10(13), and 10(14) as to whether counsel obtained adequate mental health expert assistance and adequately investigated and presented petitioner's background, employment history, and mental impairments;

c. Claims 2(12), 10(6), 10(9), and 10(13) as to Mendoza's alleged

142

attempts to create an alibi;

       d.   Claims 1(1), 2(12), 10(6), 10(9), and 10(13) as to Mendoza's alleged criminal history;

       e.   Claim 1(2) as to District Attorney Investigator David Stone and Detective Billy Tatum;

       f.   Claims 2(12), 2(17), and 10(13) as to witnesses Tammy and Jennifer O'Neil; and

       g.   Claims 2(18), 8(3)(A), 10(17), 10(18), and 18, to the limited extent that the alleged facts supporting those Claims will be heard through underlying Claims identified above.

2.    In all other respects, the motion is **DENIED**.  Petitioner's request for an evidentiary hearing on Claim 8(4) is denied without prejudice.

3.    Claims 1(3), 2(2), 2(7), 2(13), 3(1), 10(1), 10(2), 10(3), 10(5), 10(7), 10(8), 10(12), 10(15), 10(16), 11(11), and 13, and portions of Claims 1(2), 2(1), 2(11), 2(12), 2(14), 2(17), 10(6), 10(9), and 10(13) are **DENIED**.

4.    No later than April 8, 2011, the parties shall file a joint report providing:

       a.   proposed briefing schedules for any motions *in limine*;

       b.   an estimate of the number of hours needed by Petitioner and by Respondent for the presentation of evidence at the hearing; and

       c.   an estimate of the date by which the parties will be prepared for the evidentiary hearing and two suggested dates for the commencement of the hearing.

**IT IS SO ORDERED.**

Dated: March 14, 2011.

_____

        AUDREY B. COLLINS
       United States District Judge